THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TONY KOLE, et. al., | ) | |
| | ) | Civil Case No: 1:11-cv-03871 |
| Plaintiffs, | ) | |
| | ) | Hon. Charles R. Norgle, Sr. |
| v. | ) | U.S. District Judge |
| | ) | |
| VILLAGE OF NORRIDGE, et. al., | ) | Hon. Morton Denlow |
| | ) | U.S. Magistrate Judge |
| Defendants. | ) | |

PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS AMENDED COMPLAINT

NOW COME TONY KOLE ("KOLE") and GHOST INDUSTRIES, LLC ("GHOST") (collectively "Plaintiffs"), by their attorney, Walter P. Maksym, Jr., and submit the following argument and authorities in opposition to Defendants' Motion to Dismiss Amended Complaint (the "Complaint" - Doc. 15), and Memorandum in Support ("Defs' Memo" - Doc. 15.1), stating:

INTRODUCTION

*"No man's life, liberty or property is safe,
so long as the legislature is in session."* - Mark Twain

Plaintiffs were astounded to encounter an unexpected retaliatory reaction to their mere filing an application with the Village of Norridge for issuance of a Weapons Dealers' Business License (the "WDBL") when Defendants demanded they sign the *Ultra Vires* Agreement (the "UVA" - Am. Comp. Ex. "C") imposing the unconstitutional conditions (the "UCs" - Am. Comp. 23, Ex. "C", pp. 1-3) summarized below, as a prerequisite to approval of their WDBL and FFL applications. To thwart their applications Defendants deliberately delayed and held issuance of their WDBL hostage thereby forestalling and preventing their ability and right to obtain issuance of the FFL and WDBL and commence a lawfully business. Defendant original two-paragraph Weapons Dealer Ordinance ("OWDO" - Am. Comp. Ex. "B"), under which Plaintiffs applied for their WDBL in order obtain their FFL, was circumvented by Defendants arbitrary and surreal imposition of the UVA requirement and UCs neither contained therein nor otherwise authorized by any other law. Defendants never had and have never shown that the UVA or Revised Ordinance "RO" restrictions and prohibitions bear any rational relationship to any valid, *"extremely strong"* governmental purpose. See *Ezell v. Chicago,* 651 F.3d 684 (7th Cir. 2011)

Contrary to Defendants' charge, Plaintiffs do not maintain they have an "unfettered right to sell arms". (Defs' Memo p. 6) The rights claimed by Plaintiffs are understandably subject to the type easily justified laws that reasonably regulate rather than restrict as recently discussed in *Ezell.* However, their

rights to engage in the lawful occupation of selling arms and ammunition were and continue to be severe limited by the UVA and are ultimately outlawed by the RO. Such severe burdens and prohibitions are proximate to thee core of the Second Amendment rights and therefore require not only an *"extremely strong"* public-interest justification but, additionally, *"a close fit between the government's means and its end"* - neither of which ever existed or are even raised or established in this case.

<u>FACTS</u>

Plaintiffs' operate a reputable business whose product distributors and manufacturers are located in, *inter alia*, Illinois, Minnesota, Texas, Maryland, New York, Louisiana, Missouri, Ohio, Pennsylvania, Kansas, Arizona and Massachusetts and foreign counties such as Italy, Germany and Austria. So, virtually 100% of the firearms that Plaintiffs import, have sold and sell physical crossed state lines and are marked via the Internet, the U.S. Mail, and telephonically, thus comprising interstate commerce. Even the few firearms that were manufactured in Illinois were wholesaled by the manufacture to out-of-state distributors and thus left the State of Illinois and then re-entered it before being acquired by Plaintiffs.

Plaintiffs allege, *inter alia*, that, without lawful authority, Defendants held back their WDBL by conditioning its issuance upon their execution of the UVA's and capitulation to its UCs not mentioned, required or authorized by the OWDO. (Am. Comp. ¶¶ 16-27, Exs. "B" & "C") They were thus forced to accept the UVA in order to obtain their WDBL on numerous arbitrary and UCs imposed pursuant to Defendants' subjective personal whims and subject to pain of loss of their WDBL and livelihood without any due process for any noncompliance. They were also confined, without and basis in the OWDO or any other law, to *inter alia*, pursue interstate sales via mail order and the Internet rather than ordinary, local over–the-counter retail sales. In summary, abbreviated with Plaintiffs' commentary, the most severe and oppressive restrictions of the UVA are:

1. being arbitrarily barred from physically delivering any firearm or ammunition to any recipient in their store other than to themselves and their employees that successfully pass a Criminal Background Investigation and possess a valid FOID card. All deliveries sent from their store are required to be by unmarked packaging if the delivery is of a "used" firearm and shall be delivered in original packaging as provided by the manufacturer, wholesaler, or distributor if it is a "new" firearm and be in secure packaging sent via post office or courier to a licensed FFL;

2. being arbitrarily barred from storing firearms or ammunition on the premises overnight or longer than 12 hours during any day and any firearms in their inventory in their store must either be disabled by a locking device or secured in a locked cabinet *(thus preventing prospective, qualified purchasers from seeing or examining or receiving them);*

3. being arbitrarily barred from maintaining a sales or retail display of any firearms or ammunition in their store *(thus preventing prospective, qualified purchasers from seeing or examining or receiving them);*

4. being arbitrarily barred from posting or erecting any exterior signage indicating to the public that its offices are located in their store or indicating the their business (i.e. weapons sales) and had to

limit interior signage to that required by state and federal law *(whether or not otherwise permitted by Norridge ordinance or other law, thus effectively hiding the nature and existence of Plaintiffs' business from the public and severely preventing qualified purchasers from finding or identifying their business)*. However, that they may put only its name on one or more interior door to their store;

\* \* \*

6.  being arbitrarily obligated to have their officers and employees submit to an annual Criminal Background Investigation and must provide Norridge with such releases as are necessary to effectuate the investigation *(thus compelling them to give evidence against themselves and waive their privacy and any potential claims)*;

\* \* \*

9.  being arbitrarily barred from receiving more than an arbitrary cap of only 40 long guns or hand guns at the store *per month* for the first 12 months of the UVA, which numbers shall increase by only 10 % 12 months, and 24 months thereafter, *or having no more than 20 firearms in the store at any one time (thereby severely limiting their business and putting a cap on their sales and inventory)*;

10. being arbitrarily are barred from receiving more than an arbitrary cap of only 4,000 rounds per month for the first 12 months following the date of this Agreement and the above-referenced amounts shall increase by 10% 12 months and 24 months thereafter, and to have no more than 1,000 rounds in their store at anyone time. Provided, however, larger quantities (not in excess of the monthly amount) may be in the store for no longer than 1 hour after they are delivered from the distributor, wholesaler or manufacturer *(thereby severely limiting their business and putting a cap on their sales and inventory)*;

\* \* \*

12. being arbitrarily obligated to allow, without prior notice, 1 random and unannounced on-site inspection of the store per month by Norridge inspectors or police at any time during regular business hours or whenever the store is occupied, in each case solely to monitor compliance with this Agreement. Additionally, Plaintiffs must allow 2 such on-site inspections per month during regular business hours that must be scheduled with them at least 24 hours in advance;

13. being arbitrarily made subject to licensing requirements not contained in the OWDO Norridge will renew Plaintiffs' WDBL twice annually provided that they remain in compliance with this Agreement and to exempt Plaintiffs from any change in its business license ordinances and rules in any amendments Norridge may make to its Code of Ordinances which directly or indirectly impacts Plaintiffs business under the Weapons Dealer License granted by Norridge. In the event that Norridge repeals its OWDO within thirty six months of the execution of the Agreement (which it did), Norridge will exempt them from the repeal during that period *(thus subjecting them not to the OWDO, but termination of their WDBL and livelihood without due process and effectively making it possible to drive them out of business)*; and

14. being arbitrarily made subject to loss of their WDBL, financial, goodwill, investment and livelihood not just for potential violations of the provisions of the OWDO, but, additionally, for any breaches of any of the conditions of the UVA to do business as a weapons dealer and such breach is not cured within 3 business days after delivery of written notice to them specifying the breach, its license will become forfeit and they must cease doing business under that license *(thus subjecting them to termination of their WDBL and livelihood without due process and effectively making it possible to drive them out of business)*. (See Am. Comp. Ex. "B" p. 1-4, ¶¶ 1-14) (Emphasis supplied)

THE RULE 12 (B)(6) DISMISSAL STANDARD

Rule 12(b)(6) allows a defendant to seek dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). On a Rule 12(b)(6) motion the court must accept as

true the allegations of the complaint and draw all reasonable inferences in favor of plaintiff. *Pisciotta v. Old Nat'l Bancorp,* 499 F.3d 629, 633 (7th Cir. 2007) (internal citation omitted). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1940 (2009) (the plausibility standard as something less than the "probability standard," but there must be "more than a sheer possibility that a defendant has acted unlawfully." That standard is met when the factual content allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.; *Rodriguez v. Plymouth Ambulance Serv.,* 577 F.3d 816, 821 (7th Cir. 2009) A defendant need only be provided with "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly, 550* U.S. 544, 555 (2007) (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957)) A plaintiff need not plead particularized facts, but the factual allegations in the complaint must be sufficient to "state a claim to relief that is plausible on its face[.]" Id at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1940 (citing *Twombly,* 550 U.S. at 556) See also *Brooks v. Ross,* 578 F.3d 574 (7th Cir. 2009) (discussing *Iqbal* and *Twombly*).

To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting Fed. R. Civ. P. 8(a)(2)) A plaintiff need not plead all the elements required to ultimately prevail in a cause of action, so long as the allegations in the complaint make clear that her claim is plausible on its face. *See Twombly,* 550 U.S. at 570. *Twombly* should not be interpreted to require fact pleading. *Erickson v. Pardus*, *551 U.S.* 89, 93 (2007) ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" [omission in original]). A Rule 12(b)(6) motion is designed only to "test the sufficiency of the complaint, not to decide its merits." *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990) The Court must take the facts alleged by the plaintiff as true and must construe all allegations in the complaint in the light most favorable to the plaintiff. *E.g., Colfax Corp. v. Illinois State Toll Highway Auth.,* 79 F.3d 631, 632 (7th Cir. 1996) A complaint may be dismissed only if it is clear that the plaintiff can prove no facts in support of his or her claims that would entitle him or her to relief. *E.g., Cook v. Winfrey,* 141 F.3d 322, 327 (7th Cir. 1998) As "technical forms of pleading or motions" are not required by the Fed. R. Civ. P 8(e)(1), and a plaintiff's complaint need only allege a basis for relief, *Shah v. Inter-Continental Hotel Chicago Operating Corp.,* 314 F.3d 278, 282 (7th Cir. 2002). Further, the Supreme Court held that federal courts may not apply a "heightened pleading standard," more stringent than the requirements of Rules 8 and 9 of the Federal Rules of Civil Procedure, in § 1983 claims alleging municipal liability. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993)

Allegations need only provide the defendant with "fair notice of what the ... claim is and the

grounds upon which it rests". *Twombly* at 555. A plaintiff need not plead particularized facts, but the factual allegations in the complaint must be sufficient to "state a claim to relief that is plausible on its face[.]" *Id* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1940 (citing *Twombly,* 550 U.S. at 556). See also *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998) (reversing 12(b)(6) dismissal for want of discretion, holding that confusion or ambiguity "[is] a poor ground for rejecting meritorious claims . . .[and can be dealt with] by means other than dismissal").

To avoid dismissal, the "allegations must plausibly suggest … a right to relief, raising that possibility above a 'speculative level.'" *E.E.O.C. at* 776 (citing *Twombly,* 127 S. Ct. at 1965) In interpreting the effect of *Twombly* and *Iqbal,* the Seventh Circuit has emphasized the Supreme Court's admonition that plausible claims are not the stuff of probabilistic reasoning: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable * * * [And the 'plausibility' requirement] simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations. *Brooks,* 578 F.3d at 581 (quotation marks omitted) (quoting *Twombly,* 550 U.S. at 556) So, a plaintiff need not allege specific facts unless the factual detail is "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Brooks,* 578 F.3d at 581 (discussing the Seventh Circuit's interpretation of *Twombly, Iqbal, supra*). Recently, Judge Virginia Kendall applied *Iqbal* and noted that the "level of facts required varies with the type of claims asserted." *Mounts v. United States Parcel Service of America,* 2009 WL 2778004, at *5 (N.D. Ill. Aug. 31, 2009)

According to *Riley v. Villach,* 665 F. Supp. 2d 994 (W.O. Wis. 2009), the Seventh Circuit is proceeding cautiously, as it should. It has continued to emphasize that *Twombly* and *Iqbal* have not changed the fundamentals of pleading, citing to *Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d 599 (7th Cir. 2009) ("Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact."). According to *Riley*, the bottom line seems to be that "the height of the pleading requirement is relative to circumstances." *Cooney* at 971. (The plausibility standard has greatest force when special concerns exist about the burden of litigation on the defendant or when the theory of the plaintiff seems particularly unlikely. However, in the ordinary case, the burden remains low. So long as the Plaintiff avoids using legal or factual conclusions, any allegations that raise the complaint above sheer speculation should be sufficient.)

<u>PLAINTIFFS' COMPLAINT GIVES FAIR NOTICE OF PLAUSIBLE FEDERAL AND STATE CLAIMS</u>

To state a § 1983 claim, a Plaintiff only need establish that the defendants deprived them of a right secured by the U.S. Constitution or laws. See *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970) Despite Defendants' blunderbuss motion, Plaintiffs' Count I sufficiently places the them on notice of not

only the many the constitutional offenses of their UVA and RO but the deprivations Defendants has deliberately caused and have conspired to cause them. Loss of the exercise of a fundamental right as law abiding citizens, not to mention the right to engage in commerce regarding its exercise are actionable. See *Libertad v. Welch*, 53 F.3d 428, 438 n.6 (1st Cir. 1995) (noting, "the intangible right to freely conduct one's lawful business constitutes 'property'" The concepts of liberty and property under has not been limited to physical or tangible 'things.' See *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980) The right to make decisions about one's own business also fits this definition of "property."

THE SALES AND PURCHASE OF FIREARMS AND AMMUNITION HAVE LONG BEEN
FAIRLY IMPLIED AS NECESSARILY INCIDENT TO SECOND AMENDMENT RIGHTS

Plaintiffs, as both a duly licensed federally and municipally licensed firearms dealer, have asserted injuries sufficient to establish standing to challenge the Defendants current severe prohibitions and time-ticking absolute ban on the sale, transfer, keep, display, possession of firearms and inability to engage in interstate commerce of firearms. Their claims are actionable because there is, necessarily associate with the core Second Amendment right, the concomitant right to sell, purchase, transfer sale, transfer, keep, display, and possess firearms. In *Andrews v. State,* 50 Tenn. 165, 178, 8 Am. Rep. 8, 13 (1871), in striking down a pistol carrying statute as too restrictive under the Second Amendment, the Tennessee Supreme Court held that "the right to keep arms for this purpose *involves the right to practice their use....* The right to keep arms *necessarily involves the right to purchase them*, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews* also held that "the right to *keep* them [arms], *with all that is implied fairly as an incident to this right*, is a private individual right, guaranteed to the citizen, not the soldier." (Emphasis supplied) 50 Tenn. at 182. *Andrews* was cited several times in *District of Columbia v. Heller,* 128 S.Ct. 2783, 2806, 2809, 2818 (2008) See also *State v. Tomas*, No. 526776 (Ohio Ct. Com. Pl. Dec. 7, 2010) (declaring a statute unconstitutional, finding, "the State has no compelling interest in prohibiting this particular defendant from possessing firearms in his *place of business* and home") (Emphasis supplied) This especially makes sense with respect to FFLs, like Plaintiff's, who's very livelihood is to sell them.

