# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Tony Kole, et al., | ) | |
| | ) | No. 11 C 3871 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| Village of Norridge, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Tony Kole and Ghost Industries, LLC sued the Village of Norridge (the "Village") and various Village officials for allegedly impeding Plaintiffs' attempts to open and operate a gun store in the Village. Presently before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint. R. 13. On March 22 and 28, 2012, the Court (Judge Norgle) issued orders (i) dismissing all claims against Village Police Chief James Jobe and Village Clerk Judith Bernardi and all individual-capacity claims against Village Attorney Mark Chester, R. 55, and (ii) dismissing all individual-capacity claims against the remaining Village officials. R. 54. This Order now addresses Plaintiffs' claims against the Village itself and the remaining official-capacity claims against the individual defendants. For the reasons explained below, Defendants' motion to dismiss is granted in part and denied in part.[1]

---

[1] At the outset, the Court notes that Defendants obtained leave to file a 43-page brief in support of their motion to dismiss. Plaintiffs ostensibly wanted equal time and asked for leave to file a response of "a concomitant number of pages" "not to

**Legal Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.,*
*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th
Cir. 2009). A complaint must include "a short and plain statement of the claim
showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under notice
pleading standards, a plaintiff's "factual allegations must be enough to raise a right
to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555
(2007). Put differently, a "complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*
*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "In evaluating
the sufficiency of the complaint, [courts] view it in the light most favorable to the
plaintiff, taking as true all well-pleaded factual allegations and making all possible
inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*,
649 F.3d 610, 614 (7th Cir. 2011). Courts also "consider documents attached to the
complaint as part of the complaint itself." *Reger Dev., LLC v. Nat'l City Bank*, 592
F.3d 759, 764 (7th Cir. 2010). The following background is a summary of Plaintiffs'
allegations, viewed in the light most favorable to Plaintiffs.

---

exceed the length this Court previously permitted Defendants leave to file." R. 18.
But in clear violation of the Court's order granting leave, R. 22, and Local Rule
5.2(c), Plaintiffs filed a 48-page response using 10.5 font and narrow spacing. R. 36.
As a result, Plaintiffs' brief is actually more than *twice* as long as Defendants'
(approximately 25,900 words vs. 12,600 words). To make matters worse, Plaintiffs'
response is not organized around the elements that they would have to establish for
each claim and is rife with grammatical and spelling errors. Nonetheless, the Court
has considered Plaintiffs' entire response. In the future, however, the Court will
promptly strike briefs that do not comply with page limits and local rules.

## Background

On November 16, 2010, Plaintiffs applied to the Village for a weapons dealer business license. They wanted to open a gun store in the Village at 7601 West Montrose Avenue, Suite 2. At the time, a Village ordinance (the "Ordinance") provided that it was unlawful to sell firearms without a license from the Village. *See* Village of Norridge Code of Ordinances § 22-361 (1972). Plaintiffs executed a lease for the premises while they were waiting for the Village to issue the weapons dealer business license and for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to issue their Federal Firearms License.

The ATF arranged an inspection of the premises as part of the Federal Firearms License application process.[2] But the ATF cancelled the inspection after the Village refused to give an approval to proceed and told the ATF that Plaintiffs would not be allowed to transfer firearms on the premises.

Shortly thereafter, the Village informed Plaintiffs that it was reluctant to issue them a license because "God forbid something should ever happen." Although the Ordinance generally allowed licensed gun stores, there were no gun stores in the Village. The Village originally enacted the Ordinance to accommodate K-Mart, but by 2010, K-Mart had voluntarily stopped selling firearms.

On November 30, 2010, Plaintiffs—under economic duress, they allege— ultimately entered into an agreement with the Village (the "Agreement"). The

---

[2] In the Amended Complaint (R. 11 at ¶ 17), Plaintiffs allege that the inspection was scheduled for November 2, 2010, but this date appears to be an error. Plaintiffs appear to suggest that the inspection was scheduled *after* they submitted their license application to the Village on November 16, 2010. *Id.* at ¶¶ 16-17.

Agreement provides that the Village would issue Plaintiffs a weapons dealer business license, but subject to strict terms and conditions. Taken together, the terms and conditions require Plaintiffs to sell guns over the Internet and by mail, instead of through in-person retail sales. Those terms and conditions include:

- Plaintiffs may not deliver firearms or ammunition to any recipient at the premises;

- All deliveries from the premises must be sent in unmarked packaging for used firearms and in the original packaging for new firearms;

- Plaintiffs cannot store firearms or ammunition on the premises overnight or for more than 12 hours a day, and any inventory must be disabled by a locking device or secured in a locked cabinet;

- Plaintiffs cannot maintain a sales or retail display of firearms or ammunition on the premises;

- Plaintiffs cannot post exterior signage advertising their location to the public or indicating that they sell firearms and must comply with limits on interior signage;

- Plaintiffs' officers and employees must submit to fingerprinting and annual criminal background checks, at the Village's expense;

- Plaintiffs must install and maintain a video surveillance system;

- Plaintiffs must abide by monthly limits on the quantity of firearms and ammunition received at the premises and a limit on the quantity of firearms and ammunition that may be on the premises at any one time; and

- Plaintiffs must allow one random and two scheduled inspections of the premises per month.

In addition to the terms and conditions in the Agreement, the Ordinance itself also requires Plaintiffs to provide daily reports of their firearm sales to the Village Police Chief. *See* Village of Norridge Code of Ordinances § 22-362 (1972).

Under the Agreement, Plaintiffs' license was for an initial one-year term, subject to renewal for two additional one-year terms as long as Plaintiffs complied with the terms of the Agreement. The Agreement also exempts Plaintiffs from any changes made to the Ordinance during that three-year time period, including if the Village later repealed the Ordinance and banned gun stores outright.

With the Agreement in place, Plaintiffs moved forward. The ATF conducted its inspection and issued Plaintiffs a Federal Firearms License on January 18, 2011. Plaintiffs then began to operate their business out of the premises.

Shortly thereafter, on February 9, 2011, the Village amended its ordinance (the "Revised Ordinance") as the parties apparently anticipated. The Revised Ordinance limits the number of weapons dealer business licenses to one (*e.g.*, the license issued to Plaintiffs) through April 30, 2013. As of April 30, 2013, the Revised Ordinance terminates that type of license altogether and bans gun stores from the Village. As a result, once the Agreement and its three-year exemption from the Revised Ordinance expires on November 30, 2013, Plaintiffs may be forced to close up shop, or at least relocate their business outside the Village.

On February 14, 2011, Village Trustee Dominic Falagario told the Norridge Harwood Heights News—falsely, according to Plaintiffs—that "the one current

Village weapons dealer licensee has agreed that it will cease doing business in the village no later than April 30, 2013."

On June 7, 2011, Plaintiffs filed this lawsuit against the Village, Village President Ronald Oppedisano, Village Trustees Ursula Kucharski, Dennis Stefanowicz, Dominic Sulimoski, Dominic Falagario, Jacqueline Gregorio, and Robert Martwick, Village Police Chief James Jobe, Village Clerk Judith Bernardi, and Village Attorney Mark Chester. The 73-page Amended Complaint is divided into 18 counts with 9 federal and 9 pendant state law claims (as discussed below, because many of the counts combine multiple theories into a single count, Plaintiffs actually assert well over 18 legal theories). In short, Plaintiffs allege injuries related to (1) the review process while the Village was considering their license application, (2) the terms and conditions imposed by the Agreement, and (3) the Revised Ordinance's upcoming ban on gun stores. Plaintiffs seek various remedies, including compensatory damages and injunctive and declaratory relief.

## Analysis

### Count I: 42 U.S.C. § 1983 – U.S. Const. Amends. I, II, IV, V & XIV

Count I contains a hodgepodge of constitutional claims pursuant to 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In Count I, Plaintiffs allege violations of the First, Second, Fourth, and Fifth Amendments (incorporated

against local governments under the Fourteenth Amendment). Plaintiffs' Second Amendment claim broadly attacks the Agreement's terms and conditions and the Revised Ordinance's upcoming ban on gun stores. Plaintiffs' other claims are less clear and are often only explained, if at all, in Plaintiffs' response to Defendants' motion to dismiss. Plaintiffs' First Amendment claim is based on the Agreement's restrictions on retail displays and exterior signage and also alleges that the Agreement and Revised Ordinance are unlawful prior restraints. Plaintiffs' Fourth Amendment claim is based on the Agreement's provision allowing the Village to conduct monthly inspections of the premises and the Ordinance's requirement that Plaintiffs report gun sales to the Village Police Chief. Plaintiffs' Fifth Amendment claim appears to raise due process and potentially takings issues related to the review process for Plaintiffs' license application and the Village's decision not to renew their license after the Agreement expires in November 2013.

As noted above, Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(d)(1) similarly requires that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). And Rule 10(b) requires that "each claim founded on a separate transaction or occurrence . . . must be stated in a separate count" if "doing so would promote clarity." Fed. R. Civ. P. 10(b).

