**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONY KOLE and GHOST INDUSTRIES, LLC,<br>an Illinois limited liability company, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 3871 |
| v. | ) ) | |
| VILLAGE OF NORRIDGE, an Illinois municipal<br>corporation, | ) ) ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

Plaintiffs, TONY KOLE and GHOST INDUSTRIES, LLC, by and through LAW FIRM

OF DAVID G. SIGALE, P.C., submit their Memorandum of Points and Authorities in Support

of their Motion for Preliminary Injunction.

Dated: November 21, 2013                Respectfully submitted,

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com


By: _____/s/David G. Sigale_____
            David G. Sigale

Attorney for Plaintiffs

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

Table of Authorities ……………………………………………………………… ii

Preliminary Statement ................................................................................................. 1

Statement of Facts ...................................................................................................... 1

Summary of Argument ............................................................................................... 8

Argument..................................................................................................................... 8

    I.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.......................................................... 9

    II.  TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE GUN STORE BAN'S HARM ........................................................................... 10

    Ill. PLAINTIFFS WILL PREVAIL ON THE MERITS, AS NORRIDGE'S GUN STORE BAN VIOLATES THEIR, AND THEIR CUSTOMERS', SECOND AMENDMENT RIGHTS. ...................................................................................................... 11

    IV. THE BALANCE OF INTERESTS FAVOR IMMEDIATE INJUNCTIVE RELIEF.................................................................................................................. 17

Conclusion ……………………………………………….................................................. 18

TABLE OF AUTHORITIES

Cases

*Andrews v. State*,
50 Tenn. 165 (1871) ................................................................................. 11

*Christian Legal Soc 'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ................................................................. 10, 17

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ................................................................................. 14

*Dearth v. Holder*,
893 F.Supp.2d 59 (D.D.C. 2012) ............................................................. 11

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008) ............................................... 9, 10, 11, 12, 14, 15

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ........................................................... *passim*

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*,
549 F.3d 1079 (7th Cir. 2008) ................................................................. 8

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) .......................................................... 9-10

*Kennedy v. Louisiana*,
128 S. Ct. 2641 (2008) ............................................................................. 14

*Lawrence v. Texas*,
539 U.S. 558 (2003) ................................................................................. 14

*Martin v. Harrington & Richardson, Inc.*,
743 F.2d 1200 (7th Cir. 1984) ............................................................... 15

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ..................................................................... 9, 12, 14

*Miles Christi Religious Order v. Twp. of Northville*,
629 F.3d 533 (6th Cir. 2010) ................................................................. 10

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ................................................................. 13

*National People Action v. Wilmette*,
914 F.2d 1008 (7th Cir. 1990) ................................................................................. 9

*Reliable Consultants, Inc. v. Earle*,
517 F.3d 738 (5th Cir. 2008) …………………………………………………………... 15

*Reno v. Flores*,
507 U.S. 292 (1993) ………………………………………………………………… 12

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ................................................................................................ 11

*Schad v. Borough of Mt. Ephraim*,
452 U.S. 61 (1981) …………………………………………………………………... 16

*Schneider v. State of New Jersey*,
308 U.S. 147 (1939) ………………………………………………………………… 16

*Teixeira v. County of Alameda*,
2013 U.S. Dist. LEXIS 128435 (N.D.CA) …………………………………………… 12, 13

*United States v. Chafin*, 423 F.App'x. 342
(4th Cir. 2011) ………………………………………………………………..………… 16

*United States v. Marzzarella*,
614 F.3d 85 (3rd Cir. 2010) …………………………………………………………… 12

*United States v. Miller*,
307 U.S. 174 (1939) ………………………………………………………………… 15


Constitutional Provisions

U.S. Const. amend. II ........................................................................................... *passim*

U.S. Const. amend. XIV ……………………………………………………….......... 9


Statutes, Rules, and Ordinances

Norridge, Illinois, Code of Ordinances, Chapter 22 - Businesses,
Article VIII - Weapons Dealers ……………………………………………………… 2

An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1697-11 ……………………………………………………………….. 4-6