A license authorizing a particular act is permission, vesting in the grantee a right or privilege to perform the act the license authorizes, by the grantor having power to authorize the act. See *Gibbons,* 22 U.S. 9. Once licenses are issued, their continued possession may, as here, become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases, the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. *Sniadach v. Family Finance Corp.,* 395 U. S. 337 (1969); *Goldberg v. Kelly,* 397 U. S. 254 (1970)

In *Spinelli v. City of New York*, 579 F.3d 160, 169 (2nd Cir. 2009) a gun shop owner brought a §

1983 action against a city and city officials alleging violation of her Fourth Amendment and procedural due process rights in connection with the summary suspension of her firearms dealers license. The Second Circuit held that Ms. Spinelli had a protectable property interest in her firearms dealer's license that could no be deprived without due process. Id. at 169 Interference with of deprivation of a businessperson's livelihood, as in *Spinelli*, and in the instant case, violates due process. 579 F.3d at 174-76. Apart from abstract interest in "pursuing a particular livelihood," *Spinelli*, 579 F.3d at 171, the deprivation here, as in *Spinelli*, strikes at "the very means" by which plaintiffs earn their livings and support their families. *See Goldberg v. Kelly*, 397 U.S. 254, 264 (1970); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 341-342 (1969) (even temporary deprivation of wages may "drive a wage-earning family to the wall"). Though Illinois explicitly grants municipalities the authority to issue and revoke licenses for cause (65 ILCS 5/11-60-1), the Seventh Circuit has held that in a § 1983 action federal courts may enjoin municipalities from imposing a sanction against a licensee (such as those here imposed under the UVA and RO) without providing a due process hearing. See *Bethune Plaza v. Lumpkin*, 863 F.2d 525, 529 (7th Cir. 1988) Earlier, in *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973) (a § 1983 remedy is available for an improper denial).

### UNDER *EZELL*, A RIGHT TO LAWFULLY ENGAGE IN THE FEDERALLY LICENSED BUSINESS OF WEAPONS AND AMMUNITION SALES TO QUALIFIED PERSONS IS NECESSARILY IMPLIED

Long before *Ezell*, Georgia, like Defendants, sought to totally ban the sale of pistols (excepting the larger pistols *"known and used as horsemen's pistols"*) and other weapons. In 1846 the Georgia Supreme Court held the statute unconstitutional under the Second Amendment. *Nunn v. State*, 1 Ga. 243, 251 (1846) See also *City of Lakewood v. Pillow*, 501 P. 2d 744, 745 (Colo. 1972) that, in ruling ban on gun sales unconstitutional, stated, "[W]e note that this ordinance would prohibit gunsmiths … from carrying on a substantial part of their business. Also, the ordinance appears to prohibit individuals from transporting guns to and from such places of business.")

Thereafter, striking down a pistol carrying statute as too restrictive, the Tennessee Supreme Court stated what was obvious to the Seventh Circuit in *Ezell*, "the right to keep arms for this purpose involves the right to practice their use.... The right to keep arms *necessarily involves the right to purchase them*, to keep them in a state of efficiency for use, *and to purchase and provide ammunition suitable for such arms*, and to keep them in repair." (Emphasis supplied) *Andrews v. State*, 8 Am. Rep. 8, 13 (Tenn. 1871) *Andrews* also held, "the right to keep them [arms], *with all that is implied fairly as an incident to this right*, is a private individual right, guaranteed to the citizen…." (Emphasis supplied) 50 Tenn. at 182. Recently, *Andrews* horse-sense ruling was cited several times in *Heller*, 128 S.Ct. at 2783, 2806, 2809, 2818. The right of a FFL to engage in the business of selling such lawful products is protected by the Due Process Clause, the Second Amendment and the comprehensive Federal FFL scheme.

In addition to *Ezell echoing Andrews, Tomas* and *Spinelli* there are scores of reported cases

7

where, in addition to *Heller* and *McDonald*, many courts have found laws violative of the right to keep, bear and commercially sell arms and ammunition.[1] The core right discussed in *Ezell*, as identified in *Heller* and *McDonald* - the right to possess arms for self-defense - is not "fully preserved in full" by both the UVA and RO. Defendants did not reasonably regulate and so their reliance on *Justice v. Town of Cicero*, 577 F.3d 768 (7th Cir. 2009) *cert. denied*, 130 S. Ct. 3410 (2010) is misplaced - the Cicero ordinance left "law-abiding citizens free to *possess* guns, … consistent with … *Helle*r." *Id.* at 774.

<u>THE SEVENTH CIRCUIT DOOMS THE DEFENDANTS</u>

The Seventh Circuit, recently used essentially the same horse-sense rational employed well over a century ago in *Nunn* and *Andrews*, to hold that firearm training is protected under the Second Amendment, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that makes it effective" See *Ezell* where the Seventh Circuit allowed gun owners to obtain an injunction against Chicago's ban on public firing ranges, holding their Second Amendment challenge had a strong likelihood of success on the merits.

In a lengthy and exhaustive reversal, a unanimous *Ezell* panel explained its methodology for assessing Second Amendment claims, "[t]he question is not whether or how easily Chicago residents can comply with the range-training requirement by traveling outside the city; the plaintiffs are not seeking an injunction against the range-training requirement," Judge Sykes wrote for the majority: "The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; *that ranges are present in neighboring jurisdictions has no bearing on this question*." (Emphasis supplied) Making short work of the kind of thinking Norridge hangs its hat, the Seventh Circuit rebuked Judge Kendall for the same "… profoundly mistaken assumption" in reasoning that one may measure harm to a constitutional right by the extent to which it can be exercised in another jurisdiction. "It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-

---

[1] S*tate ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139 (W.Va. 1988) (gun carrying law); *Barnett v. State*, 695 P.2d 991 (Or. 1985) (prohibition on black jacks); *State v. Delgado*, 692 P.2d 610 (Or. 1984) (prohibition on switchblade knives); *State v. Blocker*, 630 P.2d 824 (Or. 1981) (prohibition on carrying a club); *State v. Kessler*, 614 P.2d 94 (Or. 1980) (prohibition on possessing a club); *Junction City v. Mevis*, *supra* (Kan. 1979) (gun carrying ordinance too broad); *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972) (*restrictions on firearms sales*, possession, and carrying too broad); *City of Las Vegas v. Moberg*, 485 P.2d 737 (N.M. Ct. App. 1971) (gun carrying ordinance); *People v. Nakamura*, 62 P.2d 246 (Colo. 1936) (prohibition of firearm possession by lawful aliens); *Glasscock v. City of Chattanooga*, 11 S.W.2d 678 (Tenn. 1928) (gun carrying); *People v. Zerillo*, 189 N.W. 927 (Mich. 1922) (prohibiting possession of firearm); *State v. Kerner*, *supra*, (N.C. 1921) (pistol carrying license and bond requirement); *In re Reilly*, 31 Ohio Dec. 364 (C.P. 1919) (ordinance forbidding hiring armed guard to protect property); *State v. Rosenthal*, *supra* (Vt. 1903) (pistol carrying); *In re Brickey*, 70 P. 609 (Ida. 1902) (gun carrying); *Jennings v. State*, 5 Tex. App. 298 (1878) (statute requiring forfeiture of pistol after misdemeanor conviction); *Wilson v. State*, *supra* (Ark. 1878) (pistol carrying); *Andrews v. State*, *supra* (Tenn. 1871) (pistol carrying); *Smith v. Ishenhour*, 43 Tenn. (3 Cold.) 214 (1866) (gun confiscation); *Nunn v. State*, *supra* (Ga. 1846) (handgun ban); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 13 Am. Dec. 251 (1822) (gun carrying).

speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs," The Court added, "[t]hat sort of argument should be no less unimaginable in the Second Amendment context." … "The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City…"

There can be little doubt the reception the Seventh Circuit would give Defendant's virtually identical "profoundly mistaken assumption" in reasoning that they can totally ban gun dealers simply because, "[t]he Village recognizes four dealerships in close proximity to the Village available to serve residents." (Defs' Memo p. 9) Defendants do not say where, citing *Nordyke*, a decision by the Ninth Circuit that often has diametrically opposed views to our Seventh Circuit's. While the Seventh Circuit has not yet specifically addressed the constitutionality of gun sales ordinances, it has plainly identified an old and solid rational in *Ezell* that unquestionably seals the outcome of this case. It is hard to imagine that it would not most certainly deep-six Defendants defense[2] and with it, the severe regulation and prohibition manifest in the instant case – under the "means-end" justification standard, modeled after the court's approach in First Amendment cases.

Rather than applying the undue-burden test from abortion cases, the in *Ezell* the Seventh Circuit stated a standard more akin to First Amendment questions. It ruled, "We can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context," the opinion holds:

> First, *a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.* How much more easily depends on the relative severity of the burden and its proximity to the core of the right." (Emphasis supplied)

As the Seventh Circuit pointed out in *Ezell*, *McDonald* the Second Amendment, as construed in *Heller*, protects "the right to possess a handgun in the home for the purpose of self-defense. Like Chicago, Defendants advance the illogical notion, that the right to "keep[] operable handguns at home for self-defense", that they acknowledge exists, justifies their view that firearms and ammunition cannot be sold, purchased or transferred in Norridge. Their argue there is absolutely no right to sell or transfer firearms is, given *Heller, McDonald*, and *Ezell*, simply nonsensical.

Unlike regulatory restrictions that involve minors, felons or the mentally ill, Chicago's ban (like Norridge's) targets to curtail and restrict, rather than merely reasonably regulate the rights of responsible, law-abiding citizens. Thus, they are "serious encroachments" on Second Amendment rights, unjustified by strong and legitimate concerns. "Properly regulated firing ranges open to the public should not pose

---

[2] Affirmative defenses cannot defeat a claim at this stage unless (not the case here), a plaintiff has pled facts sufficient to establish them and thereby plead themselves out of court. *See* Fed. R. Civ. P. 8(c).

significant threats to public health and safety," Judge Sykes wrote in *Ezell*. "On the other side of the scale, the plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the range ban is in effect. The balance of harms favors the plaintiffs." An injunction should also halt other portions of the ordinance that indirectly prevent range training, the court added. These include the prohibition of firearms outside of the home and rules preventing the firing of guns within city limits. In a concurring opinion, Judge Ilana Rovner took aim at the contradictory firing-range training requirement and ban, which she described as "not so much a nod to the importance of live-range training as it was a thumbing of the municipal nose at the Supreme Court." As the Seventh Circuit recently found, firearms training is protected under the Second Amendment, because, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that makes it effective…" Id.

It necessarily and logically follows that the Plaintiffs' ability as a federally licensed FFL to lawfully sell and purchase lawful firearms to eligible, law abiding citizens for protection necessarily implies a corresponding right to sell, acquire and maintain the weapon itself in order proficiency in their use; "the core right wouldn't mean much without" such sales of the instrumentalities makes it effective. Defendants should know of *City of Chicago v. Beretta U.S.A. Corporation*, 213 Ill. 2d 351 (2005) (noting firearms are clearly lawful products an therefore can be manufactured and sold).

Defendants' should aware of well established law that laws that prohibited engaging in the sale or of a lawful product without a license, to be issued only on proof of public necessity and capacity to meet public demand, effects an invalid regulation of a business not affected with a public interest and a denial of liberty to pursue a lawful calling contrary to the due process clause of the Fourteenth Amendment. *New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) (The right to engage in a common calling is one of the fundamental liberties guaranteed by the due process clause. The limitation is that set by the due process clause, which, as construed, requires that the regulation shall be not unreasonable, arbitrary, or capricious, and that the means of regulation selected shall have a real or substantial relation to the object sought to be obtained.) The business of selling it is primarily private and not so affected with a municipality interest that could constitutionally limit the number of those who may engage in it. 285 U.S. at 273. Such limitations are repugnant to the due process clause of the Fourteenth Amendment. *Id.*, *Ezell*, *supra*.

A qualified American cannot keep and bear that which he or she cannot acquire, especially through FFLs[3]. In *Heller*, the Supreme Court observed that, the purpose of the Second Amendment was thought "to be 'necessary to the security of a free state.'" Id., 128 S.Ct. at 2800. If Defendants and other

---

[3] The ability and therefore the rights by qualified Americans, in and out of Norridge, to sell and purchase arms, is already bottlenecked through a relatively few remaining, already heavily regulated FFLs. See: Fact Sheet, ATF, *Decline in the Number of Federal Firearms Licenses* (June 2008) available online at *www.atf.gov/publications/factsheets/factsheet-decline-in-ffls.html*

municipalities are allowed to drive Plaintiffs out of business, not by overt restrictions on Americans' right to own firearms, such as the ban struck down in *Heller* and *McDonald*, but through the type of unconstitutional licensing conditions, severe burdens and restrictions and the gun dealer elimination program Defendants have imposed on them that impair their ability to provide and acquire them the core Second Amendment could be undermined so it can not be exercised.

DEFENDANTS FAIL TO IDENTIFY ANY LEGITIMATE, "*EXTREMELY STRONG*" GOVERNMENTAL
INTEREST THAT MIGHT WARRANT THEIR SEVERE RESTRICTIONS AND PROHIBITIONS

In the instant case, Defendants have taken the untenable and illogical position that any lawful sale, purchase or transfer of firearms can strangled out of existence by unreasonable and oppressive requirement restrictions and be totally banned. Their vague, standardless and overly broad and burdensome UVA and RO are not a reasonable "regulations" but, rather, constitute severe restrictions and prohibitions tantamount to the one recently declared unconstitutional in *Ezell*. Their infringement of Plaintiffs' fundamental right to engage and continue to pursue, engage in and expand a lawful licensed livelihood triggers and "*Ezell* review" because municipality cannot prevent or condition the expansion of a business that otherwise would comport with existing law. *Dolan v. City of Tigard*, 512 U.S. 374 (1994) (Under the well-settled DUCs discussed *infra*, government may not require relinquishment of a constitutional right in exchange for a benefit conferred by the government.)

Defendants' UVA and RO cannot withstand such scrutiny justified by any legitimate, "*extremely strong*" governmental interest as required by *Ezell*. Here, Plaintiffs make out not only plausible procedural due process claims, but, additionally, deprivation of their fundamental rights, livelihood and property together with a First Amendment claim requiring even stricter scrutiny. As to Plaintiffs' due process claims this court only need determine: whether they have been deprived of a protected liberty or property interest; if so, whether the deprivation occurred without due process. *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003) In the instant case a plausible claim is alleged that their fundamental rights, livelihoods, liberty and property were deprived without due process. After applying these tests, Plaintiffs' plausible federal claims should not be dismissed because this court may draw the reasonable inference that the Defendants could be liable under § 1983.

PLAINTIFFS' LOSS OF LIVELIHOOD INVOLVES PROFOUND LIBERTY AND
PROPERTY INTERESTS THAT REQUIRE STRONG DUE PROCESS PROTECTION

A livelihood interest in a license is not merely "sufficient to trigger due process protection," it "is profound." See *Padberg v. McGrath-McKechnie*, 203 F. Supp.2d, 261 277 (E.D.N.Y. 2002), *aff'd* 60 Fed. Appx. 861 (2nd Cir. 2003), *cert. denied*, 540 U.S. 967 (2003) The Fourteenth Amendment prohibits municipalities from depriving a person of "life, liberty, or property, without due process of law." See *Home Tel. & Tel. Co. v. City of Los Angeles*, 227 U.S. 278 (1913) "Property" cannot be defined by the

procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest… it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985) Property interests and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Roth*, 408 U.S. at 577 Shortly after *Roth*, the Supreme Court, in *Paul v. Davis*, 424 U.S. 693 (1976), reaffirmed that state law may define substantive property or liberty interests that are protected by the Fourteenth Amendment's Due Process Clause:

> … [T]here exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law,[5] and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. *Id.* at 710-11.

In the footnote to the above-quoted passage, the *Paul* Court noted: "[5] There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed *in one of the provisions of the Bill of Rights* which has been "incorporated" into the Fourteenth Amendment. .... *Id.* at 710-11 n." So is the Second Amendment. See *McDonald*, *supra*.