As the court explained Rule 10(b) in *Second Amendment Arms v. City of Chicago*, 2012 WL 4464900, at *9 (N.D. Ill. Sept. 25, 2012):[3]

> Requiring separate counts serves two purposes: (1) it gives fair notice to the defendants of the claims against them; and (2) it enables the court to grant relief on an entire count, not just part of a count. *See Livingston v. Vill. of Dolton*, 2003 WL 1463635, at *6 (N.D. Ill. Mar. 20, 2003). As another court in this district has recently explained, "The [lode]star of Rule 10 is intelligibility, good organization, and basic coherence." *Awalt v. Marketti*, 2012 WL 1161500, at *10 (N.D. Ill. Apr. 9, 2012).

Moreover, although "[o]ne set of facts producing one injury" generally "creates one claim to relief, no matter how many laws the deeds violate," multiple legal theories, if they are "sufficiently distinct that they call for proof of substantially different facts[,] may be separate 'claims.'" *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992); *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[A] court may require that allegations be grouped into logical counts for claims that are 'founded on' separate transactions or occurrences.").

Count I fails to comply with Rules 8(a)(2), 8(d)(1), and 10(b). It fails to provide Defendants with even basic notice of the grounds for each constitutional claim, particularly because it lumps together four or five different constitutional amendments with little explanation of how Defendants allegedly violated each amendment. *See, e.g., Stanard v. Nygren*, 658 F.3d 792, 800 (7th Cir. 2011) (criticizing a similar § 1983 count that alleged "in a wholly conclusory fashion that

---

[3] *Second Amendment Arms* involves a similar lawsuit filed by Tony Kole and others challenging the City of Chicago's "Responsible Gun Owners' Ordinance." Because many of the counts asserted in the two lawsuits are the same, the Court returns to the ruling in *Second Amendment Arms* several times in this Order.

the defendants had violated [the plaintiff's] First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights" without specifying the basis for the alleged violation of each amendment). Plaintiffs' response to Defendants' motion to dismiss does not help matters, as it too blends its discussion of these constitutional issues over the course of 22 pages addressing Count I. R. 36 at 5-27. Although all of the theories may be based on the same general events—the Agreement, Revised Ordinance, and surrounding circumstances—each constitutional claim naturally has a different focus and will involve, at least in part, proof of different facts.

Defendants' motion to dismiss Count I is therefore granted, with leave for Plaintiffs to amend their complaint to comply with Rules 8(a)(2), 8(d)(1), and 10(b). In particular, Plaintiffs should separate their various constitutional claims into individual counts—one count for each constitutional amendment at issue setting forth a short and plain statement of how Defendants violated the amendment should suffice. In splitting up Count I, Plaintiffs should also take care to avoid duplicative pleading. For example, although Count I makes some general references to the First Amendment, Plaintiffs already assert more specific First Amendment claims in Count III. If Count I adds nothing new on those First Amendment issues, Plaintiffs should leave the First Amendment issues to Count III.

Normally, the Court would stop there on Count I. However, Defendants' motion to dismiss has been pending for some time, and the parties have extensively briefed at least some of these constitutional issues. Based on the current briefing, the Court can and will address Plaintiffs' Second and Fourth Amendment claims—

at least for purposes of a motion to dismiss—in order to avoid requiring the parties to brief these issues again after Plaintiffs amend their complaint.[4]

### Second Amendment

In their motion to dismiss, Defendants argue that Plaintiffs fail to state a plausible claim for relief under the Second Amendment because there is no constitutional right to *sell* firearms. Defendants further argue that under the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010), "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." Defendants therefore reason that "[w]hat little justification is required to support any of the Village's regulatory efforts here is clearly met on the face of the Complaint." R. 40 at 9.

Plaintiffs may or may not prevail on their Second Amendment claim, but the Court cannot resolve the merits of the claim on a motion to dismiss. As Judge Hamilton recently observed in dissenting from the denial of rehearing *en banc* in *Moore v. Madigan*, 708 F.3d 901, 904-05 (7th Cir. 2013), "where courts will need to weigh both Second Amendment rights and state interests justifying some

---

[4] The contours of Plaintiffs' Fifth Amendment claim are not entirely clear. The Amended Complaint is vague on this issue, Defendants did not address it in detail in their motion to dismiss, and Plaintiffs intersperse a variety of due process references throughout their lengthy response. As a result, the Court cannot effectively resolve those issues at this time. Perhaps a properly pled Second Amended Complaint will contain a focused Fifth Amendment claim so that productive briefing can take place on its validity. As noted, no such claim presently exists. The Court will address the First Amendment issues in its discussion of Count III below.

restrictions on those rights, actual evidence on the burdens, consequences, and governmental interests will be vital for sound judgment"; "a trial court can do a great service by ensuring the development of a thorough and complete record that provides a reliable, accurate factual foundation for constitutional adjudication." This deliberate approach is fully warranted here—the Second Amendment issues in this case are not as simple as Defendants suggest.

In *Heller*, 554 U.S. at 635, the Supreme Court struck down the District of Columbia's ban on the possession of handguns. *Heller*'s "central holding" is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 130 S. Ct. at 3044. The Supreme Court also confirmed that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Thus, the Supreme Court explained that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. In a footnote, the Supreme Court described these measures as "presumptively lawful," *id.* at 627 n. 26, and "repeat[ed] those assurances" in *McDonald*, 130 S. Ct. at 3047.

Although the Supreme Court explained that laws regulating the commercial sale of firearms are "presumptively lawful," it did not purport to exempt those laws from constitutional scrutiny. To the contrary, the Supreme Court made clear that

the standard of review must be more exacting than rational basis review: "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller,* 554 U.S. at 629 n. 27. *See also Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) (explaining that *Heller* "specifically excluded rational-basis review"); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) ("We do not mean that a categorical limit on the possession of firearms can be justified under the rational-basis test, which deems a law valid if any justification for it may be imagined. If a rational basis were enough, the Second Amendment would not do anything.") (citations omitted).

The Seventh Circuit's analysis in *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010), is particularly instructive. *Williams* involved 18 U.S.C. § 922(g)(1)'s ban on the possession of firearms by felons—one of the other "presumptively lawful" regulatory measures specifically identified in *Heller*. Nonetheless, the Seventh Circuit explained that "the government does not get a free pass"; "it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself"; and "putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper." *Williams*, 616 F.3d at 692. The Seventh Circuit ultimately applied a form of intermediate scrutiny and upheld § 922(g)(1). *Id.* at 692-93.[5]

---

[5] Similarly, before the Ninth Circuit agreed to rehear *Nordyke v. King en banc*, the panel opinion explained that:

> We believe it most unlikely that, in a one-sentence footnote, the Supreme Court would undermine the rest of

As a result, although *Heller* and *McDonald* described certain laws as "presumptively lawful," the Supreme Court did not create an actual presumption that a plaintiff is required to "rebut," as Defendants appear to suggest. R. 40 at 10. Defendants are still required to establish that their regulatory efforts are constitutional. And in any event, at least with respect to the Revised Ordinance, the Village is seemingly doing more than just "imposing conditions and qualifications on the commercial sale of arms"—it is trying to ban gun stores outright.

To resolve the Second Amendment issues present in this case, the Court will need to follow the two-part framework established in *Ezell*, 651 F.3d at 701-03, 708-09. "First, the threshold inquiry . . . will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?" *Id.* at 701. As the Seventh Circuit explained, the answer to this question "requires a textual and historical inquiry into the Second Amendment's original meaning." *Id.* Second, if the regulated activity is not outside the scope of the Second Amendment, "then there must be a[n] . . . inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* at 703. "[T]he rigor of this judicial review will depend on how close the law comes to the

---

its analysis by declaring, inter alia, that all gun sales regulations, no matter how burdensome, should receive the rubber stamp of rational basis review. Instead, we read "presumptively lawful regulations" to mean "regulations which we presume will survive constitutional scrutiny," and to say nothing about what standard of review should be applied to them.

644 F.3d 776, 790 n. 14 (9th Cir. 2011).

core Second Amendment right and the severity of the law's burden on the right." *Id.*

As the Seventh Circuit explained:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.* at 708.

The threshold scope inquiry here involves two separate issues. The first is whether Plaintiffs have a Second Amendment right to *sell* firearms. The Second Amendment does not expressly address a right to sell firearms ("the right of the people to keep and bear Arms, shall not be infringed"); *Heller* and *McDonald* each only address a personal right to keep and bear arms; and, as Defendants note, some courts have suggested that there is no right sell firearms. *United States v. Chafin*, 423 Fed. Appx. 342, 344 (4th Cir. 2011) (unpublished); *United States v. Conrad*, 2013 WL 546373, at *7-8 (W.D. Va. Feb. 13, 2013); *Montana Shooting Sports Ass'n v. Holder*, 2010 WL 3926029, at *21 & n.17 (D. Mont. Aug. 31, 2010).

The Court does not need to resolve that issue now, however, because even if the Second Amendment does not protect the sale of firearms directly, Plaintiffs can still pursue a claim that the Agreement and Revised Ordinance infringe their customers' personal right to keep and bear arms. Surprisingly, although the parties argue at length about whether Plaintiffs have standing on behalf of their customers,

14

no one discusses *Ezell*, which addressed this very issue. *Ezell* involved a challenge to Chicago's firing range ban. One of the plaintiffs in that case was Action Target, a firing range operator. As the Seventh Circuit held, "Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to 'act[] as [an] advocate[] of the rights of third parties who seek access to' its services." *Ezell*, 651 F.3d at 696 (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976), and citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925), and *MainStreet.Org of Realtors v. Calumet City*, 505 F.3d 742, 746-47 (7th Cir. 2007)). Defendants have not offered any basis to distinguish *Ezell*. This Court is obligated to follow it and finds that Plaintiffs have standing to advocate on behalf of their customers.