36 U.S.C. §§ 40701, *et seq.* ………………………………………………………….. 14


Other Sources

CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ………………... 14

Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ………………………………………… 14

Laws of Virginia, February, 1676-77, VA. STAT. AT LARGE, 2 HENING 403 (1823) ……... 15

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms. The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983) ………………………………... 15

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

On November 30, 2013, at least some amount of time before this matter is finally concluded, Plaintiffs are going to be run out of business. This is because an Ordinance bans all gun stores in Norridge as of April 30, 2013. And while Plaintiffs' ability to operate was extended until November 30, 2013, that time is running out.

There are many serious issues in this case, most of a constitutional nature. Plaintiffs ask that they be allowed to remain in business, which does not injure Defendant in any way, while these issues are being presented to the Court.

Defendant's Revised Ordinance banning the operation of gun stores flatly violates the rights to arms, and poses an immediate threat to public safety. If not preliminarily enjoined, the ban on the sale and purchase of firearms in the Village will irreparably harm not only Plaintiffs and their business, but also the public at large. Preliminary injunctive relief, at least until these issues can be more fully fleshed out in this case, is warranted.

### STATEMENT OF FACTS

1.      Plaintiff Kole is a natural person and a citizen of the United States residing in Chicago, Illinois. He is the President and sole owner of the co-Plaintiff Ghost Industries, LLC. At all times relevant Kole possessed a valid State of Illinois Firearms Owner Identification Card (the "FOID Card") and is trained and experienced in the safety and use of various firearms or ammunition products (*See* Second Amended Complaint (Declaration of Tony Kole (hereinafter "Kole") at par. 1).

2.      Plaintiff Ghost is an Illinois limited liability company having its primary place of business in Norridge, Illinois. Ghost does business and engages in local, internet and interstate commerce as a duly federally licensed firearms and ammunition products dealer by the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") pursuant to Title I, Gun Control Act of 1968 (the "GCA"), and pursuant to other applicable regulations and federal law. Ghost possesses a valid Federal Firearms License No. 3-36-031-01-4B-02885 (the "FFL"), a copy which is attached to the Second Amended Complaint (hereinafter "2AC") (Kole at par. 2).

3.      In 2010, Plaintiffs decided, after extensive research, to start a business in the Village selling firearms to law enforcement officers, hunters, sportsmen, and other law-abiding citizens. At that time, Village had a home-rule ordinance permitting weapons dealers. Prior to securing and leasing a commercial space, Plaintiffs contacted the Village regarding any safety and other concerns the Village may have with the proposed business. Thereafter, a representative from the Village confirmed to Kole that his proposed business was permitted in the Village. The representative also provided Plaintiffs with relevant Village zoning requirements for the proposed firearms business (Kole at par. 3).

4.      In reliance on the confirmation and information from the Village, on or about November 16, 2010, Plaintiffs applied to the Village for a Weapons Dealers Business License under the Norridge, Illinois, Code of Ordinances, Chapter 22 - Businesses, Article VIII - Weapons Dealers (the "Original Weapons Dealer Ordinance"), a copy which is attached to the 2AC as Exhibit "B," so Ghost could open and operate a gun shop. Ghost executed a lease at 7601 West Montrose Avenue, Suite 2, in Norridge and waited processing of its FFL application by the ATF and its weapons dealer business license by the Village (Kole at par. 4).

2

5.    On or about November 2, 2010, the ATF arranged a routine inspection of the leased premises so that it could issue a FFL to Plaintiffs.  When *en route* to the inspection, the ATF agents informed Plaintiffs that the inspection was cancelled because the Village (A.) refused to give a routine approval to proceed; (B.) through its representative delayed issuance of a license and told Plaintiffs that the Village Present and Trustees would not allow firearms transfers on said premises (Kole at par. 5).

6.    That, at all times relevant, the law regarding the individual right to purchase and possess firearms for lawful purposes was clearly established, as well as the right to use firearms for lawful purposes including self-defense and training.