In *McKinney v. George*, 726 F.2d 1183, 1189-90 (7th Cir. 1984), the Seventh Circuit held where state substantive law grants an individual a liberty or property interest, one cannot be deprived of that substantive interest without due process of law. *McKinney* held a state can if it wants confer extra liberties which the due process clause will then also protect against deprivations without due process. 726 F.2d at 1189. Similarly, the framers of the Illinois Constitution gave the citizens of this state the "extra" liberty or property interest in bearing arms for their own self-defense and for the defense of their state which the Due Process Clause of the Fourteenth Amendment will protect. *See also Meachum v. Fano*, 427 U.S. 215 (1976) (liberty interest may originate in the federal constitution or have its roots in state law); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1122 (7th Cir. 1983) (property, for purposes of the Fourteenth Amendment, defined "as what you hold securely as a result of state or federal law") Accordingly, a liberty or property interest may stem from federal or state law, such as the Illinois Constitution.

Without access to the application and sales process, qualified citizens' the underlying substantive core right to own a handgun are cut off as well. Here, the parent substantive right is rooted in state law *and constitutions*. In Illinois there is a state created right to keep and bear arms which includes, the right to sell and transfer and firearms is necessarily implied under an FFL, provided that all of the requirements

of the Illinois Firearms Act are and Federal Law are met. Illinois has no weapons dealers licensing statute. Logic dictates these rights are necessarily implied and are thus protected by the Due Process Clause of the Fourteenth Amendment and constitute both a property and liberty interests for purposes of § 1983. See *Ezell, Dwyer v. Farrell*, 475 A.2d 257 (Conn. 1984) and *Schubert v. DeBard,* 398 N.E.2d 1339 (Ind. App. 1980) (Provided that all of the conditions of a state's Firearms Act are met, one has "a legitimate claim of entitlement" to a state a liberty or property interest, substantive rights to keep and sell firearms, provided that all of the conditions of a state firearms act are met.) Accord, Citizens are constitutionally allowed to sell handguns and state law prevails over local ordinance.

> THE UVA AND RO ARE UNCONSTITUTIONAL BECAUSE THEY SEVERELY RESTRICT, OPPRESS, INTERFERE WITH, OVER BURDEN, AND ARE DESIGNED TO AUTOMATICALLY ABOLISH PLAINTIFFS' WDBL IN ORDER TO DEPRIVE THEREOF THEM THEIR FUNDAMENTAL RIGHT TO A LIVELIHOOD AND PURSUIT OF A LAWFUL CALLING WITHOUT DUE PROCESS

In *Riley v. Rhode Island Department of Environmental Management,* Plaintiff argued that denying him the license violated his right to earn a livelihood in a lawful calling and engage in a common occupation of life, as protected by the liberty provision of the due process clause that states "nor shall any state deprive any [citizen] of life, liberty, or property, without due process of law." 41 A.2d 198, 205 (R.I. 2008)*;* U.S. Const. amend. XIV, sec. 1;  see also Ill. Const. art. 1, § 2. The *Riley* Court recognized that, "[l]iberty, as meant by the clause, is a broad concept including … the right of the individual to contract, the right of the individual to engage in the common occupations of life … and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness by a free people." *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972));  see also *Berberian v. Lussier*, 139 A.2d 869, 872 (R.I. 1958) (the liberty guaranteed to every person by federal constitution includes the right to be free from unreasonable interference in the pursuit of a livelihood). See also: *State ex rel. Makris v. Superior Court,* 193 Pac. 845, 12 A.L.R. 1428 (Wn. Sup. St. 1920) which held:

> [A]n ordinance which authorizes the issuing or withholding of a license to engage in … a business which within itself is ordinarily perfectly lawful, and committing to any officer or set of officers the power to decide according to their own notions in each particular case, the question of the propriety of issuing or withholding a license therefore, and thus deciding who may and who may not engage in such business, is authorizing the exercise of arbitrary power in violation of the guaranty of the fourteenth amendment of the constitution of the United States....

See also: *State ex rel. Schafer v. Spokane*, 186 Pac. 864 (Wn. Sup. Ct. 1920) ("The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the legislature, for the preservation of such right is the principal purpose of the constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised....")

A municipal ordinance regulating a business is unconstitutional if it confers upon the local

authorities arbitrary power, at their own will, and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places, without regard to competency of the persons applying, or the propriety of the place selected, for the carrying on of the business. See *Anderson v. City of Hermosa Beach*, 621 F. 3d 1051 (9th Cir. 2010) (City ordered to allow tattooing businesses, holding its *total ban* was "facially unconstitutional.") "Once licenses are issued … their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses involves state action that adjudicates important interests of the licensees. In such cases, the licenses are not to be taken away without that due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U. S. 535 (1971) For a regulatory scheme to survive rational basis review under the equal protection and due process clauses, the statute must bear some rational relation to a legitimate state interest and must truly only regulate - *not ban an activity. Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) Before a local government may deprive an individual of a license, it must also provide a procedure for determining eligibility or entitlement. *Bell,* 402 U. S. 535.

Plaintiff's property interest for § 1983 purposes is defined by state law such as those that arise from the existence of objective standards of eligibility for licenses. *Arnett v. Kennedy*, 416 U.S. 134 (1974) A plaintiff must "first identify a property right, second show that the state has deprived him (or her) of that right, and third, show that the deprivation was effected without due process" (*Local 342, Long Island Pub. Serv. Employees v. Town Bd. of Huntington*, 31 F.3d 1191 (2nd Cir. 1994) quoting *Mehta v. Surles*, 905 F.2d 595, 598 (2d Cir. 1990) "[O]nce government has granted a business license to an individual, the government cannot depriv[e] [the individual of] such an interest * * * without appropriate procedural safeguards*" Spinelli v. City of New York*, 579 F.3d 160 (2nd Cir. 2009) at 169 quoting *Arnett v. Kelly*, 416 U.S. 134 (1974) at 167 [Powell, J., concurring opinion]). "[T]he particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case * * * due process notice contemplates specification of facts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations'" (*Rothenberg v. Daus*, 2010 WL 3860424,*4 [S.D.N.Y. 2010] at *8. Thus, the Plaintiff's WDBL is clearly a form of property sufficient to allege a claim predicated upon deprivation of due process. (*Id. Local 342, Long Island, supra.*) Further, as the Defendants unquestionably withheld the WDBL for ransom, the Plaintiff clearly has and will suffer a deprivation thereof without being accorded any due process whatsoever. Directly relevant to a due process inquiry are the particular actions undertaken by the Defendants *vis-à-vis* the prospective unconstitutional deprivation of the Plaintiff's WDBL.

Federal law provides: "Notwithstanding ... any rule or regulation of a State or any political subdivision thereof, any person who is not prohibited by this chapter" from receipt of a firearm "shall be carry such firearm to any other place where he may lawfully possess and carry such firearm...." 18

entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and U.S.C. § 926A (requiring only that the firearm be unloaded). However, "[s]tate-created liberty and property interests, including the right to bear arms for defense and security, are protected by the Due Process Clause." *Peoples Rights Organization* v. *City of Columbus,* 925 F. Supp. 1254, 1269 (S.D. Ohio 1996), *aff'd in part & rev'd in part on other grounds,* 152 F.3d 522 (6th Cir. 1998) ("Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, ... the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law." *ld.)* The court cited the following for this proposition: *Mills* v. *Rogers,* 457 U.S. 291, 300 (1982) ("A State creates a protected liberty interest by placing substantive limitations on official discretion." *ld.) Olim* v. *Wakinekona,* 461 U.S. 238, 249 (1983) ("Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, ... the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law." *ld.)* and *Hewitt* v. *Helms,* 459 U. S. 460, 466 (1983) "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Id.)*

Like liberty interests, property interests recognized by State law are also protected by the due process clause. "The Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' ... Once a state has conferred a property right, it cannot constitutionally deprive such an interest without appropriate procedural safeguards." *Schaper v. City of Huntsville,* 813 F.2d 709, 713-14 (5th Cir. 1987), quoting *Board of Regents* v. *Roth,* 408 U.S. 564, 577 (1972) ("These [liberty and property] interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law...." *Paul* at 424 U.S. 710-11. *See Russell v. Harrison,* 736 F.2d 283, 288 (5th Cir. l984) (a complaint alleging an arbitrary and capricious deprivation of a property interest states a cause of action under the Due Process Clause).

At issue is whether the city deprived Plaintiffs of a liberty, their privileges and immunities (see *McDonald*) and/or a property interest without due process of law. Plaintiffs maintain the evidence established they were deprived of one or more of the following liberty or property interests without due process of law: the fundamental right to keep, sell, deal in and transfer lawful products, arms, and enjoy the use of their FFL, and continue to do and expand business. These "rights" constitute both a liberty or property interests entitled to Fourteenth Amendment protection. See e.g. recently enacted 5 U.S.C. Ch. 105 - Protection of Lawful Commerce in Arms.

State constitutions serve as an aid to interpreting the Bill of Rights. *Harmelin v. Michigan*, 501 U.S. 957, 966, 977-78, 983 (1991); *Benton v. Maryland*, 395 U.S. 784, 795-96 (1969) In the instant case,

they[4] prove the contemporary importance of the right, prove that the right belongs to individuals, and prove that judicial enforcement of the right does not harm society. In 1970, by an overwhelming margin the people of Illinois by direct vote, readopting and confirming their then existing right to arms in their state constitution. Thus, the people continue to adopt the right with an awareness of modern conditions, such as urbanization, modern firearms, and crime.

Like liberty interests, property interests recognized by State law and State Constitutions are also protected by the due process clause. "The Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." ... Once a state has conferred a property right, it cannot constitutionally deprive such an interest without appropriate procedural safeguards." *Schaper* v. *City of Huntsville,* 813 F.2d 709, 713-14 (5th Cir. 1987), quoting *Board of Regents* v. *Roth,* 408 U.S. 564, 577 (1972) See also *Russell v. Harrison,* 736 F.2d 283, 288 (5th Cir. l984) (a complaint alleging an arbitrary and capricious deprivation of a property interest states a cause of action under the Due Process Clause). Because the rights of citizens to free speech, and engage in a business or follow a profession are constitutionally protected, it is always a judicial question whether any particular regulation of such rights is a valid exercise of legislative powers. *In re Porterfield*, 28 Cal. 2d 91, 101-102, 168 P.2d 706, 167 A.L.R. 675 (1946)

STATE LAW - THE ILLINOIS CONSTITUTION HAS LONG GUARANTEED A FUNDAMENTAL INDIVIDUAL RIGHT TO KEEP AND BEAR ARMS

Since at least 1870, the people of Illinois have chosen to add a right to arms to their state constitution, to re-adopt the right to arms in their 1970 Constitution, and thus strengthen that existing right by declaring, "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. 1970, art. I, § 22.

While some aspects of Article I, § 22 are nearly as old as the State itself, effective 1970, the sovereign people of Illinois unambiguous guaranteed to themselves "the right of the people to keep and bear arms shall not be infringed." This secured state right is enshrined in the constitution and is considered fundamental and it must be jealously protected from infringement. "[A] fundamental right is one explicitly or implicitly guaranteed by the Constitution." Because the Second Amendment rights asserted in this case are plausibly and implicitly guaranteed by the Constitution, a strict scrutiny test must be used. Under strict scrutiny, a statute or regulation "will be deemed constitutional only if it is narrowly drawn to further a compelling state interest." *Jaynes v. Commonwealth*, 666 S.E.2d 303, 313 (Va. Sup. Ct. 2008), *cert. denied*, 129 S.Ct. 1670 (2009)

---

[4] The 44 state constitutional guarantees to arms and the history of their adoption cannot be fully examined here. To comply with page-length limitations, no quotes are given in full every version of every state constitutional provision. For full quotations see Eugene Volokh, *State Constitutional Right to Keep and Bear Arms Provisions*, 1 Texas Rev. of Law & Politics 191 (2006), available online at: *www.law.ucla.edu/faculty/volokh/beararms/statecon.htm*

This court's interpretation rights guaranteed by the Illinois Constitution should be strong and need not be limited by the protections for the right to keep and bear arms conveyed by the Second Amendment as interpreted by the U.S. Supreme Court. *See, e.g., District of Columbia v. Heller*, 554 U.S. 570 (2008) Federally guaranteed are a floor - not a ceiling - because a state may choose to provide greater protection to its citizens. See *Opperman v. South Dakota,* 428 U.S. 364 (1976) State courts have a tradition of using their independence to provide greater protection for individual rights. *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980) (a state constitution may guarantee broader rights than the federal Constitution). This has occurred with the right to keep and bear arms pre-*Heller*, e.g., *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139 (W. Va. Sup. Ct. 1988) (striking down gun carrying law as too restrictive.) *Cf. Students for Concealed Carry v. Regents of the University of Colorado*, 2010 WL 1492308 (Colo. App. April 15, 2010)

PLAINTIFFS STATE GIVE FAIR NOTICE THAT THE UVA AND RO ARE
<u>TOO RESTRICTIVE, VAGUE, OPPRESSIVE AND OVERLY BROAD BURDENS</u>

Finding that an arms law sweeps too broadly or is too restrictive, vague, oppressive or overly burdensome is no longer an uncommon occurrence. See *Heller*, *McDonald*, and *Ezell.* See also, *State v. Blocker*, 630 P.2d 824, 827 (Or. 1981) ("An "overbroad" law, according to the U.S. Supreme Court, is not vague, or need not be. … A law is overbroad to the extent that, as in the instant case, announces a prohibition that reaches conduct that may not be prohibited. A legislature can make as law as "broad" and inclusive as it chooses unless it reaches into constitutionally protected ground. …" As in *Heller, McDonald* and *Ezell*, the *Blocker* court found the arms law to be overbroad because it reached beyond permissible limits to impinge on a constitutionally protected right. *Id.* At 261-62. Accordingly, ... the Defendant's UVA and RO severe burdens and severe proscriptions against selling firearms are unconstitutionally overbroad. See *Ezell, City of Clinton v. Phillips*, 58 Ill. 102 (1875) and *City of Lakewood v. Pillow*, 501 P.2d 744, 745 (Colo. 1972) ('A governmental purpose to control or prevent certain activities, which may be constitutionally subject to state or municipal regulation under the police power, may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.... Even though the governmental purpose may be legitimate and substantial, that purpose cannot be pursued by means that, as here, broadly stifle fundamental personal liberties when the end can be more narrowly achieved.")

In determining the scope of U.S. and Illinois' constitutional guarantees of the right to keep and bear arms, this court should rule, per *Ezell*, that the UVA and RO are thus unconstitutionally overbroad, and not narrowly drawn to further any unarticulated compelling interest. "The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void and ineffective for any purpose, since its unconstitutionality dates from the time of its enactment... In

17

legal contemplation, it is as inoperative as if it had never been passed... Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no right, creates no office, bestows no power or authority on anyone, affords no protection and justifies no acts performed under it... A void act cannot be legally consistent with a valid one. An unconstitutional law cannot operate to supersede any existing law. Indeed insofar as a statute runs counter to the fundamental law of the land, (the Constitution JTM) it is superseded thereby. No one is bound to obey an unconstitutional law and no courts are bound to enforce it." *Bonnett v. Vallier*, 116 N.W. 885 (Wis. 1908); *Norton v. Shelby County*, 118 U.S. 425 (1886) Moreover, the requirement that laws be reasonably precise as to the scope of prohibited conduct serves three distinct purposes: "First, because the law assumes that man is free to steer between lawful and unlawful conduct, the law insists that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly.... Second, ...[a] vague law impermissibly delegates basic policy matters to bureaucrats, policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.... Third... where a vague law abuts upon sensitive areas of basic fundamental freedoms, it operates to inhibit the exercise of [those] freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) A law violates due process of law if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); see also *United States v. Pungitore et al.,* 910 F.2d 1084, 1104 (3rd Cir. 1990)

A person whose conduct is at the "core" of the activities clearly covered by the statute's terms may only raise a vagueness defense if the statute is one that is likely to chill the exercise of constitutionally protected conduct. See *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983) (holding that facial vagueness challenges are permissible where, as here, "a law reaches a substantial amount of constitutionally protected conduct" (citation omitted)); ("[I]f the statute's deterrent effect on legitimate expression" is "real and substantial," parties may challenge the statute "even though there is no uncertainty about the impact... on their own rights.") See also *City of Clinton v. Phillips*, 58 Ill. 102 (1875) (daily reporting of sales details too oppressive, burdensome - therefore void).