Threshold issues aside, the Court will then need to analyze the strength of Defendants' justifications for the Agreement and Revised Ordinance. Defendants ask the Court to uphold their actions based largely on a statement in the Revised Ordinance's preamble that "the amendments set forth herein . . . improve the health, safety and welfare of the Village." R. 40 at 9-10; Am. Compl., Ex. D. But this conclusory statement likely would not satisfy even rational basis review, let alone the heightened scrutiny required under the Second Amendment. At this stage, the Court does not need to decide how heavily the Agreement and Revised Ordinance burden the Second Amendment right to keep and bear arms—including what the Seventh Circuit has described as a "corresponding right to acquire" firearms, *Ezell*, 651 F.3d at 704—or how strong of a justification Defendants will need to establish in order to uphold their actions in this case. Under any standard, Defendants'

motion to dismiss falls short. As in *Williams*, the Court must "put[] the government through its paces" to justify its regulatory efforts.

Defendants offer two other arguments related to Plaintiffs' Second Amendment claim. Defendants argue that the Agreement exempts Plaintiffs from the Revised Ordinance and that as a result, Plaintiffs' professed "fear" that the Revised Ordinance will be applied against them is not an actionable injury. But Plaintiffs' concern is hardly speculative. Although the Agreement does exempt Plaintiffs from the Revised Ordinance, that exemption will expire with the Agreement on November 30, 2013. And by eliminating the one remaining weapons dealer business license, the Revised Ordinance clearly targets Plaintiffs. In *Ezell*, 651 F.3d at 695-96, the Seventh Circuit explained that "[i]t is well-established that pre-enforcement challenges . . . are within Article III" and that "[t]he very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." (Citations omitted.) The same is true here. The threat that Plaintiffs will soon have to close their business is a sufficient injury to confer standing.

Defendants also argue that Plaintiffs cannot maintain a claim related to the Agreement because they voluntarily agreed to its terms. In response, Plaintiffs rely on the "unconstitutional conditions" doctrine, which generally "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State*

16

*Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). "Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly." *Id.* Defendants do not directly address this issue in their reply. As a result, at least for purposes of this motion to dismiss, Defendants have not shown that Plaintiffs fail to state a plausible Second Amendment claim related to the Agreement's terms and conditions. The Court expresses no opinion at this stage as to whether Plaintiffs were in fact coerced into signing the Agreement or whether the unconstitutional conditions doctrine ultimately applies in these circumstances. The Court expects that the circumstances leading up to the Agreement will be fleshed out in discovery, and the parties remain free to dispute the applicability of the unconstitutional conditions doctrine.

**Fourth Amendment**

The Agreement allows the Village to conduct one random and two announced inspections of Plaintiffs' premises per month. The Ordinance also requires Plaintiffs to provide daily reports of gun sales to the Village Police Chief. Plaintiffs allege that these provisions violate the Fourth Amendment's prohibition on unreasonable searches. *E.g.,* Am. Compl. ¶ 44 (alleging that Defendants "repeatedly conduct suspicionless searches of and invade, disrupt and search Plaintiffs' place of business . . . and impose daily reporting requirements thereby causing interference with and rendering normal retail business extremely difficult if not impossible to conduct").

As Defendants correctly note, Plaintiffs' Fourth Amendment claim is foreclosed by *United States v. Biswell*, 406 U.S. 311 (1972). *Biswell* addressed the

Gun Control Act of 1968, which allowed officials to conduct warrantless inspections of federally-licensed firearm dealers in order to examine records, firearms, and ammunition. Biswell was indicted and convicted after a routine inspection uncovered two unlicensed, sawed-off rifles. Biswell challenged his conviction, arguing that the inspection violated the Fourth Amendment.

The Supreme Court affirmed Biswell's conviction. As the Court explained, "inspection is a crucial part of the regulatory scheme, since it assures that weapons are distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms." *Biswell*, 406 U.S. at 315-16. The Court further explained that "if inspection is to be effective and serve as a credible deterrent, unannounced, *even frequent*, inspections are essential." *Id.* at 316 (emphasis added). Thus, the Court concluded, "if the law is to be properly enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment." *Id.* Finally, the Court noted that inspections "pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection." *Id.*

In their response, Plaintiffs acknowledge *Biswell*, but ask the Court to follow an Illinois Supreme Court case from 1871, *City of Clinton v. Phillips*, 58 Ill. 102. In *Phillips*, the Illinois Supreme Court struck down a local ordinance requiring

18

apothecaries and druggists to report sales of liquor on a quarterly basis. The Court found that the reporting requirement was an "unreasonable search." *Id.* at 104. The Court explained that a "private citizen . . . should not be subjected to such inquisition" and that the law "is suspicious in its spirit" and "an invasion of the sanctity of private business [that] ought not to be tolerated." *Id.* at 104-05. Plaintiffs cite no other authority in support of their Fourth Amendment claim.

As an initial matter, *Phillips* cannot trump the U.S. Supreme Court's analysis of the Fourth Amendment in the exact context at issue here—regulation of licensed firearm dealers. In any event, *Phillips*'s holding about the privacy rights of businesses selling liquor is plainly obsolete.[6] Well after *Phillips*, the U.S. Supreme Court and Illinois Supreme Court have each broadly upheld liquor license inspections. *See, e.g., Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75-77 (1970); *Daley v. Berzanskis*, 269 N.E.2d 716, 718-19 (Ill. 1971). Indeed, over the last 40 years, Illinois courts have repeatedly cited the firearm and liquor industries as the two prime examples where business owners have little or no expectation of privacy and where even warrantless regulatory inspections survive Fourth Amendment scrutiny. *See People v. Krull*, 481 N.E.2d 703, 706-07 (Ill. 1985), *rev'd on other grounds*, 480 U.S. 340 (1987); *People v. Nash*, 662 N.E.2d 552, 555 (Ill. App. Ct. 1996); *People v. Layton*, 552 N.E.2d 1280, 1284 (Ill. App. Ct. 1990); *Hansen v. Ill. Racing Bd.*, 534 N.E.2d 658, 661 (Ill. App. Ct. 1989); *People v. Strauss*, 502 N.E.2d 1287, 1290 (Ill. App. Ct. 1986); *City of Chicago v. Pudlo*, 462 N.E.2d 494, 501 (Ill.

---

[6] As far as the Court can tell, *Phillips* was last cited by an Illinois court in 1899.

App. Ct. 1984); *Marcowitz v. Dep't of Pub. Health*, 435 N.E.2d 1291, 1295 (Ill. App. Ct. 1982); *People v. Piper*, 427 N.E.2d 1361, 1366 (Ill. App. Ct. 1981); *Wheeler v. City of Rockford*, 387 N.E.2d 358, 360 (Ill. App. Ct. 1979).

Plaintiffs' apparent effort to distinguish a duty to *keep* records for onsite inspection (which they concede is allowed) from a duty to *deliver* records (which they challenge) is unavailing. These duties are functionally one and the same—the only difference is whether the regulator would need to travel to the licensee's premises in order to inspect the records. The Ordinance's requirement that licensees deliver sales records to the Village Police Chief does not raise heightened Fourth Amendment concerns. The delivery of a small amount of records a relatively short distance is a minimal (and expected) burden. As the Supreme Court explained in *Biswell*, 406 U.S. at 316, when a dealer accepts a firearms license, "he does so with the knowledge that his business records . . . will be subject to effective inspection." *See also City of Chicago v. U.S. Dep't of Treasury*, 287 F.3d 628, 637 (7th Cir. 2002) ("[T]he release of the requested names and addresses does not raise any legitimate privacy concerns because purchase of a firearm is not a private transaction. The Gun Control Act requires that a transaction for the sale of a firearm be recorded and every dealer is required to make business records available to investigation. Again, every purchaser of a firearm is on notice that their name and address must be reported to state and local authorities and AFT. As a result, there can be no expectation of privacy in the requested names and addresses.") (citations omitted), *judg't vacated on other grounds*, 537 U.S. 1229 (2003). And

Plaintiffs knew full well at the time they applied for their license that the Ordinance required them to report gun sales. *E.g.,* Am. Compl. ¶¶ 14, 16.

As a result, although the Court is allowing Plaintiffs to replead their various constitutional claims asserted in Count I as separate counts, Plaintiffs' Fourth Amendment claim is dismissed. Plaintiffs have no plausible claim that the Agreement or Ordinance violate the Fourth Amendment.

## Count II: 42 U.S.C. § 1983 – Interstate Commerce, Article I, § 8, Cl. 3, Supremacy Clause, Article VI

In Count II, Plaintiffs allege that the Agreement and Revised Ordinance are preempted by federal law and impose an undue burden on interstate commerce in violation of the "Dormant Commerce Clause."[7]

### Preemption

The Amended Complaint only vaguely alleges preemption. But in response to Defendants' motion to dismiss, Plaintiffs explain the basis for their claim. Plaintiffs argue that the Agreement and Revised Ordinance "conflict with[,] intensely interfere with[, and] emasculate their [Federal Firearms License]" and "conflict with the federal scheme and public interest and defeat and render impotent Congress' intended normal and protected use of [their Federal Firearms License]." R. 36 at 32-33. In short, Plaintiffs allege that because they have a federal license to sell firearms, the Village cannot impose significant limits of its own.