7.    Following the Village's refusal to issue the business license and the resulting canceled ATF inspection, Plaintiffs sent a letter to the Village demanding compensation for the financial damages Plaintiffs business had suffered.  The Village ignored Plaintiffs' demand (Kole  at par. 11).

8.    Shortly thereafter, the Village's Attorney, Mark V. Chester, contacted Kole, purportedly on behalf of the Village and its officials.  Chester acknowledged that Plaintiffs' proposed business was a lawful permitted occupation, and told Kole that regardless of that fact, the resistance and delay that the Village's President and Trustees were exerting regarding Ghost's ATF and Village business licenses were because "they wanted to protect their political careers - God forbid something should ever happen," and that the "reason this law [the Original Weapons Dealer Ordinance] was on the books is because a large retailer, K-Mart, had earlier approached the Village and lobbied its officials to permit the sale of firearms and ammunition in the Village or else it would relocate its store which would cause the Village to lose tax revenues," but eventually K-Mart voluntarily ceased selling and transferring firearms and

3

ammunition, though the Original Weapons Dealer Ordinance remained in effect until February 11, 2011 and such business activities were, and continue to remain, lawful (Kole at par. 7).

9.      Despite knowing that Plaintiffs' business was permitted by Village Ordinance and was otherwise lawful, Village through its officials and representatives demanded, as a condition for the approval of Plaintiffs' business license, that Plaintiffs execute an "Agreement Between the Village of Norridge & Ghost Industries, LLC" (hereinafter the "UVA" (*Ultra Vires* Agreement)), a copy of which is attached to the 2AC Exhibit "C." The UVA was not imposed on any other business licensee, and resulted in the Plaintiffs being forced to comply with terms, conditions and restrictions on their ability to conduct business, as well as the waiver of their constitutional rights (Kole at par. 8).

10.     The UVA was forced upon Plaintiffs in order to prevent them from doing business, drive them out of business and deprive them of their sales, profits and livelihood. The UVA's intent was to deny Plaintiffs the ability to acquire, obtain, advertise for sale, market, keep and bear arms (Kole at par. 9).

11.     Having no recourse and facing the certainty of the Village's continued unlawful delay and withholding of the Plaintiffs' business license, which also improperly undermined Ghost's ability to be approved for an FFL by the ATF, and which also improperly denied Plaintiffs the ability to conduct their livelihood in the Village, Plaintiffs reluctantly succumbed to the Village's unconstitutional conditions and signed the UVA on November 29, 2010. Plaintiffs did not sign the UVA voluntarily, but were coerced into doing so, thus involuntarily giving up certain of their constitutional rights, as the only way they would get their business license (Kole at par. 10).

4

12. After Plaintiffs signed the UVA, the Village revised the Norridge Weapons Dealers Licensing Ordinance by adopting and enacting "An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1697-11" which was adopted on or about February 9, 2011 (hereinafter "the Revised Ordinance"), a copy of which is attached to the 2AC as Exhibit "D." (Kole at par. 11.)

13. At the time the Revised Ordinance was adopted, the Village President stated, *inter alia*, "It's so strong, I don't think anybody would want to come here. We only have the one weapons business here [Ghost] that we are aware of." (Kole at par. 12.)

14. The Original Weapons Dealers Ordinance, as amended by the Revised Ordinance, purports to allow Plaintiffs to operate their business in the Village, but a variety of its sections work to effectively prohibit Plaintiffs from fully operating by unjustifiably burdening their operation and use. Specifically, The UVA contained the following provisions to which Plaintiffs were forced to capitulate:

   a. imposed a total ban on physical deliveries of firearms or ammunition on the premises - not even to Law Enforcement; and requiring that all deliveries sent from the Plaintiffs' premises be by unmarked packaging if the delivery is of a "used' firearm and shall be delivered in original packaging as provided by the manufacturer, wholesaler, or distributor if it is a "new" firearm and be in secure packaging sent via post office or courier to a licensed federal firearms dealer (FFD);

   b. imposed a total ban on storage of ammunition or firearms on the premises thereby requiring Plaintiffs needing to first receive payment from a customer, then order a weapon from their supplier, receive it, inventory, label and rush to send it out the same day; by prohibiting Plaintiffs from storing firearms or ammunition on the Premises overnight or longer than twelve (12) hours during any day and that any firearms in Plaintiffs' inventory on the premises will either be disabled by a locking device made