ACTIONABLE INJURIES IMPOSED BY DEFENDANTS'
SEVER RESTRICTIONS AND UNCONSTITUTIONAL CONDITIONS

Demanding Plaintiffs first sign the UVA to surrender their constitutional rights a prerequisite to obtaining a WDBL that was issuable under the OWDO without them constituted the imposition of classic "unconstitutional conditions". As early as *Frost & Frost Trucking Company v. Railroad Commission* 271 U.S. 583 (1926) the Supreme Court recognized the potential for excess conditions on the exercise of constitutional rights:

"If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantees embedded in

the Constitution of the United States may thus be manipulated out of existence."

More recently, the Seventh Circuit has held in *Libertarian Party of Indiana v. Packard*, 741 F.2d 981 (7th Cir. 1983):

> It is well established that a government may not condition the availability of a public benefit on the relinquishment of rights guaranteed by the first amendment. (citations omitted)
>
> * * *
>
> The "Unconstitutional Conditions" doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. at 597, 92 S.Ct. at 2697 (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). *Accordingly, "[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly."* Elrod v. Burns, 427 U.S. at 361, 96 S.Ct. at 2683. ... (Emphasis supplied)

So, even if government may not be obligated to provide its citizens with a certain benefit or privilege, such as a license, it is not free to condition granting any such benefit, privilege or license on the recipient's relinquishing a constitutional right. Likewise, the government may not withhold or cancel the benefit (here the fundamental right to earn a livelihood by being licensed to sell lawful products, etc.) by way of penalizing the assertion of a constitutional right. In the instant case because Defendants realized that they would inevitably have to grant Plaintiffs a licenses under their two paragraph OWDO, they concocted and launched an unconstitutional scheme to illegally and deliberately delays its issuance, impose unauthorized and illegal conditions and then, ignoring due process, manipulate and drive Plaintiffs out of business. The forced UVA was the result of duress and therefore may not stand.

The limits imposed by the UVA, what the Defendants have self-servingly coined an "Operations Agreement", are not "presumptively lawful" because, although government may not be obligated to provide its citizens with a certain benefit or privilege, it is not free to condition granting the benefit or privilege on the recipient's relinquishing a constitutional right. This is because government may not withhold or cancel the benefit by way of penalizing the assertion of a constitutional right. See e.g., *Sherbert v. Verner*, 374 U.S. 398 (1963)

The extorted UCs did not constitute valid consideration. (Am. Comp. Ex. "C") See Standler, *Doctrine of Unconstitutional Conditions in the USA*, p. 31 (4 Mar. 2005)[5]:

> The government can *never* require surrender of one constitutional right as a condition to receive another constitutional right. This is an absolute rule that protects the integrity of civil liberties. ...The government *cannot* additionally require surrender of a constitutional right as a condition as a condition of *continuing* to receive a benefit. In other words, once a benefit has begun, the

---

[5] Available online at: *http://www.rbs2.com/duc.pdf*

benefit cannot be discontinued because the person used (or wants to use) their constitutional right. This rule prevents retaliation by government against those who use their civil liberties. (Emphasis in the original)

Even if a government is under no obligation to provide a person a particular benefit, such as a license, he conferral of that benefit may not be conditioned upon the surrender of a constitutional right. Id. pp. 15-16 (citing numerous U.S. Supreme Court and Circuit Court Cases and law review articles including the oft cited Note, *Unconstitutional Conditions*, 73 Harv. L. Rev. 1595 (1960)) Surely, Defendants must know[6] of the Doctrine of Unconstitutional Conditions ("DUCs"), well established law that, "(a) when granting a benefit, privilege or license, etc., may not, as the terms to its possession, impose conditions which require the abandonment of constitutional rights." *Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583, 589 (1924); *Terral v. Burke Construction Company*, 257 U.S. 529, 532 (1922) As early as *Frost* the Supreme Court recognized the potential for excess conditions on the exercise of constitutional rights: "If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guarantees embedded in the Constitution of the United States may thus be manipulated out of existence." *Id.* For a discussion of how constitutional rights would be virtually meaningless if coercive, UCs (threat plus penalty), such as those imposed here, are permitted and a comparison with blackmail (constitutional rights need not be exercised), see generally, Mitchell N. Berman, *Commercial Speech and the Unconstitutional Conditions Doctrine: A Second Look at "The Greater Includes the Lesser"*, 55 Vanderbilt L. Rev. No. 3, 693 (2002):

> Every constitutional right entails a claim-right that the state not penalize the exercise (or no waiver) of the constitutional right itself in the sense of imposing (or allowing to obtain) consequences upon the right-holder that are adverse relative to the consequences that the state would impose (or allow to obtain) but for the state's purpose in having the right-holder experience the consequences as disagreeable. That is largely what it means to have a constitutional right. It follows that the withholding of what seems to be a "benefit" is in fact a "penalty" - and hence is unconstitutional - if undertaken for the purpose of punishing or discouraging exercise of a right. And a conditional proposal is coercive (in the constitutional sense) if the state threatens to impose a penalty for the refusal to waive a constitutional right.

See also *Unconstitutional Conditions*, 25 Mich. L. Rev. pp. 777-782 (1927) (under the DUCs local governments cannot, in the guise of a conditional license to do business, exact of the relinquishment of an applicant's liberty, property or other constitutional rights); *Sherbert v. Verner,* 374 U.S. 398 (1963) (government may not withhold or cancel the benefit [here a weapons dealer license] by way of penalizing the assertion of a constitutional right); *Pickering v. Board of Education*, 391 U.S. 563 (1968) (limiting

---

[6] Defendants' stubborn, "ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless." *Del Gonzlez-Sevin v. Ford Motor Company*, Appeal No-1665 (Slip. Opin. pp. 4-6, 7th Cir. Nov. 23, 2011, Posner, J.) (with photos).

free speech in order to obtain or maintain a government benefit forces an unconstitutional condition).

Defendants grasp for straws erroneously arguing that because Plaintiff reasonably fear that, further illegal reprisals may be taken against them under their Program and UVA as well as the possibility of additional injuries does not deprive them of their right to redress what they have done. The fact remains that Defendants forced Plaintiff to forfeit, *inter alia,* their right to display their goods, sell or transfer them in their store, expand or advertise their business, identify sign their business, prepare and transmit daily sales reports each day before noon (an unreasonable, time-consuming, and disruptive burden) and can not continue their business, but must permanently close shop in 2013 - *next year*, etc. are existing and inevitable harms, not a mere "fear" imposed by the existence of the UVA and the RO (See Am. Comp. Ex. "D" pp. 5-6, ¶¶ F & H) The RO arbitrarily states in relevant part:

F. *Renewal* …There shall be no renewal of any weapons dealer license for any period after the expiration of the license term ending April 30, 2013. ….

H. *No expansion.* A licensee may not expand its operation beyond boundaries of the premises described in the license application.

In *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987) the Supreme Court held such a "condition" on the approval a building permit that the *applicant could expand only* if he granted the Commission an easement *constituted an unconstitutional condition and a taking for which Nollan would first have to be compensated*.) As in *Nollan*, here there is a substantial relationship ("essential nexus") between the withheld and severely restricted to-be-revoked benefit and the unconstitutional condition Defendants had no right to manipulate and impose.

All of the acts complained in the instant case of caused Plaintiffs large loss of profits, good will, and economic opportunities. Plaintiffs did not and would never have "voluntarily" agreed to limit the scope and operation of their business". Because Plaintiffs; tentatively approved FFL could become valid on their leased premises once their WDBO was approved, they only had one odious option - no true choice – either give up their right start their business or succumb to Defendants extorted UCs in order to obtain a WDBL and resort to judicial relief. Under economic duress and Defendants lopsided position of power, they were relegated to they latter.

Plaintiffs provide plenty of factual allegations to rebut any such spurious presumption, in addition to the necessarily and implied constitutional right to conduct a lawful business that commercially sell weapons to qualified purchasers authored by Plaintiffs' FFL as well as the licensed issued them under Defendants' own OWDO. See *Ezell*, *supra*. Plaintiffs' First Claim should not be dismissed.

<u>A Federal Claim is Stated for the UVA's Recission</u>

Plaintiffs' claim for recission is plausible because they pleads that they were illegally manipulated and into signing it so that Defendants could impose UCs that constituted a lack, failure or

frustration of lawful consideration. "'[R]escission' is the cancelling of a contract so as to restore the parties to their initial status." *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill.App.3d 156, 165 (2004), quoting *Horan v. Blowitz*, 13 Ill.2d 126, 132 (1958) "Where a contract is rescinded, the rights of the parties under that contract are vitiated or invalidated." *Coregis*, 355 Ill.App.3d at 165. Here, since the UVA's and its terms and UCs were not authorized by any law. "…[W]here the amount of consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail." *Ahern v. Knecht*, 202 Ill.App.3d 709, 715 (1990) *Ahern* at 715. "[S]ubstantial nonperformance or breach of contract warrants rescission where the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." *Ahern*, at 715. A plaintiff desiring to rescind a contract must merely show the defendant's nonperformance or inability to perform and offer to return the defendant to the *status quo ante. Ahern*, at 715-16. "If any part of the consideration for a promise be illegal, … the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise." *Menominee River Co. v. Augustus Spies L & C Co.*, 132 N.W. 1122 (Wis. Sup. Ct. 1912)

In the instant case the consideration, a license that Defendants should have not withheld – but was held hostage in order to force and imposed UCs upon Plaintiffs, was neither sufficient nor lawful. Moreover, since the UVA was imposed, induced and based on unlawful considerations and UCs that Defendants had no right to demand or impose on Plaintiffs, it is unenforceable. Defendants UVA and RO, together, ban display and ultimately retail sales of firearms they ultimately prohibits gun stores. (Am. Comp. Exs. "C" & "D") This alone is sufficient to demonstrate a constitutional deprivation necessary to confer standing to challenge the ban on gun stores, have the UVA and RO declared void *ab initio*.

PLAINTIFFS' LIVELIHOOD, DUE PROCESS AND OTHER CLAIMED RIGHTS ARE WELL ESTABLISHED RIGHTS FOR PURPOSES OF A QUALIFIED IMMUNITY ANALYSIS

Defendants erroneously contend, "[n]o case has ever suggested, expressly or by implication, let alone clearly established, that any provision of the [UVA] or [RO] are illegal is preposterous" (as if someone had to before they were drafted in 2011). (Defs' Memo. p. 33) However, its hard to believe that they would not know that almost a century ago the Supreme Court held, "[g]overnment may "*not wantonly or arbitrarily to deny a license to or take one away from a reputable dealer." Plymouth Coal Co. v. Pennsylvania*, 232 U.S. 531, 545 (1914); *Hall v. Geiger-Jones Co.,* 242 U.S. 539, 553-54 (1916) See also *New State Ice Co. supra*. It is well-established that, "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition." *Dent v. West Virginia*, 129 U.S. 114, 121 (1889) See also *City of Canton*, *supra* (demand for daily detailed reports of sales oppressive and unconstitutional). They should know of the DCC and the DUCs. Further, application these

old doctrines and other well-entrenched law discussed in this memo makes clear Defendants' Weapons Dealers [elimination] Program" (the "Program") (Defs' Memo p. 21) is unconstitutional because their UVA and RO restrict and prohibit rather than reasonably regulate Plaintiffs' business enterprise. See e.g., *Adams v. Tanner*, 244 U.S. 590 (1917)

Moreover, national rules govern even though no case on all fours has been rendered. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Kurowski v. Krajewski*, 848 F.2d 767 (7th Cir. 1988) As discussed above, Plaintiffs' allegations, if proved, would demonstrate a violation of well established liberty and property rights protected under substantive due process concepts because Defendants used their UVA and RO and positions to manipulate Plaintiffs out of a lawful engaging in a licensed business. Such conduct prohibiting and purporting to destroy rights acquired under law is without legal foundation. See *United States v. Peters*, 9 U.S. 115 (1809)

Yet, Defendants' doggedly persist in their boast that their launch of a "Weapons Dealers [elimination] Program" (the "Program") is just hunky-dory. They do so even though it is obviously purposely concocted to defeat their own OWDO and impose severe restrictions and eventually totally bar all firearms sales and transfers planned effect would prevent and violate Plaintiffs and other citizens' exercise numerous federal and state constitutional rights. Via their Program they have maneuvered imposition of UCs to accomplish indirectly, though subterfuge, what they have been told by old law they could not so achieve. Their argument lacks constitutional and common sense.

DEFENDANTS' DELIBERATE DELAY, LACK OF SET
REVIEW TIME AND OWDO and RO WERE UNCONSTITUTIONAL

Defendants' have conceded deliberate delay and their ordinances (the OWDO and RO) set no review time. Licensing ordinance that, as here, lack of written time frame for review, are facially unconstitutional. *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002) (a licensing law becomes unconstitutional when it "fails to place time limits within which a decision maker must issue the license."); *ATL Corp. v. City of Seattle*, 758 F. Supp. 1147 (W.D. Wash. 2010) (failure, as here, to grant or deny a license within a timely manner is also unconstitutional.) Beyond pleading these facts, Plaintiffs identify actionable injuries caused them by Defendants via their UVA and the RO in the form of the overly broad *ad hoc* restrictions and loss of their business and profits due inability to freely advertise, display, sell and transfer their wares, etc. as well as being arbitrarily doomed to be driven out of business and be deprived of their livelihood. Plaintiffs were "waiting" for FFL only because of Defendants' intentionally delayed - not due any normal or routine review by the Village. (Am. Comp. ¶ 16.)

PLAINTIFFS HAVE STANDING TO SEEK RELIEF ON BEHALF OF
THEMSELVES AS WELL AS THEIR POTENTIAL THIRD-PARTY CUSTOMERS

Defendants' reliance on *Kowalski is misplaced and dos not* rule out third party standing for potential gun purchasers under the unique facts of this case. Under Article III, 2, of the Constitution, the

federal courts have jurisdiction over this dispute between appellants and appellees if it is a "case" or "controversy." . . . See *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 37 (1976) In order to establish standing, it is incumbent upon a plaintiff or petitioner to demonstrate an "injury in fact" in that he or she will actually suffer harm from the challenged action, which in this case is the prospective termination of the Plaintiffs' business license. "The existence of injury in fact, an actual legal stake in the matter being adjudicated, ensures that the party seeking relief has some concrete interest in prosecuting the action which casts the dispute in a form traditionally capable of judicial resolution." See *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 [1974]; *Malley v. Farleym* 2011 N.Y. Slip. Opin. 21232 (July 7, 2011) The injury alleged in the matter at bar are more than "conjectural" in nature and demonstrate that the injury asserted must fall within their "zone of interests". But for the UVA and RO, they would be able to continue to engage in their lawful calling, and thus meet elementary standing requirements. See *Raines v. Byrd*, 521 U.S. 811, 818 (1997))

To establish standing to challenge an ordinance or Defendants illegal actions, a plaintiff only need show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); that is "pegged to a sufficiently fixed period of time" *ACLU of Florida, Inc. v. Miami-Dade County School Bd.*, 557 F.3d 1177, 1194 (11th Cir. 2009); and which is not "merely hypothetical or conjectural," *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008). Plaintiffs have established standing because they have been, are or will be deprived of or may well incur penalties and the loss of constitutional rights including their livelihood under the UVA and RO. See *Florida v. United States Dep't of Health & Human Servs.*, 780 F. Supp. 2d 1256 (N.D. Fla. 2011), aff'd in part, rev'd in part, 648 F.3d 1235 (11th Cir. 2011), cert. granted (Appeal No. 11-398, Nov. 14, 2011); *Virginia v. Sebelius*, 702 F. Supp. 2d 598, 602-07 (E.D. Va. 2010) (both declaring the Health Care and Education Reconciliation Act of 2010 unconstitutional). Plaintiffs have put Defendants on fair notice of their claims, standing to assert them and the conduct underlying them.