---

[7] In Count II, Plaintiffs also repeat the allegations from Count I that Defendants violated the First, Second, Fourth, Fifth, and Fourteenth Amendments. These allegations are duplicative of Count I. When Plaintiffs amend their complaint, they should address this issue as well to avoid duplicative pleading.

As the Supreme Court has explained, there are "two cornerstones of our pre-emption jurisprudence": (1) "the purpose of Congress is the ultimate touchstone in every pre-emption case"; and (2) "[i]n all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

There are three general types of preemption: express preemption, field preemption, and conflict preemption. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 576 (7th Cir. 2012). For express preemption, "Congress can define explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990). For field preemption, "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *Id.* at 79. For conflict preemption, a state law is pre-empted "to the extent that it actually conflicts with federal law." *Id.* Conflict preemption exists where "it is impossible for a private party to comply with both state and federal requirements," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted).

Plaintiffs do not contend that Congress expressly preempted state and local regulation of firearm sales. Express preemption does not apply here.

Plaintiffs primarily argue that Congress intended to occupy the field of regulating firearm sales by "put[ting] in place a comprehensive scheme to regulate the movement of firearms in commerce." R. 36 at 32-33.

This argument is frivolous. Federal Firearms Licenses are governed by 18 U.S.C. § 923. In that same chapter, Congress expressly provided that:

> No provision of this chapter shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

18 U.S.C. § 927. Similarly, as Defendants note, ATF regulations confirm that:

> A [federal firearms] license issued under this part confers no right or privilege to conduct business or activity contrary to State or other law. The holder of such a license is not by reason of the rights and privileges granted by that license immune from punishment for operating a firearm or ammunition business or activity in violation of the provisions of any State or other law.

27 C.F.R. § 478.58. Moreover, the Supreme Court has itself recognized that state and local governments have ample room to enact firearm regulations. *McDonald*, 130 S. Ct. at 3047 ("[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."). As a result, Congress clearly has not occupied the field of regulating firearm sales.

Alternatively, Plaintiffs argue that the Agreement and Revised Ordinance conflict with their Federal Firearms License. Plaintiffs do not suggest that they cannot comply with both. Rather, Plaintiffs argue that the Agreement and Revised

Ordinance generally frustrate Congress's purposes and objectives in issuing federal licenses. But as in *Second Amendment Arms*, 2012 WL 4464900, at *7, Plaintiffs' conclusory arguments about the supposed "emasculation" of their Federal Firearms License cannot overcome the straightforward language of 18 U.S.C. § 927 and are not enough to state a plausible conflict preemption claim.

Defendants' motion to dismiss Count II is therefore granted with respect to Plaintiffs' preemption claims under the Supremacy Clause.

**Dormant Commerce Clause**

The Amended Complaint also only vaguely alleges that the Agreement and Revised Ordinance affect interstate commerce. But again, in response to Defendants' motion to dismiss, Plaintiffs explain their claim. Plaintiffs argue that the Agreement and Revised Ordinance unduly burden interstate commerce because their "product distributors and manufacturers are located in . . . Illinois, Minnesota, Texas, Maryland, New York, Louisiana, Missouri, Ohio, Pennsylvania, Kansas, Arizona and Massachusetts and foreign countries. . . . So, virtually 100% of the firearms that Plaintiffs import, have sold and sell physical[ly] crossed state lines and are mark[et]ed via the Internet, the U.S. Mail, and telephonically, thus comprising interstate commerce." R. 36 at 2. Plaintiffs then argue that the Village is harming these out-of-state distributors and manufacturers by restricting and eventually eliminating gun stores in the Village. *Id.* at 29.

The Constitution generally gives Congress the power to regulate interstate commerce. U.S. Const. Art. I, § 8 ("The Congress shall have power . . . To regulate

Commerce . . . and among the several States."). Although the Commerce Clause does not expressly limit state power over interstate commerce, courts have long recognized that in certain circumstances, state and local laws imposing substantial burdens on interstate commerce are not allowed. "This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce." *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003).

Under the Dormant Commerce Clause, state and local laws are generally analyzed under a two-tier approach. The first step is to determine whether the law "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). A law is discriminatory if it involves "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* This first step is designed to ferret out laws that raise "the evils of 'economic isolation' and protectionism"—"where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978).

If a law is not discriminatory, the second step is to apply the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld *unless the burden imposed on such commerce is clearly*

25

> *excessive in relation to the putative local benefits*. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, an on whether it could be promoted as well with a lesser impact on interstate activities.

(Citation omitted, emphasis added.) The Seventh Circuit has explained that "a plaintiff has a steep hill to climb" to meet this standard, *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665 (7th Cir. 2010), and likened it to "normal rational-basis" review. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131-32 (7th Cir. 1995). *See also Cavel, Int'l, Inc. v. Madigan*, 500 F.3d 551, 556 (7th Cir. 2007); *Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 938 (N.D. Ill. 2012).

Plaintiffs argue that they can prevail under both steps. At the first step, Plaintiffs argue that the Agreement and Revised Ordinance effectively discriminate against out-of-state manufacturers and distributors by closing off a market in Illinois, or at least in the Village. The Court disagrees. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 (1978). Plaintiffs are still required to establish that the Agreement and Revised Ordinance benefit in-state manufacturers and distributors. *Oregon Waste Sys.*, 511 U.S. at 99; *see also Cavel,* 500 F.3d at 555 (upholding a state ban on slaughtering horses for human consumption because "[t]here is no discrimination . . . insofar as the prohibition against slaughter is concerned. If a

local firm . . . wanted to slaughter horses, it could not do so. No local merchant or producer benefits from the ban on slaughter."). Plaintiffs do not even argue that the Agreement or Revised Ordinance benefit in-state manufacturers and distributors. The Agreement and Revised Ordinance operate with equal force whether a firearm came from Illinois or out-of-state. As a result, Plaintiffs cannot show that the Agreement or Revised Ordinance discriminates against interstate commerce.

At the second step, Plaintiffs argue that the Agreement and Revised Ordinance impose a substantial burden on interstate commerce without any legitimate local benefit. Defendants respond that the Court should rule on the face of the Amended Complaint that Plaintiffs cannot satisfy the *Pike* test. This is a close call on a motion to dismiss. Plaintiffs undoubtedly face an uphill battle to show that the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits. But at this stage, they have stated a plausible claim. Just as with the Second Amendment claims, the Court can better assess the burdens and benefits based on a thorough and complete factual record. The Court cannot meaningfully balance these factors based on the very limited record currently before the Court on Defendants' motion to dismiss.

Defendants' motion to dismiss Count II is therefore denied with respect to the Dormant Commerce Clause. When Plaintiffs amend their complaint, however, they should take the allegations raised for the first time in their response to Defendants' motion to dismiss and include them in the complaint itself.

## Count III: 42 U.S.C. § 1983 – Prior Restraint on Commercial Speech

The Amended Complaint is also vague concerning Plaintiffs' First Amendment claim. But Plaintiffs' response (R. 36 at 33-38) clarifies that Count III has two separate components. First, Plaintiffs allege that the Agreement's restrictions on retail displays and exterior signage improperly restrict commercial speech. Second, Plaintiffs allege that the Agreement and Revised Ordinance are unlawful prior restraints. The Court addresses each issue in turn.

### Commercial Speech

The First Amendment protects commercial speech but ultimately "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562-63 (1980). Restrictions on commercial speech are analyzed under a form of "intermediate" scrutiny. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). In *Central Hudson*, 447 U.S. at 566, the Supreme Court established a four-part test for analyzing restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Plaintiffs' First Amendment challenge to the Agreement's restriction on retail displays fails at the first step of the analysis. The "lawful activity" inquiry under

*Central Hudson* focuses on whether the speech at issue "is speech proposing an illegal transaction." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982). As the court explained in *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Worcester*, 851 F. Supp. 2d 311, 314 (D. Mass. 2012), a case cited by Plaintiffs, R. 72 at 3-4, "[a] transaction need not be criminal to be 'illegal' in this context, and its illegality may stem from its prohibition by a city ordinance." (Citing *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376 (1973)). Here, per the Agreement, Plaintiffs' license does not allow them to make in-person retail sales on the premises. As a result, the First Amendment does not protect Plaintiffs' ability to display firearms for retail sale. Plaintiffs obviously allege that the Agreement's underlying prohibition on in-person retail sales infringes on a host of other constitutional rights. But that is not a First Amendment issue.

Plaintiffs also challenge the Agreement's restriction on exterior signage. This challenge does survive the first step. Although Plaintiffs are not allowed to conduct in-person retail sales on the premises, and thus the First Amendment would not protect exterior signage to promote in-person sales, the Agreement broadly prohibits "any exterior signage indicating to the public that its offices are located on the Premises or indicating the business of Ghost (i.e. weapons sales)." Am. Compl., Ex. C ¶ 4. Thus, for example, the Agreement would prohibit Plaintiffs from posting exterior signs even referring potential customers to their internet site. As a result, the limit on exterior signage does concern at least some lawful activity. Next, the Court will have to consider whether the Village has a substantial interest to

support this restriction, whether the restriction directly advances that interest, and whether it is narrowly drawn to serve that interest. Again, at this stage, the Court finds that Plaintiffs have stated a plausible claim. The Court will assess these factors in due course based on a thorough and complete factual record.