5

for use on firearms or secured in a locked cabinet;

c.       imposed a total ban on the commercial display of Plaintiffs' lawful products by prohibiting Plaintiffs from maintaining a sales or retail display of any firearms or ammunition on the premises;

d.       prohibited Plaintiffs from posting or erecting any exterior signage indicating to the public that its offices are located on the premises or indicating the business of Plaintiffs (*i.e.* weapons sales), requiring the limitation of interior signage to that required by state and federal law and only allowing Plaintiffs to put its name on one or more interior door to premises;

e.       limited the amount of firearms Plaintiffs received per month by requiring that Plaintiffs agree to receive no more than forty (40) long guns or hand guns at the Premises per month for the first twelve (12) months following the date of the UVA and the above-referenced amounts shall increase by ten (10) percent twelve (12) months, and twenty four (24) months thereafter, and to have no more than twenty (20) firearms in the premises at any one time;

f.       required that Plaintiffs agree to receive no more than four thousand (4,000) rounds of ammunition per month for the first twelve (12) months following the date of the UVA and the above-referenced amounts shall increase by ten (10) percent twelve (12) months and twenty four (24) months thereafter, and to have no more than one thousand (1,000) rounds on the premises at any one time.  Provided, however, larger quantities (not in excess of the monthly amount) may be on the premises for no longer than one (1) hour after they are delivered from the distributor, wholesaler or manufacturer;

g.       arbitrarily dictated that Village's only current weapons dealer (Plaintiffs) must cease doing business no later than April 30, 2013;

h.       required that in the event that Plaintiffs breach any of the conditions of the UVA and such breach is not cured within three (3) business days after the Village delivers written notice to the Plaintiffs specifying the breach, its license will become forfeit and Plaintiffs will cease doing business under that license.

i.       required that the Village will only renew Plaintiffs' license twice provided that Plaintiffs remain in compliance with the UVA and to exempt Plaintiffs from any change in its business license ordinances and rules in any amendments the Village may make to its Code of Ordinances which directly or indirectly impacts Plaintiffs' business under the Weapons Dealer License granted by the Village and requiring that the Village in the

> event it repeals its Weapons Dealer Ordinance within thirty six months of
> the execution of the UVA, will exempt the Plaintiffs from the repeal
> during that period.

(*See* Revised Ordinance; *See also* Kole at par. 13.)

15.     As a result of the Revised Ordinance, coupled with the terms of the UVA, Ghost

will be forced to close its business or relocate out of town as of November 30, 2013 (Kole at par.

14).

16.     As a result of the above, Plaintiffs fear prosecution under the Revised Ordinance,

arbitrary revocation of the license eventually issued them by the Village, as well as interference,

prohibition and the unlawful elimination of their otherwise lawful business activities, and

reprisals by the Defendants, should they undertake such conduct in and about the Village or with

respect to their suppliers and customers that may in any way be considered or construed by

Defendants to be a breach of said UVA or a violation of the Revised Ordinance (Kole at par. 15).

17.     As a direct and proximate result of Village's unlawful impositions, Plaintiffs'

business, and the expansion thereof, is essentially limited to only conducting online sales and

shipping from suppliers and other out of area dealers, thereby resulting in the potential loss of

tens of thousands of dollars in sales and thousands of dollars in profits per day (Kole  at par. 16).

18.     The UVA and Revised Ordinance and burdensome requirements and restrictions

contained in the Ordinances challenged in this complaint unjustifiably inhibit Kole's and Ghost's

efforts to advertise, and sell firearms from Ghost's business location in Norridge (Kole at par.

17).