In the matter at bar, the limitations on and prospective arbitrary revocation of the Plaintiff's business license impedes their ability to conduct business and as such an injury in fact has been and will be visited upon them herein, unless enjoined. See, e.g. *New York State Association of Nurse Anesthetists v. Novella*, 2 N.Y.3d 207 (2004) (licensees had standing to challenge state actions that, as here, caused actual economic loss). Defendants' anticipatory, prospective, arbitrary termination of Plaintiffs' licensed livelihood denial of the applications here created an actual case or controversy. Such deprivations and denials constitute injury that is the direct result of the regulation, the invalidation of which would redress the injury. "To meet the standing requirements of Article III, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested

relief.'" *Raines*, 521 U.S. at 818, quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984) Moreover, Plaintiffs may bring a pre-enforcement challenge to a local licensing ordinance or practice that impact their current or prospective ability to conduct a lawful business. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) "An 'injury in fact' need not be substantial to support federal court jurisdiction over this challenge to agency action; an identifiable trifle will suffice." *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 714 (D.C. Cir. 1977), citing *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)

 Plaintiffs have sufficiently pled their standing by alleging: (1) constitutional violations of their fundamental rights; (2) injury to business or property, and (3) causation of the injury by Defendants' unconstitutional UVA and RO, etc. When even one individual plaintiff has standing, this eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit.") The Defendant's argument is at odds with the Supreme Court's repeated pronouncements that, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Grained v. City of Rockford,* 408 U.S. 104, 108 (1972); *Steffen v. Thompson*, 415 U.S. 452 (1974) Critically, Defendants' RO and UVA contain and subject Plaintiffs to substantial limitations, deprivation of fundamental rights, caps and penalties. Defendants' approach would have Plaintiffs discover the meaning and validity of its UVA and RO only under continual threat of fine or loss of livelihood. Such an exercise is not reasonably necessary. See *Grained.* Further, Plaintiffs have standing to challenge the constitutionality of the provisions of the UVA recapped *infra* at pp. 2-3 of this Memo, and RO they seek be declared unconstitutional. They satisfy all three *Lujan* elements raised by Defendants: (1) an invasion of a legally recognized interest (their right to pursue a lawful livelihood) which is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal link between that injury and the defendants' actions (forcing the UCs contained in the UVA and RO), such that the injuries (lost profits due to suppression of their business and speech and the arbitrary anticipatory of their business license without due process) are fairly traceable to the action complained of; and (3) that a favorable decision in this case will likely redress the injury.

 Plaintiffs' liberty and property interests are directly targeted and adversely affected by the UVA and RO. *Buckley v. Valeo,* 424 U.S. 1, 11-12 & n. 1046 (1976) There is no need to invoke the special standing rules applicable to overbroad laws that affect fundamental rights. See *Schad v. Borough of Mount Ephraim,* 452 U.S. 61 (1981); *Buckley,* 424 U.S. 11-12; Monaghan, *Overbreadth,* 1981 Sup. Ct. Rev. 1. Plaintiffs identify constitutional and financial injuries that they have suffered, and will suffer from

the RO's subsections B-K and M-O of ¶ 24 and all subsections of ¶ 25. They challenge Defendants' absolute ban on gun dealers created subsections A and L of ¶ 24 of the RO and, *inter alia,* the sale, purchase, transfer and gifting of firearms, and assert a correlate injury - not being able to keep, bear, sell, transfer firearms or ammunition, which grants them standing to do so. Given their injuries, Plaintiffs have standing to bring their claims that their constitutional rights have been and are being violated.

PLAINTIFFS HAVE STANDING ON BEHALF OF POTENTIAL THIRD PARTY CUSTOMERS

Plaintiffs' have standing to assert third-party potential gun purchasers' interests in this case because they sets forth facts that plausibly shows potential gun purchasers, both in and out of in and out of Norridge, might not assert their own rights because the Defendants regulation not only overly-burdens First and Second Amendment rights by banning speech, but is specifically designed to deprive the public in general and of information including the very existence and nature of Plaintiffs' business. Indeed, given Defendants' tactics of suppressing information, it is unlikely potential purchasers would ever even know that have deprived their ability to receive banned information.

The crushing UCs imposed by the UVA and RO's time-delayed ban on Plaintiffs business both suffers from obvious "overbreadth[7]" since it is a total ban on lawful trade. "Overbreadth" can refer to the ability of a person to strike down a statute on its face, *even if* the statute's specific application to him might be constitutional and is often referred to as a doctrine of third-party standing designed to avoid the chilling effect that might occur when a statute is unconstitutional in many of its applications but is without proper plaintiffs to challenge it. See *Broadrick v. Oklahoma,* 413 U.S. 601, 610-13 (1973) Defendants UCs do not merely have a "chilling effect", they are designed to and do freeze out Plaintiffs and their customers' ability to exercise an implied and a corresponding activity, selling and purchasing arms, without which their, as Judge Sykes said in Ezell, core Second Amendment right wouldn't mean much or be made effective. There is also a third meaning of overbreadth doctrine, which refers to the actual operation of a legal rule. To say that a legal rule is, as in the matter at bar, overbroad in this sense is to say that, regardless of its precise drafting, its actual effect is to inhibit the exercise of otherwise protected First Amendment freedoms. Alternatively, plaintiffs claim that the UVA and RO violate their *customers' First and* Second Amendment rights because Defendants' scheme is targeted to keep the public in general and potential gun purchasers in particular by depriving them of information and dark by suppressing Plaintiffs' speech. Accordingly, Plaintiffs' First Claim states a claim and should not be dismissed due to any claimed lack of standing

DEFENDANTS' RO OPPRESSIVE DAILY REPORTING REQUIREMENTS AND THEIR ORWDO
AND RO ARE VOID FOR FAILURE TO CONTAIN OBJECTIVE STANDARDS FOR ELIGIBILITY

---

[7] The term "overbreadth" was coined in *NAACP v. Button*, 371 U.S. 415, 433 (1963) to describe just the kind of situation presented in the matter at bar.

Defendants say they can find no plausible basis for Plaintiffs' Fourth or Fifth Amendment claims, and they fail to provide "fair notice of what the ... claim is and the grounds upon which it rests." (Defs' Memo p. 5) However, Plaintiffs plead that Defendants' RO contains the following overly burdensome daily detailed r*eporting* requirement of every transaction they make:

Sec. 22-365. Report of sale.
Every weapons dealer licensed pursuant to this article *shall make out and deliver* to the Village Chief of Police *every day before the hour of 12:00 noon*, a legible and correct *report of every sale* or gift made under authority of such license *during the preceding 24 hours, which report shall contain the date of such sale or gift, the name of the purchaser or donee with his address and age, his nationality and citizenship, the number, kind, description and price of such weapon, the number of the purchaser's permit and the purpose given by such person for the purchase of such weapon, which report shall be substantially in the following form: Number of permit ... Number of weapon ... Name of purchaser ... Address of purchaser ... Citizen or alien ... If alien, name of country subject of . . . Age of purchaser ... Kind or description of weapon ... For what purpose purchased ... Price. * * *"* (Emphasis Supplied) (See Amend Comp. Ex. "D" p. 7)

Plaintiffs are aware that requiring *keeping records* of the sales of dangerous products and *inspections* have been upheld, as the Seventh Circuit did in *Biswell*, "[w]hen a dealer chooses to engage in [a] pervasively regulated business and to accept a [gun dealership] license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective *inspection*." (Emphasis supplied) 406 U.S. at 316. However, Defendants appear to be unaware that the Illinois Supreme Court long ago held that an ordinance, much less burdensome than the RO, requiring a business' records to merely be the subject *inspection*, but go so far as to affirmatively require that they deliver quarterly reports to a municipality of the kinds and quantities of intoxicating products sold and to whom and names of customers to unreasonable, oppressive, an invasion of the sanctity of private business, and void. *City of Clinton v. Phillips*, 58 Ill. 102 (1875) By stark contrast and presumably as a result of this precedent, Illinois law (720 ILCS 5/24-4) requires no such oppressive and burdensome *reporting*, only that a seller on demand of a peace officer shall produce for *inspection* their sales register and allow such peace officer to inspect it and all stock on hand. For the above reasons, the Fourth and Fifth Amendment Claims are sufficient and should be upheld.

### Plaintiffs Second Claim States a Claim under the Dormant Commerce Clause

The Dormant Commerce Clause ("DCC") is the judicial concept that the Constitution bars the states from legislating on certain matters that affect interstate commerce, even in the absence of Congressional legislation. It is applied to block states from regulating in a way that materially burdens against interstate commerce. See, *Gibbons v. Ogden*, 22 U.S. 1 (1824), and *Cooley v. Board of Wardens*, 53 U.S. 299 (1851) More recent treatments of the concept include *Healy v. The Beer Institute*, 491 U.S. 324 (1989), and *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987)

The DCC involves not federal power to act but the restrictions on state power that are inherent in

the Commerce Clause. There is no actual "DCC" found in the Constitution. Rather, the Supreme Court from the Commerce Clause has inferred the restrictions on state action. The DCC requires that laws that impact interstate commerce be subjected to scrutiny under a two-tiered framework: any statute that facially discriminates against out-of-state commerce will fall subject to the *per se* rule, and all other statutes that have an effect on interstate commerce are analyzed under the balancing test set forth in established in *Pike*. See *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003) The second tier of scrutiny governs non-discriminatory state or local laws which, as here, affect interstate commerce. Such laws are subjected to the aforesaid *Pike* balancing test:

> When the statute regulates even-handedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
>
> * * *
>
> When the statute regulates even-handedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. ... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will … depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. *Pike*, 397 U.S. at 142.

*Pike* balancing thus requires a court to evaluate many different issues relating to the challenged UVA and RO, including the legitimacy of the Defendants (here unarticulated) local public interests, the extent of the burdens imposed on interstate commerce, and the degree to which the they are, if properly adopted legislative acts, tailored to promote the governmental interest while having a minimal effect upon such commerce. However, in the matter at bar, there is no "legitimate local public interest" that would warrant totally preventing any expansion of Plaintiffs' lawful and licensed business and the UVA is no law, but rather the product of Defendants off the record conspiracy.

Numerous Seventh Circuit and Supreme Court decisions consistently state that laws can either be discriminatory or nondiscriminatory, and that *Pike* balancing comes into play when a law is nondiscriminatory. See *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003), rehearing denied, 336 F.3d 545 (7th Cir. 2004) ("In determining which tier to apply, the rule of thumb is that essentially any statute that facially discriminates against out-of-state commerce will fall subject to the per se rule, and all other statutes that have an effect on interstate commerce will be analyzed under the Pike balancing test.")

Plaintiffs have forth a valid DCC claim demonstrating that either the local law "discriminates on its face against interstate commerce," *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005); *or* imposes a "burden . . . on [interstate] commerce [that] is clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) *See, United*

*Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) Plaintiffs have shown both. Again, in the instant case, the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits, since the UVA and RO have none. Upon determination that challenged provision affects interstate commerce, this court "*must* then apply either the virtual per se invalidity or the *Pike* balancing test") (emphasis supplied) *Solid Wastes Management Association v. Meyer*, 63 F.3d 652, 657 (7th Cir. 1995)

When considering the purpose of the challenged statute . . . it is [the court's] duty to determine the practical effect of the law." *Meyer*, 63 F.3d at 658 Plaintiffs assert the effects of the UVA and RO are, in fact, discriminatory; at a minimum, they include the imposition of tangible burdens on interstate commerce. The UVA and RO were targeted to totally ban the sale of lawful products imported by a federally and municipally licensed dealer. (See Am. Comp. Exs. "A", "C" & "D") They have practical effect of suppressing the general demand, trade in and availability of such perfectly lawful products, and greatly lowering their sales. If allowed to persist, this would lead to diminished production and exporting from those states and countries from which Plaintiffs purchase their stock in trade produced in other jurisdictions and sold to them through interstate commerce. "

At this stage in the case, courts are required to accept these allegations as true: the UVA and RO burden interstate commerce by suppressing the interstate trade in a lawful product in the absence of any putative local benefit. Such an economic barrier necessarily burdens interstate commerce. See, e.g., *Proctor & Gamble Co. v. City of Chicago*, 509 F.2d 69, 78 (7th Cir. 1975) ("Though the ordinance may not directly dictate such a result, one effect is that the free flow in commerce of a particular product is disrupted. Such a disruption must be deemed a burden on interstate commerce.")

Barring gun dealers is in essence banning not only the necessary instrumentalities that lie at the heart of the exercise of the core Second Amendment right, but Plaintiffs pursuit of their lawful livelihood, and interstate trade. On its face, the UVA and RO only bar the sale of guns within the Norridge, without regard to their source. In its ultimate effect, the UVA and RO do discriminate between in-state and out-of-state interests by effect. See, e.g., *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S 511, 521-522 (1935) (ban on sale of imported product "will set a barrier to traffic between one state and another as effective as if customs duties . . . had been laid upon the thing transported. . . . [and] are placed by an express prohibition of the Constitution, beyond the power of a state") The burdens of such bans and severe regulations are directly borne by those out-of-state gun manufacturers and distributors who supply lawful products to Plaintiffs who now find the markets for their products to be closed, shut down by a hostile government that gives them, like Plaintiff Kole, a nonresident, no voice in the political process. The UVA and RO have the same effect as a ban on interstate trade between foreign gun manufacturers and distributors and Plaintiffs, a domestic retailer, designed to punish both for their lawful conduct in pursuit

of a lawful calling. Such a prohibitions have undeniable discriminatory effects that the DCC is intended to forbid. At a minimum, such effects should trigger scrutiny under the more lenient *Pike* standard.

Preemption applies, only when there is a federal law on point. When there is no existing federal law, the DCC applies to tell us what states may or may not do. The DCC ultimately means that because Congress has been given power over interstate commerce, states cannot discriminate against interstate commerce *nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity.* Any state law which affects interstate commerce must be: (1) rationally related to a legitimate state concern and (2) the burden on interstate commerce must be outweighed by the benefit to the state's interests. In determining whether the burden is outweighed by the benefits, a court must examine whether the state objective could be achieved by a means less restrictive on interstate commerce. Furthermore, it is important to note that promoting the economic interest of its own citizens at the expense of out-of-state citizens is not a legitimate government objective. Moreover, in *United States v. Lopez,* 514 U.S. 549 (1995), the Supreme Court pointed out that "[o]ne element of our (DDC) jurisprudence has been the principle that the States may not impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses" *Lopez* at 579.

A claim should not be dismissed at the pleading stage where, as here, it alleges under the DCC that a law places an excessive burden on interstate commerce in relation to its local purpose and or singles out Plaintiff for bill of attainder [8] mistreatment not permitted by their ordinances or any other laws.