Defendants argue that Plaintiffs voluntarily agreed to the terms of the Agreement and therefore waived any First Amendment challenge. But as discussed above with respect to the Second Amendment, Plaintiffs allege that they were coerced into signing the Agreement and that the "unconstitutional conditions" doctrine applies. The Court cannot resolve this issue at this time. Defendants also argue that Plaintiffs freely chose not to have exterior signage. This too presents a fact issue that the Court cannot resolve on a motion to dismiss.

### Prior Restraints

The second part of Count III involves prior restraints. Plaintiffs allege that the Agreement and Revised Ordinance are impermissible prior restraints on speech because they "violate [Plaintiffs'] right to conduct a lawful business and their right to engage in related commercial speech." R. 36 at 35. Defendants argue that Plaintiffs allege only a restraint on general business practices, not a "prior restraint" on speech as courts have used the term. Defendants are correct.

In the First Amendment context, "prior restraint" is a term of art. It does not apply to every restriction that affects speech. Instead, as the Seventh Circuit has explained, a restriction is a prior restraint if it meets four elements:

> (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision

30

> maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker.

*Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (citations omitted). Ultimately, prior restraints are unconstitutional if they stifle speech by allowing the decision maker unlimited discretion or unlimited time to issue a permit. *E.g., FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990).

The Agreement and Revised Ordinance are not prior restraints, let alone unconstitutional prior restraints. Although the Agreement certainly regulates and limits Plaintiffs' ability to erect exterior signage, it does not (1) require Plaintiffs to apply to the Village for approval of a sign, (2) empower the Village to approve or reject a sign based on its content, (3) require affirmative action from the Village, or (4) require any exercise of judgment by the Village. As discussed above, Plaintiffs may pursue their claim that the Agreement's ban on exterior signage violates the First Amendment, but that is not a prior restraint issue. Plaintiffs do not even attempt to establish *Samuelson*'s elements of a prior restraint.

The Revised Ordinance does not regulate speech at all. It simply prohibits Plaintiffs, as of November 30, 2013, from operating a gun store in the Village. It does not purport to stop Plaintiffs, for example, from operating a gun store nearby and advertising in the Village. Nor does it require that Plaintiffs submit any proposed advertisements to the Village for pre-approval. Moreover, even the

31

original Ordinance did not require Plaintiffs to obtain a license before engaging in speech; it required a license in order to sell firearms. Plaintiffs therefore have not shown that any "prior restraint" on speech exists in this case.

Defendants' motion to dismiss Count III is therefore granted with respect to Plaintiffs' commercial speech claim for the Agreement's ban on retail displays and Plaintiffs' prior restraint claim, but denied with respect to Plaintiffs' commercial speech claim for the Agreement's limits on exterior signage.

## Count IV: 42 U.S.C. § 1983 – Retaliation for Commercial Speech

In Count IV, Plaintiffs allege that Defendants retaliated against them for attempting to exercise protected commercial speech. As discussed above, Plaintiffs have stated a plausible substantive claim that the Agreement's limit on exterior signage infringes commercial speech in violation of the First Amendment.

To state a retaliation claim as well, Plaintiffs would have to properly allege that: (1) they engaged in protected First Amendment activity; (2) they suffered a deprivation that would likely deter protected activity in the future; and (3) a causal connection between the two. *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) (citing *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

But Plaintiffs do not even suggest that the Village retaliated against them for engaging in activity arguably protected by the First Amendment (*e.g.,* placing exterior signage on the premises). Instead, in discussing Counts IV and V together, Plaintiffs argue only that they "engaged in constitutionally protected activities by applying for, obtaining and taking steps to commence operating a business

objectionable to Defendants and spawning their retaliation." R. 36 at 38. This argument appears to be directed solely at Count V and ignores Count IV entirely. Plaintiffs have not alleged any facts to support a plausible First Amendment retaliation claim. And as discussed above, once the Village prohibited certain types of gun sales through the Agreement, commercial speech related to those illegal transactions is not protected by the First Amendment.

Defendants' motion to dismiss Count IV is therefore granted.

## Count V:  42 U.S.C. § 1983 – Retaliation

Count V as currently pled is almost nonsensical. In Count V, Plaintiffs allege that the Village retaliated against them for engaging in protected activity under the Supremacy Clause (apparently a reference to preemption), the Commerce Clause, and the First, Second, Fourth, Fifth, and Fourteenth Amendments.

Again, to maintain a retaliation claim, Plaintiffs would have to plausibly allege that they engaged in constitutionally protected activity, that they suffered a deprivation that would likely deter protected activity in the future, and a causal connection between the two. *Watkins*, 599 F.3d at 794.

As discussed with respect to Counts I and II, Plaintiffs have not stated a plausible substantive claim under the Supremacy Clause or Fourth Amendment. As a result, a retaliation claim fails as well. As discussed with respect to Count IV, Plaintiffs have not stated a First Amendment retaliation claim. On this issue, Count V is duplicative and fails for the same reason. With respect to the Commerce Clause, Plaintiffs argue that Defendants retaliated against them for engaging in

interstate commerce. Plaintiffs do not cite any authority supporting a retaliation claim for engaging in interstate commerce and the Court has found none. Nor have Plaintiffs pled any facts to plausibly suggest that Defendants retaliated against them because of the interstate nature of their business. Thus, on all of these issues, Plaintiffs fail to state a plausible claim for retaliation.

With respect to the Second Amendment, however, Plaintiffs appear to have a plausible claim. Although the Court has not yet decided whether Plaintiffs themselves have a Second Amendment right to *sell* firearms, for purposes of a motion to dismiss, Plaintiffs have sufficiently alleged that they engaged in a constitutionally protected activity. They have also alleged retaliatory action by Defendants. For example, Plaintiffs allege that after they signed the Agreement and began selling firearms, the Village enacted its Revised Ordinance which bans gun stores outright and may soon put them out of business. As a practical matter, this claim may be duplicative of Plaintiffs' substantive Second Amendment claim. But at this stage, Plaintiffs appear to have a plausible claim for relief.

The basis for Plaintiffs' Fifth Amendment retaliation claim is not clear. As discussed with respect to Count I, the Court is allowing Plaintiffs to amend their complaint to explain their Fifth Amendment claims. If Plaintiffs also intend to pursue a Fifth Amendment retaliation claim, they should include a separate count with a short and plain statement explaining what Fifth Amendment right they exercised and how Defendants retaliated against them for exercising that right.

At this stage, Defendants' motion to dismiss Count V is granted because Count V, like Count I, fails to comply with Rules 8(a)(2), 8(d)(1), and 10(b). However, when Plaintiffs amend their complaint, they may replead retaliation claims based on the Second and Fifth Amendments. Each claim should be addressed in a separate count, and each should provide a short and plain statement of the claim showing that Plaintiffs are entitled to relief.

**Count VI: 42 U.S.C. § 1985 Conspiracy**

In Count VI, Plaintiffs allege that various Village officials—the President, Trustees, and Attorney—conspired to violate their civil rights under 42 U.S.C. § 1985. Section 1985 provides a cause of action "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). Defendants argue that Count VI fails to state a claim because of the intracorporate conspiracy doctrine. Defendants offer other arguments as well, but the intracorporate conspiracy doctrine is dispositive in this case.

As the court explained in *Dargis v. Sheahan*, 2005 WL 946909, at *11 (N.D. Ill. Mar. 25, 2005), *aff'd on other grounds*, 526 F.3d 981 (7th Cir. 2008),

> under the intracorporate conspiracy doctrine, a conspiracy cannot exist solely between members of the same entity. Thus, managers of a corporation jointly pursuing its lawful business do not become conspirators when acts within the scope of their employment are said to be discriminatory or retaliatory. The Seventh Circuit has applied this doctrine to officials working within a government agency as well as private corporations.

35

> Therefore, as public employees working within the same government agency, the individual Defendants cannot be held liable for conspiring to discriminate against Plaintiff.

(Citing *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999), *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994), and *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990).) *See also Doe v. Bd. of Ed. of Hononegah Cmty. High Sch. Dist. #207*, 833 F. Supp. 1366, 1381-82 (N.D. Ill. 1993) (explaining that the test for whether alleged conspirators acted within the scope of their employment "is not the wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within the scope of the conspirators' official duties").

Plaintiffs do not address the intracorporate conspiracy doctrine in their response. R. 36 at 39. Plaintiffs cite *Wessel v. Village of Monee*, 2010 WL 2523574, at *7 (N.D. Ill. June 14, 2010), but that ruling never discussed the intracorporate conspiracy doctrine. *Wessel* rejected a variety of other, unrelated arguments in declining to dismiss the plaintiffs' § 1985 claim. Plaintiffs therefore offer no reason why the intracorporate conspiracy doctrine would not apply here.