19.     But for the enactments and burdensome requirements and restrictions contained in

the UVA and Ordinances challenged in this complaint, Plaintiffs would advertise, and sell

firearms from, its business location in Norridge, and their would-be customers in and around

7

Norridge who wish to exercise their constitutionally-protected rights to purchase firearms for lawful purposes including self-defense and training would be able to purchase said firearms, and accompanying ammunition, from Plaintiffs' business location in Norridge (Kole at par. 18).

## SUMMARY OF ARGUMENT

Defendant Norridge's gun store ban unquestionably violates the constitutional guarantees of purchasing arms for self-defense and lawful purposes, as do the other parts of the Revised Ordinance and Ultra Vires Agreement that, regardless of their validity as generally applied, undeniably frustrate constitutionally-secured activity.

Considering the certainty of success on the merits, Plaintiffs are entitled to preliminary injunctive relief. In relevant part for this Motion, Plaintiffs will soon suffer irreparable harm in the absence of injunctive relief, for which there is no adequate remedy at law. Granting Plaintiffs relief cannot injure Defendant. And given the degree to which the firearms sales ban threatens public safety and deprives the public of constitutional rights, the public interest - already favoring the exercise of fundamental rights - is clearly satisfied by immediately enjoining the Defendant's unconstitutional ban, at a minimum while this matter is pending.

## ARGUMENT

A plaintiff seeking a preliminary injunction must prove three threshold elements: "[f]irst, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citations omitted). Upon satisfying these threshold requirements, the Court "must somehow balance the nature and degree of the plaintiffs injury, the likelihood of prevailing at trial, the possible injury to the

defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id*. (citations

omitted). In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff

is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to

win, the more need it weigh in his favor." *Id*. (citations omitted).

Plaintiffs easily satisfy all three threshold requirements for obtaining preliminary

injunctive relief, and the balance of interests weigh heavily in their favor.

I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
PRELIMINARY INJUNCTIVE RELIEF.

Defendant's residents, like most Americans and people residing in this country, enjoy a

fundamental right to keep and bear arms. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).

"[T]he inherent right of self-defense has been central to the Second Amendment right." *District

of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008). The Second Amendment right is

incorporated against the Defendant *via* the Fourteenth Amendment. *See McDonald*.

However, if firearms sales are banned in Norridge, individuals including the plaintiffs'

customers will be frustrated in their ability to obtain the means of exercising Second Amendment

rights. With expiration of the November 30 grandfathering period, many would-be gun owners,

including Plaintiffs' would-be customers, will be unable to purchase firearms in Norridge.

"Even a temporary deprivation of first amendment freedom of expression rights is

generally sufficient to prove irreparable harm." *National People's Action v. Wilmette*, 914 F.2d

1008, 1013 (7th Cir. 1990) (citations omitted). The Seventh Circuit in *Ezell v. City of Chicago*,

651 F.3d 684 (7th Cir. 2011) favorably compared First and Second Amendment freedoms: "The

loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the

intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if

those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from

9

exercising those rights in the future.' *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010) (internal alteration and quotation marks omitted); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)." *Ezell*, 651 F.3d at 699.

"The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages." *Ezell*, 651 F.3d at 699.   .

Considering that the Second Amendment exists to secure the right of self-defense, the inability to access constitutionally-protected arms causes a profound loss of a sense of one's security - to say nothing of the irreparable harm resulting from a successful criminal attack, or tragic accident that could have been averted with the purchase and intended use of a firearm. The irreparable harm flowing from any delays in obtaining relief is palpable.

## II. TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE GUN STORE BAN'S HARM.

There is no way to quantify, in terms of money damages, the inability to engage in protected Second Amendment activity such as defensive shooting.  The infringement of constitutional rights is frequently considered to be beyond quantification with money damages. *See*, *e.g.*, *Christian Legal Soc 'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

No legal remedies will be available to would-be gun owners who are deprived of the right to purchase firearms from gun stores in the Villages. And quite obviously, no legal remedies will suffice to compensate those killed or injured for lack of ability to purchase a firearm for self-defense in the Village, owing to the Defendant's firearms sales ban.