THE DEFENDANTS' "LOCAL PURPOSE", IF ANY, ARE EITHER ILLEGITIMATE OR *DE MINIMUS*

Constitutional scrutiny under *Pike* also requires courts to determine whether the challenged regulation is based upon a "legitimate local purpose." In cases, such as this, where no legitimate purpose can be found, the Commerce Clause requires that the law be struck down. See, e.g., *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520 (1959) Were a legitimate local purpose to be found, the degree to which the regulation is tailored to serve such genuine interest, along with the importance of the interest itself,

---

[8] A "bill of attainder" is a law, or legal device, used to outlaw people, suspend their civil rights, confiscate their property, put them to death, or otherwise punish them without a trial. The UVA is in the nature of a *bill of attainder* - special legislation - because the Bill of Attainder Clause prohibits the singling out of particular individuals or entities for legislatively mandated punishment. See *United States v. Brown,* 381 U.S. 437 (1965) U.S. Const. Art. I, § 9, paragraph 3 provides: "No Bill of Attainder … will be passed." "The Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function or more simply - trial by legislature." *Brown* at 440. Yet, Defendants outrageously characterize their UVA as special legislation and a bill of attainder by saying it "is limited to Ghost Industries - an Illinois company - and, *at most, would impact street-level customers in the Village.*" (Emphasis supplied) (Defs' Memo p. 16) Again, Defendants show no strong public interest to justify this arbitrary pervasive impact.

would be balanced against the burden on interstate commerce. *Pike*, 397 U.S. at 142. Moreover, under *Ezell*, such severe burdens and prohibitions are proximate to their core of the right and therefore require an *extremely strong* public-interest justification and a close fit between the government's means and its end - neither of which are even raised or established in this case. Thus, any analysis under *Pike* must take into account the UVA and RO's severe limitations and ultimate prohibition as well as the complete absence an *extremely strong* public-interest justification and a close fit between the government's means and its end required by *Ezell*. In the instant case, the Defendants have proffered no strong or permissible public-interest justification. (Defs'. Memo. p. 9)

The text of the UVA and RO reveal a single primary purpose: their "Program" to first severely confine and then totally eliminate the sales, etc. of perfectly lawful, constitutionally necessary products in Norridge. However, Defendants disregard that a municipalities simply do not have a legitimate "local" interest in restraining lawful acts by persons in their own or other states. *Cf. Bie*, 336 F.3d at 547 n.2 ("Obviously, it will likely be harder in most cases for a state to come up with a local justification for a statute with extraterritorial effects.") Illinois courts have long been skeptical of attempts to support exercises of the police power on such vague grounds. See, e.g., *City of Springfield v. Hashman*, 332 Ill. App.3d 748 (4th Dist. 2002) ("Attempted regulation having no clear and present relation to the public safety, or imposed where the threat to public health and safety is remote, may be voided.") As a result, even if such amorphous aims may be considered "legitimate," *Pike* requires that courts consider their weakness when balancing them against an ordinance's burdens. See 397 U.S. at 142 ("[T]he extent of the burden that will be tolerated will … depend on the nature of the local interest involved."). Such a vague, subjective "concern" does not qualify as an "extremely strong" *Ezell* justification that could prevent the local sale of lawful firearms to qualified law abiding citizens entitled to exercise their core rights.

DEFENDANTS MAY REASONABLY REGULATE BUT CANNOT UNDULY RESTRICT OR PROHIBIT
A LAWFUL OCCUPATION OR BUSINESS THE RIGHT TO ENGAGE IN INTERSTATE COMMERCE

As discussed in Cooke, *The Right to Engage in Interstate and Foreign Commerce as an individual or as a Corporation,* Mich. L.R., Vol. 8, No. 6, (1910):

The right to engage in interstate commerce is a fundamental right that existed long before our Constitution was adopted. It was expressly guaranteed to the free inhabitants of each state, by the Article of Confederation, and impliedly guaranteed by Article 4, § 2, Const. U.S., as a privilege inherent in American citizenship. …

See also Prentice, *The Origin of the Right to Engage in Interstate Commerce*, Harv. L. R. Vol. 17, No. 1 (1903) Also *apropos* is the following poignant statement in *Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co.*, 111 U.S. 746, 756-57 (1884):

As in our intercourse with our fellow-men certain principles of morality are assumed to exist, without which society would be impossible, so certain inherent rights lie at the foundation of all action, and upon a recognition of them alone can free institutions be maintained. … Among these

inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, *by which is meant the right to pursue any lawful business or vocation*, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment. *The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them, without let or hinderance* [sic], *except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright. …* (Citation omitted) (Emphasis supplied)

DEFENDANTS' UVA AND RO ARE UNCONSTITUTIONAL SEVERELY CONFLICT
WITH AND AS DESIGNED TO RENDER PLAINTIFF FEDERAL LICENSE IMPOTENT

In *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) (State law invalided because it conflicted with a federal licensing law of steamboat operators protected by the terms of their federal license to engage in trade by rendering the federal law impotent in that state]) Here, likewise, Plaintiffs are protected by federally license to dealer in firearms - so licensed and authorized by ATF - with a concomitant and independent constitutional right to engage in interstate commerce. The Defendants oppressive restrictions and bans have made it possible for local authorities who are unanswerable to the federal government to seriously impede and defeat Plaintiff's interstate importation and sales of lawful firearm to qualified purchasers by constructing an *de facto* trade barrier. Plaintiffs allege lost sales and business opportunities that are real and concrete - not theoretical or potential injuries as mischaracterized by the Defendants. It is well established that the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs. Inc.,* 471 U.S. 707, 712 (1985) (quoting *Gibbons,* 9 Wheat. 1, 211) Preemption will also be implied if state or local law "actually conflicts with federal law." State and Federal law directly conflict, "where it is impossible for a private party to comply with both state and federal requirements *or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress*." (Emphasis supplied) *Hillsborough, supra*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)

Relevant to this case, Congress put in place a comprehensive scheme to regulate the movement of firearms in commerce. *See United States v. Mobley*, 956 F.2d 450, 453 (3rd Cir. 1992) ("By channeling the sales of firearms through federally licensed dealers, the Act sought to 'insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest.'"). Thus, *the Federal firearms laws are "comprehensive legislation to regulate the interstate market in a fungible commodity*." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) Indeed, Congress found that "[o]nly through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business … dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be

made possible." *Id.* at 2114; *see also Scarborough v. United States*, 431 U.S. 563, 572 n.10 (1977)`

If anything, Plaintiffs' activities - selling firearms, accessories, and ammunition affect interstate commerce. See *United States v. Stewart*, the Ninth Circuit held that "[g]uns … are regulated by a detailed and comprehensive statutory regime *designed to protect individual firearm ownership* while supporting 'Federal, State and local law enforcement officials in their fight against crime and violence.' (Emphasis supplied) 451 F.3d 1071, 1076 (9th Cir. 2006) Because Defendants UVA and RO conflict with and intensely interfere with emasculate their FFL, Plaintiffs ask this Court for relief because the Federal firearms laws are a valid exercise of Federal power that, operate to preempt the Defendants severe restrictions and prohibitions to the extent that a conflict exists. *Raich*, 545 U.S. at 29 ("state action cannot circumscribe Congress' plenary commerce power"). See also *Ogden, supra*, and *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 (9th Cir. 2007) (the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law,"); *U.S. v. Rothacher,* 442 F.Supp.2d 999, 1007 (2006) ("the primacy of the Supremacy Clause is such that it authorizes congressional commerce power to override state law").

Even if the regulations are not comprehensive enough and the federal interest is not dominant enough to pre-empt the entire field of firearms sales regulation, Norridge's "Program", UVA and RO must be invalidated because they conflict with the federal scheme and the pubic interest and defeat and render impotent Congresses' intended normal and protected use of Plaintiffs' FFL. Under the above authorities and *Ezell,* Plaintiffs have fairly alleged that the severe burdens imposed by the UVA and RO are legally impermissible. Given Defendants' severe restrictions and anticipatory bans, *Pike* balancing is unnecessary since they made no attempt to specify any valid public interest through less invasive and burdensome methods. Instead, they undermined the federal scheme, public interest and suppressed interstate commerce in lawful products, the availability of which lies at the core of a fundamental right that are not even produced in Illinois. It is clear they have failed to even allude to any "*extremely strong public-interest justification and a close fit between the government's means and its end*" that might outweigh the UCs and termination of their livelihood imposed on them by their Program, UVA and RO.

### PLAINTIFFS' THIRD CLAIM IDENTIFIES VIOLATIONS OF THE FIRST AMENDMENT
### DEFENDANTS' UVA AND RO VIOLATE PLAINTIFFS RIGHT TO COMMERCIAL SPEECH

Defendant acknowledge in citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. Here, the UVA prohibits ordinary signage and display of lawful products - the dissemination of information regarding a legitimate existing occupation. A complete ban of a legal business' advertising that is not misleading impedes the free flow of information and far exceeds the State's legitimate interest and is not narrowly tailored to achieve a legitimate purpose. *State v. Café Erotica, Inc.,* 507 S.E.2d 732

(Sup. Ct. Ga. 1998) Further, the chilling effect of regulation depends as much on the potential penalty as motivation for the speech. A small fine in a political speech case is probably less of a deterrent than a jail sentence - or disbarment (here, loss of livelihood) - in a commercial speech case. See Farber, *Commercial Speech and First Amendment Theory*, 74 NWU L. Rev. 372, 386 n. 20 (1979)

By finally bringing commercial advertisements within the First Amendment, the Supreme Court seemed ultimately impressed by the interests *of listeners*, "the particular consumer's interest in the free flow of commercial information, may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) See, e.g., *United States v. United Foods, Inc.,* 121 S.Ct. 2334, 2346-47 (2001); Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions*, 147 U. Pa. L. Rev. 771, 779 n. 22 (1999) ("As a basis for First Amendment protection … commercial communications are valuable to the listener."); Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 42 n.22 (2000) [9] (Analyzing in detail the *Central Hudson* test and exploring how courts make judgments under the "commercial speech" doctrine. The "[c]ommercial speech doctrine . . . is sharply audience oriented."). "[S]o long as self-interest in providing a supply is as legitimate as the self-interest underlying an informed demand, the law could hardly treat the advertiser's economic stake as 'utterly without redeeming social importance' and isolate the consumer's interest as the exclusive touchstone of commercial speech protection." *Glickman v. Wileman Bros. & Elliot, Inc.*, 521 U.S. 457, 479 (1997) (Souter, J., dissenting) (quoting *Va. Pharmacy,* 425 U.S. at 762. The Court granted this point in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001) ("[S]o long as the sale and use … is lawful for adults, the … industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information.")

At a minimum, applying the four elements of the Supreme Court's "Central Hudson" test show Defendants have, 1.) prohibited "concerns lawful activity", 2.) have not shown any speech to be "misleading", 3.) have not shown any "substantial interest", and 4.) they have not shown that regulation/prohibition directly advances any governmental interest or it is not more extensive than is necessary to serve any such interest. "[A] strict standard of review" should apply "to suppression of commercial information, where the purpose of the restraint is to influence behavior by depriving citizens of information." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 577 (1980) discussed in detail in Post, *supra*. Subsequently, Justice Thomas has written forcefully that the *Central Hudson* test ought not to be applied to situations in which "the asserted interest is one that is to be achieved through keeping would-be recipients of the speech in the dark." 44 *Liquormart v. Rhode Island,* 517 U.S. 484, 523 (1996) Justice Stevens has also argued strongly against the *Central Hudson* test,

---

[9] Available online at: *http://digitalcommons.law.yale.edu/fss_papers/190*

because "[the First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Id.* at 503.

In *44 Liquormart,* the Supreme Court directly addressed a state's attempt to ban the advertising of beer, wine, and liquor prices. It unanimous ruled that "[a] complete ban on truthful non-misleading commercial speech" is unconstitutional. *"The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what government perceives to be their own good…." Id.* The decision struck down a Rhode Island statute and similar regulations in ten other states. *"Even in the absence of First Amendment considerations, an ordinance regulating the right to engage in a lawful occupation or business must bear a rational relationship to a valid governmental purpose."* [Citations omitted.] (Emphasis supplied) Further, standards for excluding persons from engaging in such commercial activities must bear some reasonable relation to their qualifications to engage in those activities. *Perrine v. Municipal Court,* 488 P.2d 648 (Cal. Sup. Ct. 1971) Here, there are no standards.

A "prior restraint" exists when, a law gives "public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975) Plaintiffs adequately allege how the UVA and RO constitute severe unconstitutional prior restraints barring all product displays and exterior signage violate their right to conduct a lawful business and their right to engage in related commercial speech. (See VA, Am. Comp. Ex. "B" p. 1-4, ¶¶ 4-5) Licensing requirements — especially regarding "commercial speech", not as severe and prohibited as the total bans imposed here, are permissible prior restraints as long as public officials apply "reasonably objective, nondiscriminatory criteria unrelated to the content of the expressive speech" – not present in this case. A licensing law or other "prior restraint" such as the UVA becomes unconstitutional when, as here, it exhibits one of the following two characteristics: 1) it places "'unbridled discretion in the hands of a government official' and might result in censorship;" or 2) it "fails to place time limits within which a decision maker must issue the license." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990); *Weinberg, supra,* at 1045.

Both the UVA and the RO constitute unconstitutional prior restraints under the above standards. At the time of the filing of Plaintiffs application, Defendants did not have power or discretion over gun dealer licensing except for the OWDO. Defendants bootstrap their defense on their perpetration - the UVA- what they purposely mischaracterize as "the Operations Agreement" which does not, as they falsely maintain, "[e]xpressly eliminates both elements of an unconstitutional prior restraint - unbridled discretion to limit speech; and unlimited delay of the review process." The UVA had nothing to do with any license "review", since none was provided for by the OWDO at the time. They do not regulate, i.e., "established clear, content-neutral limits (i.e. limiting time, place and manner of signs and displays" but ban them). The Village and plaintiffs agreed to objective standards, which offered no room for Village

discretion or delay. To illustrate Defendants' perverse logic, shockingly, they claim they could use an unauthorized UVA "eliminating future licensing processes [and their ordinances] altogether". (See Defs' Memo, pp. 20-21) At 21. However, the UVA totally bans all product displays and all outdoor signage - "prior restraints." These bans are the result of the UCs Defendants had no lawful authority to impose. They had no right to single Defendants to arbitrarily limit their lawful business activities in the absence of any enacted law they can point to. In any absence of any such lawful authority, anything done beyond the language and terms of its OWDO was unlawful. Whether a home-rule or not, powers may not be exercise willy-nilly or *ad hoc* by lawyers lips after the fact - only though validly adopted ordinances and duly authorized actions prerequisite to any such exercise power - not present here. A bald claim of "wide ranging powers" does not justify arbitrary or *ultra vires* actions or deprivations. They simply had no right to impose such arbitrary prerequisites because the OWDO contained no such requirements or conditions.

Under *Ezell* Defendants can choose to not license, or by proper ordinance, license gun dealerships they cannot totally bar them now, in 2013, or any other time. The RO which ends (as Defendants term it) their so-called "Gun Dealership Licensing [and automatic elimination] Program" unconstitutionally and forever bans such lawful businesses. Defendants tout their plot to deliberately abandon and forever abdicate their obligation to recognize and protect, even reasonably regulate, constitutional rights as if it were some discretionary exercise. Under it and the RO, the Village *admittedly* "eliminates the licensing process" of a lawful occupation for the sale lawful products and brag that this "removes all discretion over lawful gun dealerships" by doing so. (Defs' Memo, p. 20-21; Am. Comp. Ex. "D") Their tellingly culpable "Program" concession in and of itself, to paraphrase Shakespeare's proverbial phrase in *Hamlet*, "hoists them on their own petard". "Where rights secured by the constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda v. Arizona*, 384 U.S. 436, 491 (1966) "The assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice." *Davis v. Wechsler*, 263 U.S. 22, 24 (1923)

<u>PLAINTIFFS IDENTIFY DEPRIVATIONS OF THEIR FIRST AMENDMENT RIGHTS</u>

Plaintiffs need not allege they ever requested approval for any because the UVA is facial unconstitutional and such request would clearly be futile and unnecessary. As discussed, government and bureaucrats cannot extort to coerce waiver of constitutional rights by UCs such as the basic commercial needs for an exterior sign and to display goods. The assertion Plaintiffs "voluntarily chose not to be willing speakers" by capitulating under the circumstance to the UVA is absurd. They had no genuine "choice". Their argument that imposing UC's not contained in their licensing ordinance as a prerequisite to Plaintiffs pursuit of a livelihood or obtaining a business license, i.e., requiring them to surrender of constitutional rights without lawful consideration is not supported by any of the authorities they cite.

In *Virginia State Board of Pharmacy* the Supreme Court invented the contemporary category of

commercial speech recognizing it was necessary to implement two distinct constitutional values:

> So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.... And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decision - making in a democracy, we could not say that the free flow of information does not serve that goal. *Id.* at 765.