The intracorporate conspiracy doctrine compels dismissal of Plaintiffs' § 1985 claim. The Village officials are all members of the same municipal entity and were acting within the scope of their employment when they took the actions at issue. *See, e.g., Hononegah Cmty. High Sch. Dist. #207*, 833 F. Supp. at 1382 ("[D]efendants . . . could only have conspired to coverup or conceal the offending teacher's conduct within their official capacities as school administrators. They

would have been in no position to have controlled or hindered any investigation into the teacher's conduct as individual citizens."). Indeed, Plaintiffs themselves allege that the Village officials "entered into a combination, conspiracy and scheme to devise a plan *to use their offices* in concerted action" to violate Plaintiffs' civil rights. Am. Compl. ¶ 20 (emphasis added). Moreover, the Court has already dismissed all individual-capacity claims against the Village officials; the only claims that remain are official-capacity claims. R. 54, 55. In light of the intracorporate conspiracy doctrine, Plaintiffs fail to state a plausible § 1985 claim.

Defendants' motion to dismiss Count VI is therefore granted.

### Count VII:  42 U.S.C. § 1983 *Monell* Claim

In Count VII, Plaintiffs assert a separate *Monell* claim against the Village. Defendants argue that Counts I-VI already include *Monell* claims and that Count VII should be dismissed as duplicative. Oddly, Plaintiffs respond that "Defendants' arguments are irrelevant at this stage because they go to the merits of Plaintiffs' claims and not the sufficiency of the Complaint." R. 36 at 49. But the exact opposite is true. Defendants say nothing about the merits of a *Monell* claim and only take issue with whether Count VII is duplicative of other counts.

As the court explained in *Second Amendment Arms*, 2012 WL 4464900, at *10, "*Monell* does not provide a cause of action but instead provides the theory under which a municipality might be liable for its employees' constitutional violations." (Citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). Thus, although "a municipality cannot be held liable under § 1983 on a

*respondeat superior* theory," *Monell*, 436 U.S. at 691, a municipality may be liable "if its officers acted pursuant to (1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012).

*Second Amendment Arms* addressed a similar *Monell* count in Tony Kole's complaint against the City of Chicago. As the court explained:

> Here, Plaintiffs have alleged – in other counts – that the City, by way of the Ordinance, has violated their constitutional rights. The Court is thus puzzled by what this separate *Monell* claim adds to Plaintiffs' case. Count X either duplicates the surviving § 1983 claims brought in Counts I-VIII or states only a theory under which Plaintiffs might recover for other constitutional violations but does not present a viable claim in and of itself. Either way, it does not currently state an independent claim upon which relief may be granted.

2012 WL 4464900, at *11. The court ultimately dismissed the *Monell* count without prejudice and allowed the plaintiffs to file an amended complaint clarifying what independent claims, if any, they intended to assert. *Id.*

This Court is equally puzzled. Counts I-V already assert § 1983 claims alleging that the Village is liable for a wide range of constitutional violations. It is unclear what Count VII adds to the mix. And like the *Monell* count in *Second Amendment Arms*, Count VII does not currently state a separate claim for relief. Defendants' motion to dismiss Count VII is therefore granted. This Court will also allow Plaintiffs an opportunity to clarify what independent claims, if any, they assert in Count VII when they file their Second Amended Complaint.

**Count VIII: Antitrust – Unlawful Conspiracy to Restrain Free Trade**

In Count VIII, Plaintiffs allege that Defendants, "by unconstitutional economic regulation" (the Agreement and Revised Ordinance), have unreasonably restrained competition and trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Am. Compl., Count VIII, ¶ 68. Defendants argue that Plaintiffs fail to state a substantive claim under Section 1. Defendants also argue that they are immune from liability in whole or in part under either state action immunity or the Local Government Antitrust Act, 15 U.S.C. § 35(a).

Again, *Second Amendment Arms* is instructive. As the court explained in dismissing Tony Kole's antitrust claim against the City of Chicago and various City officials:

> To state a claim under 15 U.S.C. § 1, Plaintiffs must allege (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Defendants argue that Plaintiffs falter at the first step by neglecting to identify "any 'contract, combination, or conspiracy' or any other agreement entered into or engaged in by Defendants which resulted in an unreasonable restraint of trade." The Court agrees. Plaintiffs allege only that Defendants "have and continue to unreasonably restrain competition and trade that affects interstate commerce," and that unspecified "acts and decisions constitute a scheme that through concerted action, combination, and/or conspiracy in restraint of trade and commerce among the several States by produced [sic] and imposing the New Gun Ban Ordinance on the Plaintiffs that constituted and continue to constitute ongoing violations of the Sherman Antitrust Act that directly interfered with and continue to interfere [with] Second Amendment Arms' full lawful FFL rights and privileges and has caused and continues to cause lost

profits, loss of good will, loss of freedom and liberty and other injuries and damages as hereinabove alleged and deny the other Plaintiffs herein to engage in trade and commerce as above stated."

The Court is unable to discern from these allegations which of the Defendants allegedly conspired, or how they did so. The Supreme Court has made clear that enactment and compliance with a local ordinance does not alone amount to a conspiracy for Sherman Act purposes, *see Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 267 (1986), and Plaintiffs have not alleged more here. There can be no liability under Section 1 of the Sherman Act in the absence of a conspiracy, agreement, or other concerted action by separate entities to restrain trade, so the Court grants Defendants' motion to dismiss Count XI.

2012 WL 4464900, at *11 (record citations omitted).

This Court agrees with the analysis in *Second Amendment Arms*. Plaintiffs filed the same claim in this case, and it too does not adequately allege a conspiracy, agreement, or other concerted action to restrain trade. Moreover, intracorporate conspiracy principles apply with equal force in the antitrust context. As the Supreme Court explained in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984):

[I]t is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. . . . [O]fficers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.

*See also Fisher*, 475 U.S. at 266 ("We have . . . deemed it 'of considerable importance' that independent activity by a single entity be distinguished from a

concerted effort by more than one entity. . . . Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement. Thus, if the Berkeley Ordinance stabilizes rents without this element of concerted action, the program it establishes cannot run afoul of § 1.") (citations omitted).

Defendants' motion to dismiss Count VIII is therefore granted. Because the Court finds that Plaintiffs fail to state a claim under Section 1 of the Sherman Act, the Court does not need to address Defendants' immunity arguments.

## Count IX: Commercial Disparagement – Lanham Act

Plaintiffs assert a number of claims based on Trustee Falagario's statement to the Norridge Harwood Heights News that "the one current Village weapons dealer licensee has agreed that it will cease doing business in the village no later than April, 30, 2013." Am. Compl., Count IX, ¶ 67. Plaintiffs allege that this statement was false and that they were harmed because the statement suggested to potential customers that they would soon go out of business.

In Count IX, Plaintiffs allege commercial disparagement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Section 43(a) provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> *       *       *

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.*

By its terms, Section 43(a) applies only to statements "use[d] in commerce" and made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The Seventh Circuit has explained that the term "commercial advertising or promotion" applies to certain types of "promotional materials" such as "classic advertising campaign[s]" and other "systematic communicative endeavor[s] to persuade possible customers to buy the seller's product." *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 521-22 (7th Cir. 2012). *See also Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000) (holding that Section 43(a) applies if a statement was made "by a defendant who is in commercial competition with plaintiff" and "for the purpose of influencing consumers to buy defendant's goods or services").

Plaintiffs have not cited any authority applying Section 43(a) in any circumstances remotely similar to this case. The Village is acting as a regulator, not as a competitor trying to drive business away from Plaintiffs in an attempt to sell firearms itself. Although 15 U.S.C. § 1125(a)(2) provides that State instrumentalities are subject to Section 43(a) "in the same manner and to the same extent as a nongovernmental entity," Plaintiffs are still required to establish that

Defendants used a false representation "in commerce" and "in commercial advertising or promotion," as the statute requires. They cannot do so.

Defendants' motion to dismiss Count IX is therefore granted.

**Pendant Count I:  Declaratory Judgment**[8]

In Pendant Count I, Plaintiffs seek a declaratory judgment that the Agreement and Revised Ordinance violate the Illinois Constitution, Article I, Sections 1 (inherent and unalienable rights), 2 (due process and equal protection), 4 (freedom of speech), 6 (searches and seizures), 12 (right to remedy and justice), 15 (eminent domain), 22 (right to arms), and 24 (retained rights). Plaintiffs seek that relief under Illinois's declaratory judgment statute, 735 ILCS 5/2-701.

Defendants argue that 735 ILCS 5/2-701 applies only in state court proceedings. The Court agrees. *See, e.g., Second Amendment Arms*, 2012 WL 4464900, at *14 ("[T]he federal rather than the state declaratory judgment statute governs. . .; the Illinois declaratory judgment statute is a procedural rule that creates no substantive rights."). As in *Second Amendment Arms*, the Court will simply construe Pendant Count I as seeking relief under the federal declaratory

---

[8] Curiously, despite their 48-page, 25,900-word response, Plaintiffs devote only two pages to defending their nine pendent state law claims, often with no citation to authority or discussion of the elements of the claims. Plaintiffs have therefore left it to the Court to sort through Illinois law and the facts alleged in the Amended Complaint to determine whether Plaintiffs state plausible claims. The Court does so reluctantly. "Rule 8(a)(2) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud. Federal judges have better things to do, and the substantial subsidy of litigation (court costs do not begin to cover the expense of the judiciary) should be targeted on those litigants who take the preliminary steps to assemble a comprehensible claim." *Stanard*, 658 F.3d at 798 (quoting *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)).

judgment statute, 28 U.S.C. § 2201. When Plaintiffs file their Second Amended Complaint, they should revise Pendant Count I accordingly.