10

III. PLAINTIFFS WILL PREVAIL ON THE MERITS, AS NORRIDGE'S GUN STORE BAN VIOLATES THEIR, AND THEIR CUSTOMERS', SECOND AMENDMENT RIGHTS.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). While the Supreme Court has noted that "laws imposing conditions and qualifications on the commercial sale of arms" are presumably acceptable (*See Heller*, 128 S.Ct. at 2817), which Plaintiffs do not contest, it is the outright ban of the sale of arms that it unconstitutional. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 128 S.Ct. 2781, 2821 (2008).

There is no doubt the purchase of firearms for self-defense implicates the Second Amendment. And while a categorical ban on the purchase of firearms transcends levels of scrutiny and is unconstitutional on its face, should the Court employ means-ends scrutiny in its analysis, *Ezell* mandates that either strict scrutiny or near-strict scrutiny be employed, as "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708.

"The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Further, this Court has already noted that the Village's ban infringes on Plaintiffs' customers' right to keep and bear arms, much like Action Target, Inc.'s firing range customers were infringed by the City of Chicago' firing range ban in *Ezell* (S*ee also Dearth v. Holder*, 893 F.Supp.2d 59, 69 (D.D.C. 2012) (right to purchase firearm is a corollary to

11

right to possess firearm for self-defense). Defendant's argument that its gun store ban does not

impair peoples' ability to possess guns is disingenuous at best, and the claim that Plaintiffs do

not allege that people have been unable to obtain guns is irrelevant because the gun store ban is

unconstitutional on its face. "In a facial constitutional challenge, individual application facts do

not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is

enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that

accompanied its promulgation." *Ezell*, 651 F.3d at 697 (citing *Reno v. Flores*, 507 U.S. 292,

300-01, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

Indeed, the Seventh Circuit has already provided the framework for analyzing this issue:

"Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second

Amendment right—like the handgun bans at issue in those cases, which prohibited handgun

possession even in the home—are categorically unconstitutional. *Heller*, 554 U.S. at 628-35

("We know of no other enumerated constitutional right whose core protection has been subjected

to a free-standing 'interest-balancing' approach.'); *McDonald*, 130 S. Ct. at 3047-48." *Ezell*,

651 F.3d at 703.

*Ezell* is not alone. "In order to uphold the constitutionality of a law imposing a condition

on the commercial sale of firearms, a court necessarily must examine the nature and extent of the

imposed condition. If there were somehow a categorical exception for these restrictions, it would

follow that there would be no constitutional defect in prohibiting the commercial sale of

firearms. Such a result would be untenable under *Heller*." *United States v. Marzzarella*, 614

F.3d 85, 92, fn 8 (3rd Cir. 2010).

Although wrongly decided, the case of *Teixeira v. County of Alameda*, 2013 U.S. Dist.

LEXIS 128435 (N.D.CA), where the District Court upheld a 500 foot distance from "sensitive

12

areas" requirement for gun stores, is instructive as to this issue. The plaintiffs in *Teixeira*

attempted to compare their case to *Ezell*, but the Court stated: "But *Ezell* is inapposite because,

as the Seventh Circuit noted, '[t]he City's firing-range ban is not merely regulatory; it prohibits

the law-abiding, responsible citizens of Chicago from engaging in target practice.' *Ezell*, 651

F.3d at 708. *Ezell* recognized the difference between a ban and 'laws that merely regulate rather

than restrict, and modest burdens . . . may be more easily justified.' *Id*." *Teixeira*, 2013 U.S.

Dist. LEXIS 128435 at 21-22. The plaintiffs also cited *Moore v. Madigan*, 702 F.3d 933 (7th

Cir. 2012), in which the Seventh Circuit struck down the State of Illinois's ban on the public

carrying of firearms. The Court stated: "The plaintiffs' reliance on *Moore v. Madigan* is

similarly misplaced because that case also involved a near-total ban, this time on carrying a gun

in public." *Teixeira*, 2013 U.S. Dist. LEXIS 128435 at 22.