The Court reasoned commercial speech ought to be constitutionally protected in order to ensure "the proper allocation of resources in a free enterprise system." and that "the efficient allocation of resources depends upon informed consumer choices,"[10] which in turn requires the free circulation of commercial information, something Defendants have demonstrated contempt. Later cases have reaffirmed this reasoning. *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 481-82 (1995):

> ...[E]conomic efficiency as *the* reason why the First Amendment protects commercial speech: "Though we once took the position that the First Amendment does not protect commercial speech, we repudiated that position in [*Va. Pharmacy*] ..." There we noted that the free flow of commercial information is "indispensable to the proper allocation of resources in a free enterprise system" because it informs the numerous private decisions that drive the system. Indeed, we observed that a "particular consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.* (citations omitted) (quoting *Va. Pharmacy,* 425 U.S. at 763, 765)

Because the commercial speech barred in this case relates and is inextricably intertwined not only to the exercise of a fundamental rights including speech and livelihood, and protection of self, home, family, property, it should especially be accorded high value and vigilant First Amendment protection. Plaintiffs have protectable liberty and property interests in both their Weapons Dealer's license and their FFL. Defendants total bans and severe restrictions arbitrary burdens and unconstitutional interferers wit their property right therein. Once issued, the FFL and WDBL became property right. See *Ogden*, and other authorities discussed *supra*. From their rational, it appears Defendants fail to grasp or, could care less, that citizen's interest in a license is not merely "sufficient to trigger due process protection," it "is profound." *Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002) They fail to appreciate the private interest at stake here," the and the "'severity of depriving someone of the means of his livelihood,'" *Gilbert v. Homar*, 520 U.S. 924, 932 (1997))

The UVA is by no stretch of the imagination a "confidentially clause" but a classic, blatant example of the imposition of Us - illegal *quid pro quo* for a government benefit, a license, then openly available under the OWDO without any such oppressive conditions. Defendants ignore or are blind to

---

[10] *Friedman v. Rogers*, 440 U.S. 1, 9 (1979)

well-established body of law developed to prevent governments and their officials and representatives from manipulating the surrender of constitutional rights as they heave deliberately perpetrated here and now attempt to justify. Their nonsensical arguments that the "Plaintiffs can be deprived of an alleged right that they agree they "will not" exercise, and that Plaintiffs have identified a "deprivation" of rights and resulting injury" and "Plaintiffs' § 1983 claim is not insufficient" (Defs' Memo, p. 22) are simply wrong.

CLAIMS FOUR AND FIVE IDENTIFY ADVERSE, RETALIATORY
ACTIONS, AND THUS STATE GROUNDS ENTITLING PLAINTIFFS TO RELIEF

In their Fourth and Fifth Claims, plaintiffs allege that defendants unlawfully retaliated against them for exercising constitutional rights (both Fourth and Fifth Claim) and engaging in interstate commerce under the Commerce Clause (Fifth Claim). Defendants say to state a § 1983 retaliation claim, Plaintiffs must allege facts sufficient to show: (1) they engaged in activity protected by the Constitution; (2) they suffered a deprivation that would likely deter constitutionally protected activity in the future; and (3) a causal connection between the two. (Defs' Memo p. 23) Plaintiffs do so. First, Plaintiffs allege, activities that they actually *engaged constitutionally protected activities by applying for, obtaining and taking steps to commence operating a business objectionable to Defendants and* spawning their retaliation. Plaintiffs applied for and obtained a WDBL, which it was their right to do. In response Defendants imposed the UVA's UCs and adopted the RO under color of law to phase out and terminated their liberty and property rights without due process. These actions were implemented, not mere "*attempts*". Second, plaintiffs identify an adverse or retaliatory action - deprivation caused by the Village that would likely deter future protected activity, i.e. holding their licenses hostage in order to impose UCs and restrictions and bans not lawfully authorized. Defendants retaliated by doing everything they could to prevent, then put Plaintiffs out of business as weapons dealers. Plaintiffs do not admit that they were not subjected to an extended "review". Under the OWDO there was nothing to "review" – Defendants' conducted no "review but committed subjective, lawless acts. (See Am. Comp. Exhibit "B") Defendants further retaliated by adopting unconstitutional UVA and RO that were designed to expressly and ultimately deprive Plaintiffs duly issued license to conduct their lawful livelihood and unduly restricted their ability pursue their calling so they would be driven out of business by a date certain, without and due process. Further, Plaintiffs demonstrate a causal connection between the two.

It is no defense or excuse that the unconstitutionally imposed licensing conditions, not authorized by the ordinance or other law, were a product of (or "caused" by) Defendants' political and policy concerns about guns and gun dealerships in the community. See *California Coastal Commission, supra.* Plaintiffs allege that Defendants knew of, or were responding in any way to, Plaintiffs' exercise of their constitutional rights in retaliation to their filing of an application that would necessarily have to be issued under the OWDO. It triggered Defendants ire and actions to undo with an obvious malicious retaliatory

motive show by their imposition of the UVA and repeal of the OWDO and implementation of the WDBL abolishing RO. Accordingly, Plaintiffs plead § 1983 retaliation claims that should not be dismissed.

PLAINTIFFS' SIXTH CLAIM IDENTIFIES A § 1985 CONSPIRACY

Recently, in *Taylor v. Pittsburgh Mercy Health System, Inc.,* the district court denied a defendant's motion to dismiss and their motion for a more definite statement, holding, "*Twombly* and *Iqbal* notwithstanding, the notice pleading standard still applies in federal court. All plaintiffs must do is allege sufficient 'factual content [to] allow the Court to draw the reasonable inference that . . . [the] defendant[s are] liable … Count II sufficiently alleged that all Defendants combined and conspired together· to commit the illegal acts alleged in Count I. They alleged an action distinct from Count I. Plaintiffs have pled a plausible claims that should not have been dismissed at such an early stage of the proceedings. 2009 WL 2992606 (W.D. Pa. Sept. 17, 2009) See also *Walker v. Thompson,* 288 F.3d 1005 (7th Cir. 2002), which held that "it is enough in pleading a conspiracy to indicate the parties, general purpose, and approximate date." *Id.,* 1007-8. This is precisely what the complaint contains.

Plaintiffs conspiracy claim should not be dismissed based on what they term the "intra-corporate conspiracy doctrine". See *e.g., Wessel v Village of Monee*, Case No. 1:04-cv-03246 Doc. 75 pp. 13-14 (N.D. Ill. June 14, 2010 - Joan B. Gottschall, J.) As in *Wessel*, Plaintiffs plausibly allege beyond a 'speculative level': (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, them of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) acts in furtherance of the conspiracy; (4) whereby a they were and will continue to be either injured in their property and deprived of any right or privilege of a U.S. citizen. Defendants own documents the OWDO, UVA, RO (Amend. Comp. Exs. "B", "C" and "D"), when viewed in conjunction with Defendants Chester's and Falagario's culpable comments that plausibly reveal why and how Defendants' hatched and executed their unconstitutional scheme under. Plausibly, realizing the reality that they would have to issue and could not deny Plaintiffs application for a WDBL under their two-paragraph OWDO there attention turned to imposing severe UCs by forcing the UVA on them, repeal the pesky OWDO and replacing it with the RO. They thus combined and conspired designed to strangle and quickly and eventually kill off their business and forever drive their kind out of town. Plaintiffs' Sixth Claim should not be dismissed.

PLAINTIFFS SEVENTH CLAIM STATES A *MONELL* CLAIM

Plaintiffs Seventh Claim properly states a separate § 1983 against Defendant Village under *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978 (the "*Monell* claim"). *See Baskin v. City of Desplaines,* 138 F.3d 701, 704-05 (7th Cir. 1998) (municipal liability can stem from unwritten practices that through custom and usage come to have the force of law, i.e. the Defendant's "Program"). Defendants' arguments are irrelevant at this stage because they go to the merits of Plaintiffs' claims and not the sufficiency of the Complaint. See *Wessel, supra*, p. 14. In *U.S. v. Classic*, 313 U.S. 299 (1941),

the Court held that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." Id. at 326. *Monroe v. Pape*, 365 U.S. 167, 184-87 (1961) (police officer considered state actor under § 1983 when he allegedly performed illegal search and seizure), overruled on other grounds). Federal courts proclaim, when requiring *state officials to pay damages for disobedience to federal law (including constitutional doctrine), that state actors must follow the federal rules without waiting for litigation.* Plaintiffs' Seventh Claim should therefore not be dismissed.

### PLAINTIFFS' EIGHT CLAIM STATES A FEDERAL ANTITRUST CLAIM

Plaintiffs Eighth Claim allege that defendants violated the Sherman Antitrust Act (15 U.S.C. §1), in their prohibition (beyond regulation) of their firearms business the UVA and the OR and decision evidence a combination, conspiracy and scheme" restraining trade. (Am. Comp. ¶ 77) In that Claim they seek only the declaratory and injunctive relief to which they are entitled. (See Am. Comp. ¶¶ 77) Plaintiffs' alleges combination or conspiracy in restraint of trade. Defendants' actions do not fall within the state action immunity doctrine because it applies to state, not federal claims. Defendants are not "… immune from damages liability under the Local Government Anti-Trust Act" because that state statute applies only to State statute antitrust actions, not claims brought under the Federal Act that cannot be barred by state law. Defendants overlook the fact that they are sued under Federal, not Illinois law.

*Fisher* is inapplicable. The UVA is not a "law", moreover it and the RO is unconstitutional. Further, this case involves no "ordinary relationship between the government and those who must obey its regulatory command". Defendants' reliance on *Copperweld* is thus misplaced. Further, this case involves no "mere licensing and regulation" but severe restrictions and bans commercial trade that reduce lawful competition for antitrust purposes. It does not follow that "all municipal licensing is anti-competitive and in violation of the Sherman Act." The UVA UCs, not allowed by OWDO, constitute various bans on trade arising as a result of a combination and conspiracy to impose them. Given their admitted motives and intent there is a no "good faith argument" that their radical conduct falls within the any immunity, including what they call "state action immunity to federal anti-trust liability." As Defendants acknowledge, "municipalities only share that immunity if they act pursuant to specific state granted authority" (not present here). Therefore, Defendants' reliance on *Unity* and *Campbell* is not well taken. See Arnold, Richard A., *Implied Right of Action Under the Antitrust Laws,* Wm. & Mary L. Rev. 437 (1979)[11] Though "home rule" Norridge shows no lawful, constitutional good-faith exercise of that power.

Further, in matters of mixed state and local concern, a conflict exists if the ordinance forbids what the state or federal law authorizes. See, e.g., *City of Commerce City v. State,* 40 P.3d 1273, 1279, 1284

---

[11] Available online at: *http://scholarship.law.wm.edu/wmlr/vol21/iss2/4*

(Colo. 2002) *See also City of Portland v. Lodi*, 767 P.2d 108 (Or. 1989) (under home rule, an … ordinance . . . cannot prohibit an act that the statute permits; ordinance on carrying arms void); *Dwyer v. Farrell*, 475 A.2d 257 (Conn. 1984) (firearms ordinance effectively prohibits what the state clearly permitted and was thus void). The Illinois Municipal Code provision intended to confer state action antitrust immunity on municipalities relates to only to state claims. It does not bar a federal antitrust claim. Only Congress can exempt municipalities can only be exempted from federal law. Congress has granted no such exemption. Defendants are correct that "[no] damages, interest on damages, costs, or attorneys' fees may be recovered under the Clayton Act from any local government, or official or employer thereof acting in an official capacity." 15 U.S.C. § 35(a), however, injunctive relief is available thereunder. The individual Defendants here acted *ultra vires* and without immunity. Thus, Plaintiffs' Eighth Claim should stand.

PLAINTIFFS' NINTH CLAIM ALLEGES A VIOLATION OF THE LANHAM ACT

Plaintiffs' Ninth Claim alleges that Defendants violated the Federal Lanham Act, based on a false statement made by Defendant Falagario, on February 9, 2011, that "the one current village weapons dealer licensee [referring to Plaintiffs] has agreed that it will cease doing business in the village no later than April 30, 2013." (Am. Comp. ¶ 67). Plaintiffs did not so "agree". They allege that Trustee Falagario, acted in concert with all other Defendants, and with "the intent to call into question . . . the viability of their [plaintiffs'] business, and availability of their goods, services, and commercial activities in order to inflict pecuniary harm on them, so as to deter and dissuade potential customers from doing business with them and to reduce the marketability of their lawful product." (Am. Comp. ¶ 67) Defendant Falagario's alleged public statement to the press had a relation to Plaintiffs' commercial endeavor and Defendants intent to destroy it. It relates to Plaintiff's products, services and business - not the "effect of an ordinance", and could be considered disparaging. Plaintiffs' Ninth claim should not be dismissed.

THE INDIVIDUAL DEFENDANTS CAN BE LIABLE FOR DAMAGES UNDER THE FEDERAL CLAIMS

Eight of nine of Plaintiffs' federal claims seek money damages from the individual Defendants and the Village (the federal anti-trust claim seeks only statutory injunctive relief). The Trustees and President have no absolute legislative immunity, nor do all the individual defendants have qualified or absolute immunity from the federal claims. The UVA was not a 'legislative act" nor was it ever approve authorized or ratified. It was *ultra vires.* Said Defendants may be members of the Village's legislative body, however, their acts, especially with respect to the UVA, were not "legislative activities". Only votes and debate relating to legislation could qualify as public debate functions. In Illinois, a legislative body's decision can be reviewed for arbitrariness as a matter of substantive due process." See *City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill.2d 1, 14 (2001)

Their knowingly participation in plot to impose UCs not authorized by the OWDO or other law in

order to deliberately drive these licensees out of business on an arbitrarily set date deprives due process. Defendants can claim "immunity" under federal law so that they can continue their "Program" *carte blanche*. They violated Plaintiffs' fundamental constitutional rights. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. "[T]he Due Process Clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression." *County of Sacramento v Lewis,* 523 U.S. 833, 840 (1988): "To prevail on a substantive due process claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest." *County Concrete*, 319 F.3d at 575 (quoting *Taylor Inv., 983 F.2d at 1292*) Moreover, the Fourteenth Amendment prohibits a municipality from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Plaintiffs allege Defendants abused their office to deprive them of the lawful use, i.e., the, keeping, sale and transfer of their property as well as their right to pursue a lawful calling, etc. So, they can seek relief under the substantive due process guarantee of the Fourteenth Amendment. See *Schaefer v. Goch,* 153 F.3d 793, 797 (7th Cir. 1998) Defendants' abuses of office, constitute outrageous *ultra vires* conduct effecting in violation of or contrary to formally enacted state procedures. *See Easter House v. Felder*, 910 F.2d 1387, 1410-13 (7th Cir. 1990) *See also Summers v. State of Utah*, 927 F.2d 1165, 1170 (10th Cir. 1991) (due process claim may exist *against individual officer who had effected deprivation in manner inconsistent with law*). Such acts do not qualify as "legislative" and are not subject to absolute immunity under the "functional test" discussed in *Bogan or Reed.*

There was no "…passage of the Operations Agreement" [UVA]. It was never formally "approved by the Village Board, and the [RO]," as Defendants misrepresent. (Defs' Memo p. 30) There is no record of any such approval and no mention of UVAs or "Operations Agreements" in the OWDO, the RO (Am. Comp. Exs. "B" & "D") or anywhere else. Most illuminating, no Village or other public record of it ever being authorized, approved or ratified exists or can be found, assumably because Defendants wanted to keep it and their *ultra vires*, suppressive misconduct "hush-hush" – off the record. Perhaps, they did not want the public to know what they were doing - extorting Plaintiffs to accept unconstitutionally conditions in order to obtain a business license that were nowhere present in or authorized by any law was not, by any stretch of the imagination, "endemic to any regulatory process". This statement is nonsensical. Plaintiffs do not "admit that their business license is exempt from the [RO]." The UVA RO put them out of business *next year*, in 2013. (See Am. Comp. Ex. "D" p. 5 ¶ F)

The UVA and the RO are not "classic legislative acts" but classic unconstitutional denials of due process. In deed, the UVA is not a "legislative act" since it was never authorized by ordinance, resolution, not was it ever authorized or ratified. The Complaint speaks not simply speak of 'Defendants' interest in licensing and regulating a weapons selling business, directed only to Plaintiffs because they were the only

weapons dealers to be addressed in this instance." The UVA was not "wide ranging", contrary to what Defendants argue, were limited to circumstances affecting only these particular Plaintiffs. The interests at issue did not involve the mere effective regulation but the banning of a lawful gun sales business within the Village. The UVA imposes UCs and the RO does more than merely reasonably regulate, it puts Plaintiff out of business without due process. The City of Chicago made and recently lost a similar argument in *Ezell*. The Complaint shows Plaintiffs suffered Defendants' wrath and sabotage merely because they applied for a WDBL and wanted to lawfully do business as an FFL not as the result of *bona fide* "clearly legislative" actions. So, Defendants do not have "absolute legislative immunity" that would automatically bar Plaintiffs § 1983 and other claims against them nor prevent the UVA and RO being declared unconstitutional and holding all Defendants responsible for damages and attorneys fees. See *Peterson v. Utah Dept' of Corrections*, 301 F.3d 1182, 1192 (10th Cir. 2002)

<u>ALL INDIVIDUAL DEFENDANTS DO NOT HAVE "IMMUNITY"</u>

Governmental bodies do not even get the benefit of the qualified immunity sometimes available to their minions. *Owen v. City of Independence*, 445 U.S. 622 (1980) As stated above, Governments *and their officials who deprive Fourteenth Amendment due process* do not have "qualified immunity". See *Peterson, supra,* 301 F.3d at 1192. Plaintiffs have pled allegations sufficient to pass this threshold that should not be dismissed on account of "immunity". The party asserting immunity bears the burden of establishing that his actions are protected. *Antoine v. Byers* & Anderson, *Inc.,* 508 U.S. 429, 432 (1993) Plaintiffs do not need to present evidence at this time, they need only make a short, plain statement sufficient to notify the defendants as to the nature of the accusation. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002) This court cannot find Defendants were shielded by absolute immunity, or even qualified immunity, until it is clear what their acts were. See *Alvarado v. Litscher,* 267 F.3d 648, 651-52 (7th Cir. 2001) ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate. * * * Governments *and their officials who deprive Fourteenth Amendment due process* do not have "qualified immunity". *Peterson,* 301 F.3d at 1192.