Defendants also argue that Pendant Count I fails to state a substantive claim. Defendants characterize the count as challenging the Village's powers as a home-rule municipality. Although Plaintiffs' response is silent on this point, it appears that Defendants misconstrue Pendant Count I. On its face, Pendant Count I does not challenge the Village's home-rule powers; it seeks a declaration that the Agreement and Revised Ordinance violate various sections of the Illinois Constitution's Bill of Rights. Defendants do not address those issues in their motion to dismiss. To the extent that the rights guaranteed by the Illinois Constitution mirror the federal Bill of Rights, the Court's rulings on Plaintiffs' federal claims may well resolve some of these state law issues. But since the parties have not briefed the state law issues, the Court cannot decide at this time whether Plaintiffs state plausible claims under the Illinois Constitution.

Defendants' motion to dismiss Pendent Count I is therefore denied.

## Pendant Count II: Contract Rescission

In Pendant Count II, Plaintiffs seek to rescind the Agreement as an "illegal and oppressive" contract under Illinois law. Plaintiffs argue that "there was a lack, failure or frustration of lawful consideration and [that they were] illegally manipulated into signing it." R. 36 at 46. Defendants argue that Plaintiffs fail to state a plausible claim for rescission. The Court agrees with Defendants.

Under Illinois law, "'rescission' is the cancelling of a contract so as to restore the parties to their initial status." *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. Ct. 2004) (quoting *Horan v. Blowitz*, 148 N.E.2d 445, 449 (Ill. 1958)). A party seeking rescission therefore "must restore the other party to the status quo existing at the time the contract was made." *Id.* (quoting *Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 852 (Ill. App. Ct. 1993), and *Puskar v. Hughes*, 533 N.E.2d 962, 966 (Ill. App. Ct. 1989)). *See also Ahern v. Knecht*, 563 N.E.2d 787, 792 (Ill. App. Ct. 1990) ("A plaintiff desiring to rescind a contract must . . . offer to return the value of the consideration received or otherwise return the other party to the status quo *ante*.").

In their response, Plaintiffs ignore this requirement entirely. Plaintiffs do not plausibly suggest that the parties can be restored to their initial status in these circumstances. By entering into the Agreement, Plaintiffs were able to receive their license from the Village within two weeks[9] and then operated under the Agreement for approximately six months before filing this lawsuit. Now, even more time has passed. Later this year, the Agreement will expire on its own. Already, Plaintiffs have operated under the Agreement for two and a half years.

The right of rescission also "must be exercised promptly." *Vincent v. Vits*, 566 N.E.2d 818, 821 (Ill. App. Ct. 1991). *See also Coregis Ins.*, 821 N.E.2d at 713-714 ("An unreasonable delay in taking the necessary steps to set aside a fraudulent contract will have the effect of affirming it."). Plaintiffs did not act promptly here.

---

[9] In contrast, federal regulations require the ATF to act on Federal Firearm License applications within 60 days of receipt. 18 U.S.C. § 923(d)(2).

Instead, Plaintiffs entered into the Agreement in November 2010, accepted its benefits by commencing operations in January 2011, but only filed suit seeking to rescind the Agreement in June 2011. Plaintiffs offer no explanation or excuse for the approximately seven-month delay in challenging the Agreement.

For the same reasons, Plaintiffs also cannot show a lack of consideration to support the Agreement. "Generally, courts will not inquire into the sufficiency of the consideration to support a contract. However, where the amount of consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail." *United City of Yorkville v. Vill. of Sugar Grove*, 875 N.E.2d 1183, 1195 (Ill. App. Ct. 2007) (quoting *Ahern*, 563 N.E.2d 791-92). Plaintiffs clearly received some benefit by entering into the Agreement—they have been able to operate their business, albeit in a restricted fashion, for the past two and a half years. Plaintiffs have failed to allege a plausible claim for rescission under Illinois law.

Defendants' motion to dismiss Pendent Count II is therefore granted. The Court notes, however, that Plaintiffs are not without recourse if the Court ultimately finds that all or part of the Agreement is unconstitutional. The Court can still order declaratory relief under 28 U.S.C. § 2201.

**Pendant Count III: Tortious Interference**

In Pendant Count III, Plaintiffs allege that Defendants tortiously interfered with their prospective economic advantage by restricting firearm sales. Defendants argue that Pendant Count III fails to state a claim. Defendants also argue that even

if Plaintiffs stated a tortious interference claim, they are immune from liability pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/1-101, *et seq.*

Once again, *Second Amendment Arms* is instructive. In that case, Tony Kole similarly alleged that the City of Chicago's restrictions on firearm sales tortiously interfered with his prospective business relationships and economic advantages. As the court explained in dismissing the claim:

> To prevail on a claim for tortious interference with prospective economic advantage, a plaintiff must prove: (1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the plaintiff's expectancy; (3) defendant's purposeful interference to defeat the expectancy; and (4) damages resulting from the interference. *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 641 N.E.2d 584, 590 (Ill. App. Ct. 1994) (citing *Eisenbach v. Esformes*, 582 N.E.2d 196, 199 (Ill. 1991)). Furthermore, Illinois courts long have held that the defendant's interference must be directed to a third party. *Id.*; *Eisenbach*, 582 N.E.2d at 199. "[T]he gravamen of the charge is interference with an existing relationship." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998).
>
> Here, Count XVI lacks any allegations of specific actions by the Defendants directed at third parties with an existing relationship to Second Amendment Arms - the allegations instead focus on Second Amendment Arms's and Defendants' conduct and assert only that but for the Ordinance, Second Amendment Arms would have entered into business relationships by selling firearms and firearm accessories to "qualified prospective customers in and around the City." Accordingly, Second Amendment Arms has failed to satisfy the pleading requirements for tortious interference, and Count XVI of the Second Amended Complaint is dismissed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."); *Willcutts v. Galesburg Clinic Ass'n*, 560 N.E.2d 1, 4

> (Ill. App. Ct. 1990) (upholding trial court's finding that plaintiff's claim of tortious interference failed because the plaintiff "failed to allege specific actions by defendants directed at third parties, but rather has presented broad, conclusory allegations against defendants").

2012 WL 4464900, at *14-15 (record citations omitted).

This Court again agrees with the analysis in *Second Amendment Arms.* Plaintiffs filed the same claim in this case containing only conclusory allegations that Defendants' regulatory efforts cost them business. They do not allege that Defendants directed any actions at third parties. This failure alone is fatal to Plaintiffs' claim. The Court also doubts that a holder of a Federal Firearms License could have a reasonable expectation of entering into firearm sales with prospective customers free of state or local restrictions, as Plaintiffs allege. Am. Compl., Pendant Count III, ¶¶ 51-54. As discussed above, federal firearm laws do not preempt state and local regulation, and the Supreme Court has made clear that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 130 S. Ct. at 3047.

Defendants' motion to dismiss Pendant Count III is therefore granted. Because the Court finds that Plaintiffs fail to state a claim for tortious interference, the Court does not need to address Defendants' remaining arguments concerning the Illinois Tort Immunity Act.

**Pendant Count IV: *Ultra Vires* Special Legislation**

In Pendant Count IV, Plaintiffs allege that the Agreement and Revised Ordinance violate Article 4, Section 13 of the Illinois Constitution, which provides

that "[t]he General Assembly shall pass no special or local law when a general law is or can be made applicable." As Defendants note, Article 4, Section 13 expressly applies only to "[t]he General Assembly," not local governments. In response, Plaintiffs concede that Pendant Count IV fails to state a claim. R. 36 at 47. Defendants' motion to dismiss Pendant Count IV is therefore granted.

Lest they cede any ground, however, Plaintiffs ask for leave to amend Pendant Count IV to state claims that the Agreement and Revised Ordinance violate their rights to free speech, due process, and equal protection under Article I, Sections 2 and 4 of the Illinois Constitution. R. 36 at 47-48. Plaintiffs argue that they should be allowed to amend Pendant Count IV because they invoked the wrong legal theory but pled the correct facts. This request is bizarre. Plaintiffs already assert these legal theories in Pendant Count I. And as discussed below, Plaintiffs also appear to assert these same legal theories in Pendant Count V. On that basis, Plaintiffs' request to amend Pendant Count IV is denied.

## Pendant Count V:  Unlawful Retaliation in Violation of §§ 2 & 4, Article I of the Illinois Constitution

In Pendant Count V, Plaintiffs allege that Defendants deprived them of their rights under the Illinois Constitution "in retaliation for Plaintiffs having been persistent in their attempt to sign, advertise, promote and identify their lawful business." Am. Compl., Pendant Count V, ¶ 53. In particular, Plaintiffs allege that Defendants violated Article I, Sections 2 (due process and equal protection) and 4 (freedom of speech) of the Illinois Constitution. Defendants argue that Illinois courts have never recognized a cause of action for retaliation based on an exercise of

49

state constitutional rights. Defendants further argue that there is no private right of action for damages for violations of the Illinois Constitution.