In contrast, *Ezell* and *Moore* are almost directly on point. Norridge has instituted a total

ban on gun stores, with the only exception about to expire. The Defendant has made arguments

in its Reply brief for its Motion to Dismiss why it should be allowed to ban gun stores, but

Plaintiffs should be allowed to remain in business while they challenge those alleged

justifications.

However, *Teixeira* failed to acknowledge that gun stores have no adverse secondary

effects. In the adult bookstore context, for example, the stores are regulated not for their content

but for adverse secondary effects. The same is true in the Second Amendment context. Contrary

to Defendant's argument, baseless fear of speculative harm is not an adverse secondary effect.

Guns are sold all over the United States, at hardware stores, sporting goods stores, Wal-Mart,

and many other places. Gun stores do not pollute or otherwise degrade a neighborhood, and it is

one of the few businesses where both the buyer and seller undergo stringent background checks.

13

Plaintiffs do not claim that gun stores are beyond regulation. Churches and bookstores, too, must be built to code, and comply with constitutionally-adequate zoning requirements. They can be regulated for the adverse secondary effects of noise, pollution, traffic, etc…. But a blanket prohibition on gun stores is beyond constitutional limitations. Norridge appears to be arguing that there is no place a gun store would fit in, but banning such a business outright is simply unlawful. Under *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986), Plaintiffs must be given the reasonable opportunity to open and operate somewhere within the Village limits. The Defendant ban fails this standard miserably.

Owing to the unusual nature of this complete ban on gun stores, the laws will most likely fail. *Cf. McDonald* (rarity of Chicago handgun ban indicates its unconstitutional nature) (plurality op.); *cf.* 36 U.S.C. §§ 40701, *et seq.* (Civilian Marksmanship Program); *see also Lawrence v. Texas*, 539 U.S. 558, 573 (2003) (only four states prohibit intimate practice); *cf. Kennedy v. Louisiana*, 128 S. Ct. 2641, 2653 (2008) (punishment known in only six states violates Eighth Amendment). Indeed, in *Heller*, neither the D.C. Circuit nor the Supreme Court bothered to engage in any balancing test or other extended analysis before striking down Washington, D.C.'s ban on the possession of functional firearms for self-defense, as that law literally contradicted a "core" aspect of Second Amendment rights. *Heller*, 128 S. Ct. at 2818. A complete ban on firearms sales will meet the same fate.

As far as the Founders, Thomas Jefferson said "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895).[1]

---

[1] See also CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them& .") (emphasis added) (quoted in *Heller*, 554 U.S. at 583 n.7);

The early militia was made up of males capable of bearing arms, and the militia members exercised their right to private firearm possession. *See United States v. Miller*, 307 U.S. 174, 179 (1939) ("the Militia comprised all males physically capable of acting in concert for the common defense & [a]nd further & ordinarily when called for service these men were expected to appear *bearing arms supplied by themselves*") (emphasis added). If the militia members had to arm themselves, they must have been provided the means to do so, and therefore commercial firearms sales could not have been banned.

Of course, government has attempted to ban gun sales and purchases in the past. "Between the Restoration and the Glorious Revolution, the Stuart Kings" used disarmament as a means of "suppress[ing] political dissidents." *Heller*, 554 U.S. at 592. Charles II restricted the trade in arms as a tactic to suppress the people. Joyce Lee Malcolm, The Right of the People to Keep and Bear Arms. The Common Law Tradition, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983).

But it is not within the Defendant's constitutional power to ban all gun stores - doing so violates the Second Amendment. The Supreme court has held that ". . . restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). Indeed, in *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), the Seventh Circuit confronted the issue of strict tort liability for firearms manufacturers when a criminal caused injury with a handgun. The Court said "[i]mposing liability for the sale of handguns, which would in practice drive manufacturers out of business, would produce a handgun ban by judicial fiat in the face of the decision by Illinois to allow its citizens to possess handguns." *Id.* at 1204.