Procedural due process ensures that a person will not be deprived of life, liberty or property unless fair procedures are used in making that decision, while substantive due process guarantees that a person will no be deprived of those rights for an arbitrary reason regardless of how fair the procedures used in making that decision. *Thomas v. Cohen*, 204 583, 578 (6th Cir, 2002) To plead a due process violation under § 1983 Plaintiffs only need demonstrate: 1.) they had a constitutional property interest, 2.) they suffered a loss of that interest accounting to a derivation, and, 3.) the deprivation occurred without due process of law. *Waeshle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009); *Allen v. Martin*, 460 F.3d 939, 946 (6th Cir. 2006) Plaintiffs have plausibly satisfied these elements, showing they have protected liberty and property interests and that Defendants cannot, on an arbitrary or unfair basis, prohibit them

43

from engaging in their business.[12] See *Margoles v. Tormey,* 643 F.2d 1292 (7th Cir. 1981) Because, Defendants, under the color of law, have interfered with those rights they have established a claim under § 1983. An occupational license is in the nature of a property right and thus any deprivation thereof is subject to the protection of due process. See *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)

The U.S. Supreme Court has set forth a narrow exception to this shield of immunity usually afforded to individuals acting in their official capacities (id.). This exception states that "[i]f the act which the state [officer] seeks to enforce be a violation of the U.S. Constitution, the officer, in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States" (id. at 187 quoting *Ex parte Young*, 209 U.S. 123, 159–160 [1908]. However, notwithstanding this exception that public officials can, under circumstances be susceptible to legal action. (*Giaquinto v. Commissioner of New York State Department of Health*, 11 N.Y.2d 179, 188 (2008) Specifically, "[s]tate officials acting in their official capacities may only be sued for injunctive or prospective relief" where the nature thereof "seeks to end an ongoing or future violation of the law" (id.). Here, Defendants, deliberately put in place a dooms-day device that extinguishes Plaintiffs license without due process in the absence of a meaningful deprivation hearing and adequate notice, have both caused and continue to perpetuate a continuing deprivation of the Plaintiffs' liberty, property and due process rights. (Id; *Giaquinto, supra*, *Thomasel v. Perales*, 78 N.Y.2d 561 (1991))

Plaintiff's complaint involves non-official *ultra vires* acts and malicious motives to the extent it alleges that the Defendants entered a prior agreement with their attorney, to put Plaintiffs out of business. See also *Mary and Crystal v. Ramsden*, 635 F.2d 590 (7th Cir. 1980) (refusing to extend immunity to member of a juvenile detention camp disciplinary committee); *Meyer v. Niles Township*, 477 F.Supp. 357 (N.D. Ill. 1979) (refusing to extend immunity to members of county public aid committee.) Also *Aboufariss* v. *City of DeKalb, 713* N.E.2d 804 (Ill. App. Ct. 1999), does not support dismissal. "To be protected, a public official's actions must fall within the scope of an official's authority and should not be the result of malicious motives." *Id.* at 812. Immunity should not be extended to the individual Defendants and counsel in this case because the complaint alleges malicious *ultra vires* misconduct. Willful and wanton conduct is defined as behavior that "shows an actual or deliberate intention to cause

---

[12] Federal law prohibits any person from engaging in the business of dealing in firearms without a federal firearms license. 18 U.S.C. § 922(a)(1)(A). As applied to a firearms dealer, the term "engaged in the business" is defined as: [A] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms….

harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others *or their property*." *Smith v. City of Chicago, 242* F.3d 737, 744 (7th Cir. 2001)

Plaintiffs shows malicious misconduct under color of law in light of the Complaint's other allegations incorporated by reference as permitted by Fed. R. Civ. P. Rule10(c). If the Defendants' view were accepted, Rule 10(c) would be rendered meaningless and the Plaintiffs would be forced to restate rather than incorporate many prior paragraphs in each succeeding count. Incorporation of prior paragraphs is therefore a long accepted and permissible pleading method. See *Wessel, supra* at p. 15. Willful and wanton conduct is defined as behavior that "shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others *or their property*." *Smith v. City of Chicago, 242* F.3d 737, 744 (7th Cir. 2001)

Where, as here, the motion to dismiss involves "a civil rights complaint, [federal courts] must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Diaz-Ramos v. Hyundai Motor Co.*, 501 F. 3d 12 (1st Cir. 2007) ("The allegations of the complaint … show that a clearly established constitutional right had been violated, and that a reasonable official would have understood that the challenged conduct may have violated that right. We affirm the district court's conclusion that the qualified immunity defense was not established at this early stage of the litigation.")

Liability under § 1983 can be established by showing that the defendants either personally participated in a deprivation of a plaintiff's rights, or caused such a deprivation to occur. *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981) Also, private persons (including lawyers) who, as Defendants maintain, are authorized to exercise municipal authority are deemed to be acting "under color of state law." *West v. Atkins*, 487 U.S. 42, 54-55 (1988) An attorney who, like Defendant Chester conspires with government officials to deprive a person of their constitutional rights may be found to act under color of state law); *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985) See also *Hughes v. County*, 948 F.2d 918, 923 (5th Cir. 1991) (even prosecutors are not immune for advice given to county commissioners where prosecutor not pursuing a criminal case). Conduct that constitutes state action under the Fourteenth Amendment necessarily satisfies § 1983's under color of state law requirement. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982) Therefore, this Court need only need only examine whether the conduct was state action within the meaning of the Fourteenth Amendment, as it did in *Wade v. Byles*, 83 F .3d 902 (7th Cir. 1996) Plaintiffs' allege Defendant Chester did more than merely provide "legal counsel" to the Village and its officials. He joined in a plot to and did impose UCs to prevent what

should have been a prompt and routine licensure. He made threats and used holding the license hostage extorted to obtain the UVA with out legal authority. Plaintiffs allege that Chester specifically told plaintiff Kole that the delay in licensing and imposition of said conditions by the UVA was because "they [the Board and President] wanted to protect their political careers - - God forbid something should happen . . . " (Am. Comp. ¶ 9) That allegation shows his and their personal involvement in illegally conditioning the license on the UCs imposed by their UVA. Defendants' individual "political interests" are not the necessary "public-interest" the Seventh Circuit had in mind when deciding *Ezell.*

Under these unique and troubling circumstances, Village President Oppedisano is not "equally protected by legislative immunity" by Chester in any challenged action sufficient to confer § 1983 liability. First, Chester's statements are admissible and not hearsay nor was they in any way made in "compromise negotiations" but rather in furtherance of imposing the UCs. A court does not weigh evidence in a motion to dismiss. *Aquila Records, Inc. v. Federico,* Case No. 07 C 3993, Slip Op. (N.D. Ill. Oct. 10, 2007) (Rule 12(b)(6) motion denied - not the appropriate vehicle for evaluating the strength of the evidence.) They were also culpable admissions against interest made in the course of his disclosed agency to Kole on behalf of himself and his co-defendants in order him to extort him to sign the UVA for their benefit, not to release of any claim. His comment is admissible because it was made in furtherance of a conspiracy to commit extortive, unconstitutional acts. The President's and Clerk's signing of an UVA makes them liable. Chief Jobe violated City of Clinton by he enforcing the daily reporting edict. They all acted in contravention of their duty to follow the law to only issue WDBLs under the terms of OWDO and, more importantly, to refrain from imposing UCs and deliberately putting Plaintiffs out of business without due process. No Defendant is entitled to any immunity at this early stage.

<u>THERE IS A BASIS FOR PLAINTIFFS' FIRST PENDENT CLAIM</u>

Plaintiffs' seek a declaratory judgment under the Illinois Declaratory Act (735 ILCS 5/2-701). Pendant jurisdiction allows its assertion as any state statutory claim. The fact that declaratory judgment may be sought pursuant to 28 U.S.C. § 2201 does not bar such a pendant state claim. Defendants cite no authority that § 2-701 cannot be utilized to determine the parties rights under state law. This Court clearly has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a), which provides in part, "the district courts shall have supplemental jurisdiction over *all other claims* that are so related to claims in the...."(Emphasis supplied) A basis for a declaratory judgment exists under state law.

<u>PLAINTIFFS' SECOND PENDENT CLAIM STATES A CLAIM FOR RESCISSION OF DEFENDANTS' *UVA*</u>

Plaintiffs' Second Pendent Claim rescission of the UVA. As argued above, Plaintiffs' claim for recission is perfectly plausible because he pleads that there was a lack, failure or frustration of lawful consideration and he was illegally manipulated into signing it so that Defendants could impose UCs on them. See *Coregis Horan, Ahern* and *Menominee, supra.* As above, Plaintiffs plead a basis for rescission

because the *UVA* was both illegal and unlawfully imposed without any lawful consideration or authority contrary to then controlling OWDO. Municipalities must follow their own ordinances. See *French* and *Bier, supra*. Plaintiffs' Complaint makes plausible allegations of illegality and a failure of consideration. Because there it was unlawful, *ultra vires* and illegally imposed UCs Defendants had had no right to require it to be imposed in the first place. It was and remains void *ab initio*. Accordingly, a claim is stated that the UVA can and should be rescinded.

### Plaintiff's Third Pendent Claim Should Not Be Dismissed

The state law tort of intentional interference with prospective economic advantage (IIPEA). can be established here because Plaintiffs plausibly plead, 1) the existence of a valid business relationship or expectancy; 2) knowledge of it by the alleged interferor; 3) intentional interference causing loss of the expectancy; and 4) damages. Defendants' actions here were not directed, as Defendants would have this Court believe, "only to Plaintiffs in negotiating and eventually coming to an agreement on the terms and conditions regarding plaintiffs' license." Defendants knew their intentional interference would cut off prospective business and customers as well as interstate trade. It was obviously calculated with intent and purpose to do so. They are fairly informed that their acts were directed toward causing a loss of business expectancy with their prospective customers that, in turn, caused an economic disadvantage to Plaintiffs. Defendant Chester did not "lack [] any capacity to commit IIPEA in this context" because he personally spearheaded its implementation on behalf of the other Defendants. Given the deliberate nature of their *ultra vires* and illegal actions, no Defendant is immune.

Defendants had a duty to follow their own OWDO, but instead choose to violate it. Their argument flies in the face of their own law and public policy. So, §§ 2-202, 2-203, 2-205 and 2-109 are inapplicable to this case. See *McGovern v. Pacetti,* No. 01 C 3722, 2002 WL 122314, at *2 (N.D. Ill. Jan. 29, 2002) (Pallmeyer, J.) (denying defendant police officer's motion to dismiss state law assault and battery claims on the ground that more facts were necessary in order to determine the applicability of 745 ILCS 10/2-202) Defendants' acts were not only willful and wanton but were not done pursuant to any valid law or enactment and caused the unconstitutional deprivation of Plaintiffs licenses, not the mere "issuance or denial of a license or approval."

### Plaintiffs' Fourth Pendent Claim Should Not Be Dismissed

Plaintiffs' Fourth Pendent Claim, challenges the RO under Article 4, Section 13 of the Illinois Constitution. Defendants are correct that that section applies only to the General Assembly, not to local governments. However, it and the UVA and its unconstitutional provisions violate Plaintiff's Illinois right to free speech under Ill. Const. 1970, art. I, § 4 and the Illinois due process clause (Ill. Const. 1970, art. I, § 2), and the Illinois equal protection clause (Ill. Const. 1970, art. I, § 2) A litigant who invokes the wrong legal theory but pleads the right facts survives a motion to dismiss brought pursuant to Rule 12(b)(6).

*Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1135 (7th Cir. 1992) Accordingly, Plaintiff should be allowed to amend to state an actionable per *Mellon v. Coffelt*, 313 Ill. App. 3d 619 (2nd Dist. 2000)

### PLAINTIFFS' FIFTH PENDENT CLAIM SHOULD NOT BE DISMISSED

The Fifth Pendent Claim arises under Ill. Const. 1970, art. I, § 2 &4 of the Illinois Constitution. Defendants are mistaken. Illinois allows citizens to challenge the constitutionality of governmental actions under Ill. Const. 1970, art. I, § 2 and Ill. Const. 1970, art. I, § 2. See *Mellon, supra*. Further, *City of Canton*, *supra*, and Ill. Const. 1970, art. I, § 6 bar the kind of oppressive and unreasonable reporting requirements in that it provides in pertinent part: "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications…." Statutory immunity does not apply to Plaintiffs' claims.

### PLAINTIFFS' SIXTH PENDENT CLAIM SHOULD NOT BE DISMISSED

For all of the reasons stated with respect to Plaintiffs' above-referenced federal conspiracy claim, Defendants are once again, are not protected from such liability under the Tort Immunity Act, Plaintiffs' Sixth Pendent Claim for common law conspiracy under state law should be upheld.

### PLAINTIFFS' SEVENTH AND EIGHTH PENDENT CLAIMS SHOULD NOT BE DISMISSED

As discussed in response to the attack on their Federal Landham Act count, Plaintiffs' commercial venture is identified. Their second Eighth Pendent Claim states a claim for false light under the Illinois common law because, the false statement in the RO coupled with Trustees misleading statement to the press deliberately portrayed Plaintiffs and their business false light in the public eye so as to deter prospective customers and damage their business by falsely conveying the impression that they had has greed to go out of business. Plaintiffs' commercial disparagement under the Illinois Uniform Deceptive Trade Practices Act and false light claims are, once again, not subject to all of the Tort Immunity Act protections for the reasons above stated. As a result, they should stand.

### CONCLUSION

Plaintiffs respectfully pray that this Court enter an order denying Defendants' Motion to Dismiss and for such other further relief as may be fair, just and proper in the premises.

Respectfully submitted,

TONY KOLE and GHOST INDUSTRIES, LLC, Plaintiffs,

By  */s/ Walter P. Maksym, Jr.*  
Walter P. Maksym, Jr., their attorney

Walter P. Maksym, Jr.
Attorney at Law
2056 N. Lincoln Avenue
Chicago, IL 60614-4525
Telephone: (312) 218-4475
e-mail: wmaksym@gmail.com