The exact nature of Pendant Count V is unclear. Even if Illinois law recognized retaliation claims, Pendant Count V does not appear to be a traditional retaliation claim. Pendant Count V essentially has it backwards. Instead of alleging that they engaged in protected activity under the Illinois Constitution and were penalized for it, Plaintiffs allege that they tried to open a business and Defendants retaliated by depriving them of rights under the Illinois Constitution. As Plaintiffs seem to confirm in response to Defendants' motion to dismiss, Pendant Count V "arises under . . . art. I, §[§] 2 & 4 of the Illinois Constitution." R. 36 at 48.

To the extent Plaintiffs seek *damages* for alleged violations of the Illinois Constitution, Plaintiffs have not identified any authority that would allow such a claim. 42 U.S.C. § 1983 provides a cause of action only for deprivations of rights "'secured by the Constitution and laws' *of the United States.*" *Lividas v. Bradshaw*, 512 U.S. 107, 132 (1994) (emphasis added). *See also Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011). To the extent Plaintiffs seek a *declaration* that the Agreement or Revised Ordinance violate Article I, Sections 2 and 4 of the Illinois Constitution, that claim is seemingly duplicative of Pendant Count I. In either case, Plaintiffs fail to state a plausible independent claim for relief.

Defendants' motion to dismiss Pendant Count V is therefore granted. If Plaintiffs believe that they can clarify and amend Pendant Count V to state a

plausible, non-duplicative claim for relief, they may attempt to do so when they file their Second Amended Complaint.

**Pendant Count VI:  Common Law Conspiracy**

In addition to their 42 U.S.C. § 1985 and antitrust claims, Plaintiffs also assert a common law conspiracy claim against the Village President, Trustees, and Attorney in Pendant Count VI. As discussed above with respect to Counts VI and VIII, under the intracorporate conspiracy doctrine, a conspiracy cannot exist solely between members of the same municipal entity.

Defendants' motion to dismiss Pendant Count VI is therefore granted.

**Pendant Count VII:  Illinois Deceptive Trade Practices Act**

In Pendant Count VII, Plaintiffs allege a disparagement claim under the Illinois Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/2(a)(8), based on Trustee Falagario's statement to the Norridge Harwood Heights News. Defendants argue that Pendant Count VII fails to state a claim. Defendants also argue that they are immune from liability under the Illinois Tort Immunity Act. In response to Defendants' motion to dismiss, Plaintiffs do not cite any authority supporting this claim and do not discuss the terms of the statute or the elements they must establish. Other than arguing that Defendants are not immune from liability, Plaintiffs do not address the merits of this claim at all.

The IDTPA provides that a person engages in deceptive trade practices when "in the course of his or her business, vocation, or occupation, the person . . . disparages the goods, services, or business of another by false or misleading

51

representation of fact." 815 ILCS 510/2(a)(8). To state a claim under the IDTPA, a plaintiff must allege that the defendant disparaged the *quality* of its goods or services. *See, e.g., Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F. Supp. 2d 704, 710 (N.D. Ill. 2006) (collecting cases); *Am. Wheel & Eng'g Co. v. Dana Molded Prods, Inc.*, 476 N.E.2d 1291, 1295-96 (Ill. App. Ct. 1985).

The Trustee's statement here—that Plaintiffs agreed to cease doing business by April 30, 2013—does not relate to the *quality* of Plaintiffs' goods or services. Plaintiffs have not cited any authority, and the Court has found none, that would support an IDTPA claim in these circumstances.

Defendants' motion to dismiss Pendant Count VII is therefore granted.

## Pendant Count VIII(1):[10]  Common Law Commercial Disparagement

In Pendant Count VIII(1), Plaintiffs allege a similar claim for "common law commercial disparagement," although it too cites the IDTPC. Am. Compl., Eighth Pendent Claim, ¶ 55. Defendants again argue that Pendant Count VIII(1) fails to state a claim and that they are immune from liability under the Illinois Tort Immunity Act. And in their response, Plaintiffs again do not cite any authority for this claim and do not discuss the elements they must establish.

Illinois courts are somewhat split on whether this tort even exists. *See, e.g., Becker v. Zellner*, 684 N.E.2d 1378, 1387 (Ill. App. Ct. 1997) ("There is scant authority regarding the tort of commercial disparagement. Currently, it is disputed as to whether a cause of action for commercial disparagement remains viable in

---

[10] In their Amended Complaint, Plaintiffs label two separate claims as the "Eight [sic] Pendant Claim."

Illinois."); 11 Ill. Jur. Personal Injury & Torts § 11:82 ("The common law tort of commercial disparagement has been rejected by some Illinois appellate districts, while others appear to conditionally recognize the tort. However, it appears that Illinois appellate courts have been hesitant to recognize it.").

Like a statutory IDTPA claim, the Illinois courts that have recognized a common law commercial disparagement claim have limited it to "statements which disparage the *quality* of one's goods or services." *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 719 (Ill. App. Ct. 1978) (emphasis in original); *accord Imperial Apparel, LTD v. Cosmo's Designer Direct, Inc.*, 853 N.E.2d 770, 781-82 (Ill. App. Ct. 2006); *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 702-03 (Ill. App. Ct. 2002); *Barry Harlem Corp. v. Kraff*, 652 N.E.2d 1077, 1083 (Ill. App. Ct. 1995); *Suhadolnik v. City of Springfield*, 540 N.E.2d 895, 912-13 (Ill. App. Ct. 1989).

Even assuming that a claim for common law commercial disparagement is viable in Illinois, the Trustee's statement at issue here again does not relate to the *quality* of Plaintiffs' goods or services. Plaintiffs have not cited any authority, and the Court has found none, that would support a common law commercial disparagement claim in these circumstances.

Defendants' motion to dismiss Pendant Count VIII(1) is therefore granted.

**Pendant Count VIII(2): Common Law False Light In Public Eye**

Finally, in Pendent Count VIII(2), Plaintiffs allege a claim for "common law false light in the public eye." Defendants again argue that Pendant Count VIII(2) fails to state a claim and that they are immune from liability under the Illinois Tort

Immunity Act. In their response, Plaintiffs once again do not cite any authority for this claim and do not discuss the elements they must establish.

Illinois law recognizes a claim for false light invasion of privacy, which is apparently what Plaintiffs are attempting to assert. The claim has three elements: (1) the plaintiff was placed in a false light before the public; (2) the false light in which plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant acted with malice, meaning with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *See Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201, 209-10 (Ill. 1992) (citing *Lovgren v. Citizens First Nat'l Bank*, 534 N.E.2d 987 (Ill. 1989)).

This is ultimately a privacy tort—"[t]he purpose underlying the false light cause of action is to define and protect an area within which every citizen must be left alone." *Kolegas*, 607 N.E.2d at 210. Thus, "the tort of false light invasion of privacy does not protect a party's reputation; it protects an individual's personal privacy interest to be free from false publicity. Corporations do not have such a privacy interest." *Oberweis Dairy, Inc. v. Democratic Congressional Campaign Comm.*, 2009 WL 635457, at *1 (N.D. Ill. Mar. 11, 2009) (citations omitted); *see also Am. States Ins. Co. v. Capital Assoc. of Jackson Cnty., Inc.*, 392 F.3d 939, 942 (7th Cir. 2004) ("[B]usinesses lack interests in seclusion. . . . Most states hold that business entities lack privacy interests."); Restatement (Second) of Torts § 652I & cmt. c (1977) ("A corporation . . . has no personal right of privacy. It has therefore no cause of action for any of the four forms of invasion covered by §§ 652B to 652E").

Plaintiffs seek damages for Trustee Falagario's statement that "the one current Village weapons dealer licensee has agreed that it will cease doing business in the village no later than April, 30, 2013." Am. Compl., Pendant Count VIII(2), ¶ 48. That licensee is Ghost Industries, a limited liability company. *Id.* at Exs. B & C. Plaintiffs fail to state a plausible claim that Ghost Industries had privacy rights that were violated by Trustee Falagario's statement. Plaintiffs have likewise failed to state a plausible claim that Tony Kole's privacy rights were violated.

Defendants' motion to dismiss Pendant Count VIII(2) is therefore granted.

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss, R. 13, is granted in part and denied in part. Plaintiffs shall file a Second Amended Complaint consistent with this Order on or before May 17, 2013. If Plaintiffs need additional time, they must seek an extension *before* the deadline expires. This matter is set for a status hearing on May 24, 2013 at 9:00 a.m. To the extent the parties have not already done so, the parties should confer pursuant to Fed. R. Civ. P. 26(f) and submit a proposed discovery schedule at least 3 days before the hearing.

The Court hopes that this Order will help clean up the pleadings and streamline this case moving forward. Plaintiffs are of course free to continue to pursue any of their remaining claims that have potential merit. But Plaintiffs should seriously consider whether it would be in their own interest to further streamline their theories in the next iteration of the complaint. This case is still in the pleading stage after nearly two years of litigation, largely because of the

"shotgun" approach taken by Plaintiffs to date. By attempting to assert every conceivable claim against every conceivable defendant (most of which plainly had no merit), Plaintiffs have only delayed the resolution of their core claims as the expiration date of their license quickly approaches.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  April 19, 2013