---

Laws of Virginia, February, 1676-77, VA. STAT. AT LARGE, 2 HENING 403 (1823) ("It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony ....").

Defendant has no interest, let alone an important or substantial one, in banning all gun stores. Indeed, the governmental interest here is precisely the suppression of gun ownership as the manifestation of political fear and dislike of firearms. This "purpose" is made clear when Defendant argues: "Just as the Village does not have to permit gun sales on street corners near schools, it can reasonably restrict in-person purchases in physical storefronts in a Village populated by many sensitive places." (*See* Defendant's Reply in Support of Motion to Dismiss at p.2.) By comparing lawful firearm sales to illicit back-alley transfers, and labeling the entire Village a sensitive area, Defendant's purpose amounts to no more than NIMBY – Not In My Back Yard. And even if the Defendant's actions were merely a form of regulating firearms activity in furtherance of some legitimate interest, a total ban on gun stores is plainly overbroad.

The Defendant has cited to *United States v. Chafin*, 423 F.App'x. 342 (4th Cir. 2011), but that case is about an individual who purchased a firearm illegally and then sold it illegally to a friend who was ineligible to possess a firearm due to drug use. The case has nothing to do with the present situation. Such a comparison by Defendant is at best misplaced, at worst a cheap *ad hominem* attack equating all firearms owners to criminals. Further, the criminal defendant in *Chafin* did not argue that selling firearms is historically protected.

Defendant argues in its Reply Brief in support of its pending Motion to Dismiss that gun purchases are not banned because people can buy them on the Internet. However, this is a red herring and is no different from arguing that people can purchase them outside the Village, which is an argued that failed in *Ezell*:

> In the First Amendment context, the Supreme Court long ago made it clear that "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981) (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163, 60

16

> S. Ct. 146, 84 L. Ed. 155 (1939)). The same principle applies here.
> It's hard to imagine anyone suggesting that Chicago may prohibit
> the exercise of a free-speech or religious-liberty right within its
> borders on the rationale that those rights may be freely enjoyed in
> the suburbs. That sort of argument should be no less unimaginable
> in the Second Amendment context.

*Ezell*, 651 F.3d at 697.

It is unfathomable that Defendant would even try to ban libraries, or houses of worship, or even adult bookstore, on the grounds that people can go to those places in another municipality, or that books, adult material and religious materials can be found on the Internet.

Law-abiding people are severely limited in their ability to exercise their core Second Amendment right to self-defense if they are unable to purchase firearms.  Likewise, said people are severely limited in their ability to exercise their fundamental Second Amendment right to train with a firearm for the purpose of acquiring and maintaining proficiency in order to be able to engage in self-defense (*See Ezell*, 651 F.3d at 704), if they are unable to purchase a firearm. And just as the City of Chicago's defense that people could go train with a firearm in some other city was unpersuasive to the Seventh Circuit (*Id.* at 697), so too should be any argument that it is acceptable to ban commercial firearms sales with the Defendant's borders, since people can purchase firearms, fundamentally protected for self-defense purposes, somewhere else.

## IV. THE BALANCE OF INTERESTS FAVOR IMMEDIATE INJUNCTIVE RELIEF.

The Plaintiffs are certain to prevail on the merits. Absent relief they will suffer irreparable injury in the loss of Second Amendment rights, if not actual physical harm.  The Village officials' apparent disliking of guns is not a legitimate interest.  *See Christian Legal Soc'y*, 453 F.3d at 859 (. The balance of interests could not more completely tilt in favor of immediate injunctive relief.

## CONCLUSION

The Defendant cannot ban gun stores completely from within its municipal limits. In the meantime, while this matter is pending the Plaintiffs are going to be legislated out of business at the end of the month. Plaintiffs respectfully request that the motion for preliminary injunctive relief, so that they may remain in business while this matter is being litigated, be granted.

Dated: November 21, 2013                              Respectfully submitted,


                                              By: _____/s/David G. Sigale_____
                                                          David G. Sigale

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.      On November 21, 2013, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                       /s/ David G. Sigale
                                      Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com

19