**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONY KOLE and GHOST INDUSTRIES, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 3871 |
| v. | ) ) | |
| VILLAGE OF NORRIDGE, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, TONY KOLE and GHOST INDUSTRIES, LLC, by and through LAW FIRM

OF DAVID G. SIGALE, P.C., submit their Memorandum of Points and Authorities in Support

of their Motion for Preliminary Injunction.

Dated: February 9, 2014

Respectfully submitted,

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com


By: _____/s/David G. Sigale_____
David G. Sigale

Attorney for Plaintiffs

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

### TABLE OF CONTENTS

Table of Authorities  …………………………………………………………………… iii

Preliminary Statement ..................................................................................................... 1

Statement of Facts ........................................................................................................... 2

Summary of Argument ..................................................................................................... 7

Argument........................................................................................................................... 7

    I.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
        PRELIMINARY INJUNCTIVE RELIEF.......................................................... 8

    II.  TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE
        FUNCTIONAL GUN STORE BAN'S HARM ................................................. 10

    Ill. PLAINTIFFS WILL PREVAIL ON THE MERITS, AS NORRIDGE'S WEAPONS
        DEALER ORDINANCE AND THE UVA VIOLATES THEIR, AND THEIR
        CUSTOMERS', CONSTITUTIONAL RIGHTS.............................................. 10

    IV. THE BALANCE OF INTERESTS FAVORS IMMEDIATE INJUNCTIVE
        RELIEF............................................................................................................ ... 27

Conclusion ………………………………………….................................................. 27

TABLE OF AUTHORITIES

Cases

*Alameda Books, Inc. v. City of Los Angeles*,
631 F.3d 1031 (9th Cir. 2011) …………………………………………………… 12, 16

*Annex Books, Inc. v. City of Indianapolis*,
2014 U.S. App. LEXIS 1477 (7th Cir., January 24, 2014) …………………………… 14

*Annex Books, Inc. v. City of Indianapolis*,
624 F.3d 368 (7th Cir. 2010) …………………………………………………………… 14

*Ballen v. City of Redmond*,
466 F.3d 736 (9th Cir. 2006) …………………………………………………… 24

*Camden County Board of Chosen Freeholders v. Beretta, U.S.A., Corp.*,
273 F.3d 536 (3rd Circ. 2001) ………………………………………………………… 17

*Carr v. Village of Willow Springs*,
2002 U.S. Dist. LEXIS 12867 (N.D.IL 2002) ……………………………………… 25

*Central Florida Nuclear Freeze Campaign v. Walsh*,
774 F.2d 1515 (11th Cir. 1985) ………………………………………………… 21

*Central Hudson Gas & Electric Corporation v. Public Service Commission*,
447 U.S. 557 (1980) ……………………………………………………………… 23

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006)………………………………………………………………… 10

*City of Chicago v. Beretta, U.S.A., Corp.*,
213 Ill.2d 351 (IL 2004) ……………………………………………………………… 17

*City of Cincinnati v. Discovery Network Inc.*,
507 U.S. 410 (1993) …………………………………………………………… 24

*City of Cleburne v. Cleburne Living Center, Inc.*,
473 U.S. 432 (1985) …………………………………………………………… 26

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ……………………………………………………………… 12, 16

*Clark v. Community for Non-Violence*,
468 U.S. 288 (1984) ………………………………………………………… 20

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008)........................................................................................ 8, 9, 11

*Eastern Connecticut Citizens Action Group v. Powers*,
723 F.2d 1050 (2d Cir. 1983) ……………………………………………………22

*Esmail v. Macrane*,
53 F.3d 176 (7th Cir. 1995) …………………………………………………… 26

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ……………………………………………….. 9, 12, 13, 14, 22

*Forsyth County, Georgia, v. The Nationalist Movement*,
505 U.S. 123 (1992) …………………………………………………………...18

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*,
549 F.3d 1079 (7th Cir. 2008) ......................................................................................... 8

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) ………………………………………………… 12

*Horina v. City of Granite City*,
538 F.3d 624 (7th Cir. 2008) ……………………………………………… 12, 14

*Ileto v. Glock, Inc.*,
194 F.Supp.2d 1040 (C.D.CA 2002) ……………………………………… 17

*iMatter Utah v. Njord*,
2013 U.S. Dist. LEXIS 158371 (D.UT, November 4, 2013) …………………………19, 20, 21

*Invisible Empire Knights of the KKK v. Mayor of Thurmont*,
700 F.Supp. 281 (D.Md 1988) ……………………………………………… 21

*Invisible Empire Knights of the KKK v. West Haven*,
600 F.Supp. 1427 (D.Conn. 1985) ……………………………………….. 21

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) …………………………………………… 9

*Long Beach Area Peace Network v. City of Long Beach*,
574 F.3d 1011 (9th Cir. 2009) …………………………………………….. 18

*Martin v. Harrington & Richardson, Inc.*,
743 F.2d 1200 (7th Cir. 1984) …………………………………………… 16

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010)............................................................................................................... 8

*Miles Christi Religious Order v. Twp. of Northville*,
629 F.3d 533 (6th Cir. 2010) ………………………………………………………………… 9

*Moore v. East Cleveland*,
431 U.S. 494 (1977) …………………………………………………………………………… 11

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ……………………………………………………………….. 13, 14

*NAACP v. Claiborne Hardware Company*,
458 U.S. 886 (1982) …………………………………………………………………………… 19, 21

*National People Action v. Wilmette*,
914 F.2d 1008 (7th Cir. 1990) ………………………………………………………………… 9

*New Albany DVD, LLC v. City of New Albany*,
581 F.3d 556 (7th Cir. 2009) ………………………………………………………………… 14

*People v. Sturm, Ruger & Co.*,
309 A.D.2d 91 (N.Y. App. Div.1, 2003) …………………………………………………….. 17

*Perkins v. F.I.E. Corp.*,
762 F.2d 1250 (5th Cir. 1985) ………………………………………………………………… 17

*R.V.S., L.L.C. v. City of Rockford*,
361 F.3d 402 (7th Cir. 2004) ……………………………………………………….. 12, 15, 16

*Reliable Consultants, Inc. v. Earle*,
517 F.3d 738 (5th Cir. 2008) ……………………………………………………………….... 16

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ………………………………………………………………………… 10

*Schad v. Borough of Mt. Ephraim*,
452 U.S. 61 (1981) …………………………………………………………………….. 11, 13

*Schneider v. State of New Jersey*,
308 U.S. 147 (1939) …………………………………………………………………………… 13

*Sioux City Bridge Co. v. Dakota County*,
260 U.S. 441 (1923) …………………………………………………………………………… 25

*Sunday Lake Iron Co. v. Township of Wakefield*,
247 U.S. 350 (1918) ……………………………………………………………………. 25

*United States v. Virginia*,
518 U.S. 515 (1996) ………………………………………………………………….. 16

*Van Arnam v. General Services Administration*,
332 F.Supp.2d 376 (D.Mass. 2004) …………………………………………… 21, 22

*Virginia Pharmacy Board v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976) …………………………………………………………… 22, 23

*Willowbrook v. Olech*,
528 U.S. 562 (2000) …………………………………………………………… 25, 26


Constitutional Provisions

U.S. Const. amend. I …………………………………………………………… *passim*

U.S. Const. amend. II ............................................................................................ *passim*

U.S. Const. amend. XIV ……………………………………………………….. *passim*


Statutes, Rules, and Ordinances

18 U.S.C. § 922(q)(2)(B)(ii) ………………………………………………….. 11, 15

430 ILCS 66/65(b) ……………………………………………………………… 15

An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1785-13 ……………………………………………………………….. 5

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### PRELIMINARY STATEMENT

The Defendant has boxed Plaintiffs into a corner. A new Weapons Dealer Ordinance was passed in December, 2013 ("New Ordinance"), which, through unconstitutional zoning and distance restrictions, leaves Plaintiffs no location to conduct its business. Additionally, the New Ordinance requires a draconian indemnification requirement that flies in the face of constitutional and tort law. Further, on its face the Ultra Vires Agreement ("UVA") that was forced upon the Plaintiffs is still in effect, which prohibits Plaintiffs from advertising, displaying its merchandise, stocking merchandise above certain quantities, as well as imposing other requirement. These are not only unconstitutional, but violate Equal Protection laws as presumably no other weapons dealer will be subject to similar requirements.

Despite the removal of the gun store ban, and despite the current restraining order entered by the Court against Defendant, there are many serious constitutional issues in this case. Plaintiffs ask that a preliminary injunction be entered against the Defendant while these issues are being presented to the Court.

Defendant's New Ordinance restricting the location of gun stores to a nullity violates the Second Amendment right to sell and purchase arms, and poses an immediate threat to public safety. If not preliminarily enjoined, the functional ban on the sale and purchase of firearms in the Village will irreparably harm not only Plaintiffs and their business, but also the public at large. Preliminary injunctive relief, at least until these issues can be more fully fleshed out in this case, is warranted.

### STATEMENT OF FACTS

1.      Plaintiff Kole is a natural person and a citizen of the United States residing in Chicago, Illinois.  He is the President and sole owner of the co-Plaintiff Ghost Industries, LLC. At all times relevant Kole possessed a valid State of Illinois Firearms Owner Identification Card (the "FOID Card") and is trained and experienced in the safety and use of various firearms or ammunition products (*See* Declaration of Tony Kole (hereinafter "Kole") at par. 1) (attached hereto as Exhibit "A").

2.      Plaintiff Ghost is an Illinois limited liability company having its primary place of business in Norridge, Illinois. Ghost does business and engages in local, internet and interstate commerce as a duly federally licensed firearms and ammunition products dealer by the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") pursuant to Title I, Gun Control Act of 1968 (the "GCA"), and pursuant to other applicable regulations and federal law.  Ghost possesses a valid Federal Firearms License No. 3-36-031-01-4B-02885 (the "FFL"), a copy which is attached to the Third Amended Complaint (hereinafter "3AC") (Kole at par. 2) (*See also* renewed FFL, attached hereto as Exhibit "B").

3.      Plaintiffs incorporate the facts alleged in Tony Kole's Declaration from the previous Motion for Preliminary Injunction in November, 2013.  Likewise, Plaintiffs incorporate their previous pleadings herein, including all relevant pleadings of the Second Amended Complaint and the previous Motion for Preliminary Injunction and Memorandum in Support.

4.      In November, 2010, and despite knowing that Plaintiffs' business was permitted by Village Ordinance and was otherwise lawful, Village through its officials and representatives demanded, as a condition for the approval of Plaintiffs' business license, that Plaintiffs execute an "Agreement Between the Village of Norridge & Ghost Industries, LLC" (hereinafter the

"UVA" (*Ultra Vires* Agreement)), a copy of which is attached to the 3AC and hereto as Exhibit

"C." The UVA was not imposed on any other business licensee, and resulted in the Plaintiffs

being forced to comply with terms, conditions and restrictions on their ability to conduct

business, as well as the waiver of their constitutional rights (Kole at par. 3).

5.     The UVA was forced upon Plaintiffs in order to prevent them from doing

business, drive them out of business and deprive them of their sales, profits and livelihood. The

UVA's intent was to deny Plaintiffs the ability to acquire, obtain, advertise for sale, market, keep

and bear arms (Kole at par. 4).

6.     Additionally, the UVA contained the following provisions to which Plaintiffs

were forced to capitulate:

> a.     imposed a total ban on physical deliveries of firearms or ammunition on the premises - not even to Law Enforcement; and requiring that all deliveries sent from the Plaintiffs' premises be by unmarked packaging if the delivery is of a "used' firearm and shall be delivered in original packaging as provided by the manufacturer, wholesaler, or distributor if it is a "new" firearm and be in secure packaging sent via post office or courier to a licensed federal firearms dealer (FFD);

> b.     imposed a total ban on storage of ammunition or firearms on the premises thereby requiring Plaintiffs needing to first receive payment from a customer, then order a weapon from their supplier, receive it, inventory, label and rush to send it out the same day; by prohibiting Plaintiffs from storing firearms or ammunition on the Premises overnight or longer than twelve (12) hours during any day and that any firearms in Plaintiffs' inventory on the premises will either be disabled by a locking device made for use on firearms or secured in a locked cabinet;

> c.     imposed a total ban on the commercial display of Plaintiffs' lawful products by prohibiting Plaintiffs from maintaining a sales or retail display of any firearms or ammunition on the premises;

> d.     prohibited Plaintiffs from posting or erecting any exterior signage indicating to the public that its offices are located on the premises or indicating the business of Plaintiffs (*i.e.* weapons sales), requiring the limitation of interior signage to that required by state and federal law and

3

only allowing Plaintiffs to put its name on one or more interior door to premises;

e.      limited the amount of firearms Plaintiffs received per month by requiring that Plaintiffs agree to receive no more than forty (40) long guns or hand guns at the Premises per month for the first twelve (12) months following the date of the UVA and the above-referenced amounts shall increase by ten (10) percent twelve (12) months, and twenty four (24) months thereafter, and to have no more than twenty (20) firearms in the premises at any one time;

f.      required that Plaintiffs agree to receive no more than four thousand (4,000) rounds of ammunition per month for the first twelve (12) months following the date of the UVA and the above-referenced amounts shall increase by ten (10) percent twelve (12) months and twenty four (24) months thereafter, and to have no more than one thousand (1,000) rounds on the premises at any one time.  Provided, however, larger quantities (not in excess of the monthly amount) may be on the premises for no longer than one (1) hour after they are delivered from the distributor, wholesaler or manufacturer;

. . .

h.      required that in the event that Plaintiffs breach any of the conditions of the UVA and such breach is not cured within three (3) business days after the Village delivers written notice to the Plaintiffs specifying the breach, its license will become forfeit and Plaintiffs will cease doing business under that license.

i.      required that the Village will only renew Plaintiffs' license twice provided that Plaintiffs remain in compliance with the UVA and to exempt Plaintiffs from any change in its business license ordinances and rules in any amendments the Village may make to its Code of Ordinances which directly or indirectly impacts Plaintiffs' business under the Weapons Dealer License granted by the Village and requiring that the Village in the event it repeals its Weapons Dealer Ordinance within thirty six months of the execution of the UVA, will exempt the Plaintiffs from the repeal during that period.

(*See* UVA; *See also* Kole at par. 6)

7.      Having no recourse and facing the certainty of the Village's continued unlawful delay and withholding of the Plaintiffs' business license, which also improperly undermined Ghost's ability to be approved for an FFL by the ATF, and which also improperly denied

4

Plaintiffs the ability to conduct their livelihood in the Village, Plaintiffs reluctantly succumbed to the Village's unconstitutional conditions and signed the UVA on November 29, 2010. Plaintiffs did not sign the UVA voluntarily, but were coerced into doing so, thus involuntarily giving up certain of their constitutional rights, as the only way they would get their business license (Kole at par. 5).

8.      On or about December 11, 2013, the Village again revised its Weapons Dealer Ordinance by passing "An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1785-13" (hereinafter "New Ordinance"). A copy of the New Ordinance is attached hereto as Exhibit "D." (Kole at par. 7).

9.      The New Ordinance purports to allow Plaintiffs to operate their business in the Village, but a variety of its sections work to effectively prohibit Plaintiffs from fully operating by unjustifiably burdening their operation and use. In the alternative, to the extent the opening, operation and use of gun stores might be technically feasible under the New Ordinance, such opening, operation and use is unjustifiably burdened by the challenged provisions. These include:

- Section 22-362, which prohibits gun stores from locating 1000 feet from any (a.) public or private nursery, elementary or secondary school; (b.) childcare facility; (c.) government building; (d.) public park playground, playing field, forest preserve, or other recreational area, or (e.) place of religious worship;

- Section 22-363.B.2.e, which requires a Weapons Dealer licensee to execute an agreement to indemnify, save, hold harmless the Village from any and all loss cost damage expense or liability or other claim whatsoever related to any claim filed in connection with the sale or use of a firearm, ammunition, or deadly weapon, or the issuance of a weapon dealer's license by the Village;

5

- Section 22-364.G., which limits a gun store to opening solely within a B-3 General Business District within the Village;

(Kole at par. 8).

10.     Plaintiffs have attempted to find a business location that complies with the New Ordinance, but no such location exists (Kole at par. 9).

11.     As a result of the New Ordinance, coupled with the terms of the UVA, Ghost will be forced to close its business, as it will be unable to relocate and otherwise stay in business due to the unconstitutional restrictions imposed upon them (Kole at par. 10).

12.     As a result of the above, Plaintiffs fear prosecution under the New Ordinance, arbitrary revocation of the license eventually issued them by the Village, as well as interference, prohibition and the unlawful elimination of their otherwise lawful business activities, and reprisals by the Defendants, should they undertake such conduct in and about the Village or with respect to their suppliers and customers that may in any way be considered or construed by Defendants to be a breach of said UVA or a violation of the New Ordinance (Kole at par. 11).

13.     As a direct and proximate result of Village's unlawful impositions, Plaintiffs' business, and the expansion thereof, is and has been essentially limited to only conducting online sales and shipping from suppliers and other out of area dealers (what it was allowed to do under the UVA and previous versions of the Weapons Dealer Ordinance), thereby resulting in the potential loss of tens of thousands of dollars in sales and thousands of dollars in profits per day (Kole at par. 12).

14.     The UVA and New Ordinance and burdensome requirements and restrictions contained in the Ordinances challenged in this complaint have unjustifiably inhibited, and continue to unjustifiably inhibit, Kole's and Ghost's efforts to advertise, display, and sell firearms from Ghost's business location in Norridge or any other location (Kole at par. 13).

6

15.     But for the enactments and burdensome requirements and restrictions contained in the UVA and Ordinances challenged in this complaint, Plaintiffs would advertise, and sell firearms from a business location in Norridge (Kole at par. 14).

16.     But for the enactments and burdensome requirements and restrictions contained in the UVA and New Ordinance, Plaintiffs' would-be customers in and around Norridge who wish to exercise their constitutionally-protected rights to purchase firearms for lawful purposes including self-defense and training would be able to purchase said firearms, and accompanying ammunition, from Plaintiffs' business location in Norridge (Kole at par. 15).

## SUMMARY OF ARGUMENT

Defendant Norridge's New Ordinance, alone and when coupled with the UVA imposed upon Plaintiffs, unquestionably violates the constitutional guarantees of purchasing arms for self-defense and lawful purposes.  The laws also infringe on Plaintiffs' First and Fourteenth Amendment rights.

Considering the certainty of success on the merits, Plaintiffs are entitled to preliminary injunctive relief.  In relevant part for this Motion, Plaintiffs are suffering irreparable harm in the absence of injunctive relief, for which there is no adequate remedy at law.  Granting Plaintiffs relief does not injure Defendant.  And given the degree to which the functional firearms sales ban threatens public safety and deprives the public of constitutional rights, the public interest - already favoring the exercise of fundamental rights - is clearly satisfied by immediately enjoining the Defendant's unconstitutional ban, at a minimum while this matter is pending.

## ARGUMENT

A plaintiff seeking a preliminary injunction must prove three threshold elements: "[f]irst, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to

final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citations omitted). Upon satisfying these threshold requirements, the Court "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (citations omitted). In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (citations omitted).

Plaintiffs easily satisfy all three threshold requirements for obtaining preliminary injunctive relief, and the balance of interests weigh heavily in their favor.

## I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.

Defendant's residents, like most Americans and people residing in this country, enjoy a fundamental right to keep and bear arms. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). "[T]he inherent right of self-defense has been central to the Second Amendment right." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008). The Second Amendment right is incorporated against the Defendant *via* the Fourteenth Amendment. *See McDonald*.

However, if firearms sales are functionally banned in Norridge due to zoning laws and Village Ordinances, individuals including the plaintiffs' customers will be frustrated in their ability to obtain the means of exercising Second Amendment rights. With the New Ordinance, alone and coupled with the restrictions Plaintiffs are subject to under the UVA, many would-be gun owners, including Plaintiffs' would-be customers, will be unable to purchase firearms in Norridge.

8

"Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm." *National People's Action v. Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (citations omitted). The Seventh Circuit in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) favorably compared First and Second Amendment freedoms: "The loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.' *Miles Christi Religious Order v. Twp. of Northville*, 629 F.3d 533, 548 (6th Cir. 2010) (internal alteration and quotation marks omitted); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)." *Ezell*, 651 F.3d at 699.

Besides the fact Plaintiffs are asserting the infringement of First Amendment freedoms themselves, "[t]he Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages." *Ezell*, 651 F.3d at 699. .

Considering that the Second Amendment exists to secure the right of self-defense, the inability to access constitutionally-protected arms causes a profound loss of a sense of one's security - to say nothing of the irreparable harm resulting from a successful criminal attack, or tragic accident that could have been averted with the purchase and intended use of a firearm. The irreparable harm flowing from any delays in obtaining relief is palpable.

## II. TRADITIONAL LEGAL REMEDIES ARE INADEQUATE TO RELIEVE THE FUNCTIONAL GUN STORE BAN'S HARM.

There is no way to quantify, in terms of money damages, the inability to engage in protected First Amendment activity, or Second Amendment activity such as defensive shooting. The infringement of constitutional rights is frequently considered to be beyond quantification with money damages. *See*, *e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

No legal remedies will be available to Plaintiffs who are unable to speak about their business through exterior signage. Nor are legal remedies available to would-be gun owners who are deprived of the right to purchase firearms from gun stores in the Villages. And quite obviously, no legal remedies will suffice to compensate those killed or injured for lack of ability to purchase a firearm for self-defense in the Village, owing to the Defendant's firearms sales ban.

## III. PLAINTIFFS WILL PREVAIL ON THE MERITS, AS NORRIDGE'S WEAPONS DEALER ORDINANCE AND THE UVA VIOLATES THEIR, AND THEIR CUSTOMERS', CONSTITUTIONAL RIGHTS.

### The functional ban on firearms stores imposed by the New Ordinance violates Plaintiffs', and theor customers', Second Amendment rights.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). While the Supreme Court has noted that "laws imposing conditions and qualifications on the commercial sale of arms" are presumably acceptable (*See Heller*, 128 S.Ct. at 2817), which Plaintiffs do not contest, it is the back-door ban of the sale of arms that it unconstitutional. "Constitutional rights are enshrined

10

with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 128 S.Ct. 2781, 2821 (2008).

"The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'" *Schad v. Mt. Ephraim*, 452 U.S. 61, 68 (1981) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 514 (1977) (Stevens, J., concurring)). "[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Id.* at 68. The City's permission of gun stores is illusory if, by zoning, there is no place to actually locate a gun store. The City cannot eliminate gun stores *via* zoning. It cannot zone gun stores to target them as-such, because gun stores are constitutionally protected. And the Village can only zone ranges on account of secondary effects — if any. Norridge's gun store zoning scheme violates every relevant legal principle.

According to the Norridge Zoning Map, only a tiny portion of the municipality is zoned B-3, without consideration of whether any particular B-3 lot is within 1000 feet of a "sensitive use." This is an unconstitutionally small percentage, especially given that the "facts" upon which Norridge have based the New Ordinance are relevantly incorrect, including its incorrect recitation of 18 U.S.C. 922(q)(2), which makes no mention of 1000 feet buffer zones. The Village is allowed to properly zone, "[b]ut the alternative must be more than 'merely theoretically available'—'it must be realistic as well.'" *Horina v. City of Granite City*, 538 F.3d 624, 635 (7th Cir. 2008) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)).

Mindful that the Seventh Circuit, in *Ezell*, held that First Amendment doctrine should guide the development of Second Amendment doctrine, it is useful to note how zoning fares under the First Amendment when governments claim that First Amendment-protected uses must be restrictively zoned for their alleged harm. Recently, the Ninth Circuit helpfully summed up the state of the law:

> [T]he test for the constitutionality under the First Amendment of a dispersal ordinance relating to adult businesses remains that prescribed in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). We have encapsulated that test recently as follows: First, we must determine whether the regulation is a complete ban on protected expression. *Renton*, 475 U.S. at 46. Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects. *Id*. at 47. If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substantial government interest, and whether reasonable alternative avenues of communication remain available. *Id*.

*Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1040 (9th Cir. 2011) (parallel citations omitted); *see R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004). As applied to gun ranges, the relevant test would be "more rigorous" than intermediate "if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708.

While adult establishments are acknowledged to have adverse secondary effects, there are no such secondary effects caused by gun stores — and certainly, none that would justify the types of zoning restrictions the Village enforces. The Village has no data to support any supposition that gun stores would be harmful, and even the New Ordinance's preamble is incorrect and based on supposition in any event. The Village has no evidence regarding the interaction of gun stores, specifically, and schools, government buildings, playing fields, forest preserves, recreational areas, or places of religious worship—the various land uses whose presence, under the Village's zoning ordinance, makes gun stores impossible to locate. Nor does

the Village have any evidence that would justify restricting gun stores to the B-3 zones as opposed to allowing them in any business district.

"Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." *Schad*, 452 U.S. at 69-70 (quoting *Schneider v. State*, 308 U.S. 147, 161 (1939)). *Schad* disposed of the government's unfounded claim that its alleged purpose automatically trumped plaintiff's constitutional rights:

> Mount Ephraim contends that it may selectively exclude commercial live entertainment from the broad range of commercial uses permitted in the Borough for reasons normally associated with zoning in commercial districts, that is, to avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities. The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment.

*Schad*, 452 U.S. at 73.

Likewise, there is no "defensible conclusion that unusual problems are presented by" gun stores. Indeed, this is exactly what the Seventh Circuit concluded in *Ezell*, when it noted: "[t]he City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns. . ." *Ezell*, 651 F.3d at 709.

Nothing has changed since the *Ezell* decision, aside from the Seventh Circuit's reaffirmation of this concept in *Moore*, where it noted: "Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden." *Moore*, 702 F.3d at 942. This follows a line of

Seventh Circuit cases such as *Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368 (7th Cir. 2010), where the Court affirmed a preliminary injunction against the city's restrictions on hours of operation for adult bookstores, which "did not produce any measurable benefit." *Id*. at 760. The Seventh Circuit recently ordered judgment in the bookstores' favor. *Annex Books, Inc. v. City of Indianapolis*, 2014 U.S. App. LEXIS 1477 (7th Cir., January 24, 2014). In another adult bookstore closure ordinance, the Seventh Circuit stated,

> Anyway, if an adult bookstore located 200 feet from a church attracts thieves, won't a bookstore located 1,500 feet from a church do the same? Maybe the City's concern is for the worshippers, who may become the thieves' targets when video buyers are unavailable. But if that's so, the City needs some evidence that thefts from passers by are a serious problem--and a more severe problem for outlets near churches than for outlets father away.

*New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009).

The Village has nothing better to offer this Court, besides incorrectly recited statutes and baseless "facts." Such unsupported conjecture is "verboten in the First Amendment context," *Horina*, 538 F.3d at 633, and in *Ezell* the Seventh Circuit made clear the same rule applies to attempted abridgements of the Second Amendment. "That is why the government has the burden of showing that there is evidence supporting its proffered justification for its speech restriction when asserting that the restriction survives the time, place, and manner analysis." *Id.*

In the adult bookstore context, for example, the stores are regulated not for their content but for adverse secondary effects. The same is true in the Second Amendment context. Contrary to Defendant's argument it has advanced to date, baseless fear of speculative harm is not an adverse secondary effect. Guns are sold all over the United States, at hardware stores, sporting goods stores, Wal-Mart, and many other places. Gun stores do not pollute or otherwise degrade a neighborhood, and it is one of the few businesses where both the buyer and seller undergo stringent background checks.

14

Indeed, beginning in approximately April 2014, Illinois residents will be carrying handguns throughout many areas of Chicago, well within 1000 feet of any of the gun store zoning impediments, and even inside many of the areas that contain gun range zoning restrictions.[1]  For Norridge to restrict gun stores to the point of virtual elimination on specious public safety grounds ignores the new constitutional landscape in Illinois and Norridge.  At a minimum, there is no reason the residents of Norridge cannot exercise their fundamental right to purchase and sell a firearm at a gun store located in any area they are already allowed to carry them, loaded and ready for use.

In this case, there is no connection between the secondary effects being offered and the activity of firearms purchases at a gun store. In part, this is because there are no actual secondary effects to connect.  But also, even if the Defendant's speculations were taken at face value, there is no evidence that forcing gun stores to keep distances from other businesses, or placing them in B-3 zones, will remove or even alleviate robberies or other crime.  In fact, it has appeared to be Defendant's contention that the mere existence of gun stores will somehow lead to crime and mayhem. But just as in the *New Albany DVD* case, if the alleged secondary effects exist regardless, then there is no reason to restrict a gun store's location.  The Seventh Circuit required this in *R.V.S., L.L.C.* when it stated:

> [S]imply stating that an ordinance is designed to combat secondary effects is insufficient to survive intermediate scrutiny. The governmental interest of regulating secondary effects may only be upheld as substantial if a connection can be made between the negative effects and the regulated speech. In evaluating the sufficiency of this connection, courts must 'examine evidence concerning regulated speech and secondary effects.' *Alameda Books*, 535 U.S. at 441. According to the *Alameda Books* plurality, the evidentiary requirement is met if the evidence upon which the municipality enacted the regulation 'is reasonably believed to be relevant for demonstrating a connection between [secondary effects

---

[1]  'While licensed handgun carrying will not be allowed in schools, it will be allowed in school zones. 18 U.S.C. § 922(q)(2)(B)(ii).  Additionally, concealed firearms will be permitted in parking areas. 430 ILCS 66/65(b).

> producing] speech and a substantial, independent government interest.' 535 U.S.
> at 438 (internal quotations omitted).

*R.V.S.*, 361 F.3d at 408; *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (intermediate

scrutiny "justification must be genuine, not hypothesized or invented *post hoc* in response to

litigation").

It is clear that without evidentiary support for the proposition that the gun store zoning

ordinance ameliorates any supposed secondary effects, this Court should employ strict scrutiny

and strike down these provisions. However, even if the Court finds there are secondary effects,

the restrictions would fail the "more rigorous" than intermediate scrutiny standard.

Plaintiffs have not claimed that gun stores are beyond constitutional regulation. Churches

and bookstores, too, must be built to code, and comply with constitutionally-adequate zoning

requirements. They can be regulated for the adverse secondary effects of noise, pollution, traffic,

etc…. But Norridge's restrictions on gun stores are beyond constitutional limitations. Under

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986), Plaintiffs must be given the

reasonable opportunity to open and operate somewhere within the Village limits. The

Defendant's restrictions, though not a technical ban, still fail this standard.

The zoning restrictions are unconstitutional.

**The indemnification requirement is likewise unconstitutional and meant only to chill the
exercise of Second Amendment rights.**

The Courts have held that ". . . restricting the ability to purchase an item is tantamount to

restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir.

2008). Indeed, in *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), the

Seventh Circuit confronted the issue of strict tort liability for firearms manufacturers when a

criminal caused injury with a handgun. The Court said "[i]mposing liability for the sale of

handguns, which would in practice drive manufacturers out of business, would produce a handgun ban by judicial fiat in the face of the decision by Illinois to allow its citizens to possess handguns." *Id.* at 1204; *See also Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1268-69, 1274-75 (5th Cir. 1985) (handgun sales not ultrahazardous strict-liability activity, nor subject to products liability, when product functions as designs and is misused by third-persons).

Yet imposing that type of impermissible tort liability is exactly what the Village seeks to impose in this case.

When New York State sued gun manufacturers, wholesalers and retailers for being a public nuisance, the case was dismissed in the District Court. *People v. Sturm, Ruger & Co.*, 309 A.D.2d 91 (N.Y. App. Div.1, 2003). The *Sturm, Ruger & Co.* Court noted: ". . . (2) the importance and fairness of considering such concepts as remoteness, duty, proximate cause and the significance of the indisputable intervention of unlawful and frequently violent acts of criminals--over whom defendants have absolutely no control--who actually, directly, and most often intentionally, cause the cited harm; (3) the significance and unfairness of holding defendants accountable even though their commercial activity is wholly lawful and currently heavily regulated, and that their products are nondefective; . . . ." *Id. See also Camden County Board of Chosen Freeholders v. Beretta, U.S.A., Corp.*, 273 F.3d 536 (3rd Circ. 2001); *Ileto v. Glock, Inc.*, 194 F.Supp.2d 1040 (C.D.CA 2002). Chicago tried the same thing and was rebuffed by the circuit court and eventually by the Illinois Supreme Court. *City of Chicago v. Beretta, U.S.A., Corp.*, 213 Ill.2d 351 (IL 2004). The Court in relevant part concluded: "defendants' lawful commercial activity, having been followed by harm to person and property caused directly and principally by the criminal activity of intervening third parties, may not be considered a proximate cause of such harm." *Id.* at 410-11. Norridge is attempting to force

17

Plaintiffs to indemnify it for the tortious and/or criminal acts of others when Plaintiffs have no control over such persons and no duty towards anyone with regard to those persons. This is being done purely to chill the exercise of Second Amendment rights and the operation of Plaintiffs' business.

A nearly identical indemnification requirement was struck down in *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009). In doing so, the Court first noted: "It is well established that governments may not 'recoup costs that are related to listeners' reaction' to speech. *Forsyth County*[, *Georgia, v. The Nationalist Movement*], 505 U.S. [123,] 135 n.12 [1992]. The Supreme Court explained in *Forsyth County* that recouping such costs is unconstitutional because '[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob.' *Id.* at 134-35." *Long Beach*, 574 F.3d at 1040.

The *Long Beach* Court then held:

> [T]he clause requires that the permittees agree, as a condition of obtaining a permit to engage in expressive speech, to forgo recovery on any cause of action they might otherwise have against the City. The clause encompasses not only liability for physical harm to the permittees, but also for deprivation of permittees' constitutional rights . . . We think it obvious that permittees cannot be required to waive their right to hold the City liable for its otherwise actionable conduct as a condition of exercising their right to free speech.

*Id.* Finally, the Court ruled:

> Third, the clause in the permit application requires that permittees hold the City harmless for "any liability caused by the conduct of the event" to third parties. . . The provision requires permittees to assume legal and financial responsibility even for those "activities at the event" that are outside the control of the permittee, indeed including activities of the City . . . Requiring permittees to compensate third parties for harm caused by hecklers, counter-protesters, or other persons not part of permittees' organization restricts substantially more speech than the liability found unconstitutional in *Claiborne Hardware*. *See* 458 U.S. at 916-17, 918-19. Similarly, requiring permittees to compensate third parties for harm caused by acts and omissions of the City impermissibly restricts speech.

18

*Id.* at 1040-41 (citing *NAACP v. Claiborne Hardware Company*, 458 U.S. 886, 916-20 (1982)).

Similarly, the indemnification provision at issue invokes any sale or use of a firearm, regardless of by whom, whether it is by the Plaintiffs, or a customer, or someone who steals a firearm from a customer. It could even be by a Village official viewing or inspecting the premises. The "occurrence" could be at the Plaintiffs' business premises, the street, a customer's home, or half a world away. The occurrence could be a crime, an accident, or a lawsuit by a resident offended about gun stores. The indemnification also kicks in for any claim filed regarding "the issuance of a weapons dealer's license by the Village." This could literally be interpreted any way the Village wants it to be. No doubt the Village, in drafting the Ordinance, intended it to read exactly as broad as it sounds.

The Ordinance is plainly unconstitutionally broad in its content, and is directed (almost certainly) solely to Plaintiffs because of the nature of their business, as Plaintiffs very much doubt that any other businesses, such as restaurants, clothing stores, barber shops or veterinarians, are subject to this type of ordinance. By its wording, the claim-inducing event does not even have to involve a firearm sold by Plaintiffs, just the blanket use of any firearm or ammunition by anyone at all.

In *iMatter Utah v. Njord,* 2013 U.S. Dist. LEXIS 158371 (D.UT, November 4, 2013), a non-profit association that spoke about climate change challenged a Utah Department of Transportation requirement that anyone wanting a permit to march on a state highway obtain a liability insurance policy. The UDOT also requires participants in a free speech event to sign an indemnification form in favor of the State that would:

> indemnify, defend and hold the State of Utah [et al.] harmless from and against any claim or demand for loss, liability or damage . . . arising out of or resulting from: (a) any act or omission by the Permittee, its officers, agents, employees or any persons under Permittee's control insofar as permitted by law concerning Permittee's use or occupancy of the state road right-of-way; and (b) from and against all actions, suits, damages and claims brought or made by reasons of Permittee's non-observance or non-performance of any of the terms of the Permit or the rules, regulations, ordinances and laws of the federal, state or local governments.

*Id.* at *6. The Court first determined the requirement was content-neutral, because it was applied to all such speakers regardless of content. *Id.* at 28. In this case, however, the requirement seems clearly directed solely to weapons dealers. As noted above, Plaintiffs cannot imagine that any other business in the Village, even those not subject to constitutional protection, are subject to such requirements.

Furthermore, while the *iMatter* Court did not reach the issue of protestors who were unable to speak because its message was so controversial that no third-party liability insurer would issue a policy (*Id.* at *28), that possibility is very real in this case.

The *iMatter* Court then reviewed whether the burden on free speech met the strict scrutiny standard of being narrowly tailored to achieve a significant governmental interest. *Id.* at **28-29 (citing *Clark v. Community for Non-Violence*, 468 U.S. 288 (1984)). The Court rejected the State's first argument that the requirement was to promote the safety of the marchers or bystanders, noting the requirement had no relation to that interest. *Id.* at *31. As to the second stated interest of protecting itself from financial loss, the Court found that neither the insurance nor indemnification requirements were sufficiently narrowly-tailored, and that the State had presented no evidence of any tailoring at all. *Id.* at *31-33.

The Court noted the Supreme Court's decision in *NAACP v. Claiborne Hardware*, where it held "the NAACP could not be held liable for the actions or reactions of third parties who were

not under the NAACP's control." *iMatter*, 2013 U.S. Dist. LEXIS 158371 at *38. The Court likewise noted that "UDOT's requirement as currently written forces the Plaintiffs to purchase more insurance than necessary to cover losses for which the group could legally be held liable. The State's failure to address this inconsistency is therefore another example of how the State has not narrowly tailored its insurance requirement." *Id.* at *39.

The *iMatter* Court noted other cases where putting prohibitive financial costs on protected First Amendment activity was unconstitutional. *See Central Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515 (11th Cir. 1985) (requirement of unfixed fee for police protection); *Invisible Empire Knights of the KKK v. West Haven*, 600 F.Supp. 1427 (D.Conn. 1985) (bond requirement for police and maintenance without indigency exception); *Invisible Empire Knights of the KKK v. Mayor of Thurmont*, 700 F.Supp. 281 (D.Md 1988) (same). Similarly, requiring Plaintiffs to be liable for third-parties over whom they have no control is prohibitive, chilling, and unconstitutional.

The *iMatter* Court likened the indemnification requirements to prohibitive insurance requirements, because "while the Clause does not technically compel event insurance, the realities require all but the judgment-proof and the foolhardy to give very serious consideration to purchasing private insurance." *iMatter*, 2013 U.S. Dist. LEXIS 158371 at *50 (quoting *Van Arnam v. General Services Administration*, 332 F.Supp.2d 376, 394 (D.Mass. 2004). The *Van Arnam* Court struck down an indemnification provision, holding:

> Absent a showing that those carefully-crafted remedies [marchers' efforts to minimize the risk of injury or damage, waivers of claims against the state, and existing civil and criminal sanctions for trespassing, vandalism, etc.] are unavailing in this instance, the state may not insist upon broader restrictions which substantially infringe constitutional rights.

*Van Arnam*, 332 F.Supp.2d at 404-05 (citing *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1056-57 (2d Cir. 1983).

Here, Defendant has no interest, let alone an important or substantial one, in this indemnification requirement, except for the suppression of gun ownership as the manifestation of political fear and dislike of firearms. Even though several Courts, including the Seventh Circuit, have held that firearms dealers are not liable for the criminal acts of third-parties, the Village is seeking to force the Plaintiffs to pay for any such acts anyway. That is not permissible, any more than it was in the other cases.

Law-abiding people are severely limited in their ability to exercise their core Second Amendment right to self-defense if they are unable to purchase firearms. Likewise, said people are severely limited in their ability to exercise their fundamental Second Amendment right to train with a firearm for the purpose of acquiring and maintaining proficiency in order to be able to engage in self-defense (*See Ezell*, 651 F.3d at 704), if they are unable to purchase a firearm. And just as the Village's ban on weapons dealers was impermissible to this Court, so too should be the Ordinances that do not allow Plaintiffs any business location and impermissibly require Plaintiffs to be financially liable for anything that anyone does with a firearm. They amount to a functional ban and are therefore unconstitutional, whether from the perspective of Plaintiffs or their customers.

**The advertising ban in the UVA is an unconstitutional infringement on the First Amendment freedom of speech.**

"The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Board* [*v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761-762 (1976)]. Commercial expression not only serves the economic interest of the speaker, but also assists consumers and

furthers the societal interest in the fullest possible dissemination of information." *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557, 561-562 (1980).

Because of the UVA, which by its terms is still in effect, Plaintiffs are forbidden from advertising their business on their premises through exterior signage, which makes their business the only commercial enterprise in Norridge so banned. Worse, it appears any other weapons dealer that comes into Norridge is not bound by the advertising restriction. This is a blatant violation of Plaintiffs' First Amendment rights, and their Fourteenth Amendment equal protection rights.

The Supreme Court has determined: "[i]n commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566.

In *Central Hudson*, the State of New York passed a regulation banning promotional advertising by electrical utilities. At first it was due to an electrical shortage, but after that had passed the regulation remained in place in order to promote the conservation of energy. *Id.* at 559. The State's highest Court (N.Y. Court of Appeals) upheld the regulation but the Supreme Court reversed as the above test was not met by the State, since the advertising ban was not linked to the purported state interest. *Id.* at 599-602.

In *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), a city ordinance banned portable signs with ten exceptions, which did not included plaintiff's advertising of his bagel store. The city claimed the purposes of traffic safety and community aesthetics. *Id.* at 740. Using the *Central Hudson* test, the Court determined the regulation was more extensive than necessary to achieve its goals, and that the regulations were not sufficiently narrowly tailored. The city had the burden of proving the ordinance was narrowly tailored. *Id. (*citing *City of Cincinnati v. Discovery Network Inc.*, 507 U.S. 410, 416 (1993) (ban on commercial handbills on newsracks where non-commercial handbills not so banned was not narrowly tailored and was unconstitutional). The *Ballen* Court noted the portable sign ban and exceptions were completely content-based, and the city failed to show how the banned content affected the stated governmental goals any more than the exempted content. *Id.* at 743.

Here, the advertising ban forced upon Plaintiffs fails the four part test completely. Plaintiffs' business is legal, not to mention constitutionally protected. There is nothing misleading about signage letting the public know about the existence of Plaintiffs' store. The Village has no substantial interest in banning Plaintiffs (not even other weapons dealers) from promoting their business, which means the ban cannot advance the non-existent government interest, and also means the ban is much more extensive than necessary to promote the non-existent interest. Therefore, the ban in the UVA, to which Plaintiffs have repeatedly asserted they did not willingly agree, is clearly an unconstitutional restriction upon Plaintiffs and must be struck down.

**The compulsion of the terms of the UVA upon Plaintiffs violates Plaintiffs' Fourteenth Amendment rights to equal protection.**

"'[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination,

whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (citing *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)). "[P]laintiff must simply allege that he was treated differently and that the defendant's actions were irrational, arbitrary, and even vindictive." *Carr v. Village of Willow Springs*, 2002 U.S. Dist. LEXIS 12867 (N.D.IL 2002) (citing *Olech*, 160 F.3d at 388).

While Plaintiffs are of course not arguing that a gun store must be treated equal to a candy store in every respect, they must at least be treated equal to other weapons dealers licensed under the New Ordinance. The restrictions put on Plaintiffs through the UVA violate equal protection principles.

These violations are even more egregious in this case because the UVA is presumably not going to be forced upon every future entity that wants a weapons dealer's license. Rather, those entities will certainly be asked to comply only with the New Ordinance. This means Plaintiffs will be the only weapon dealer in Norridge subject to: (1.) bans on delivery of firearms or ammunition on the business premises; (2.) bans on storing firearms or ammunition on the premises; (3.) bans on retail displays of merchandise on the premises; (4.) bans on exterior signage advertising the existence of the business; (5.) maintaining a video surveillance system monitoring its premises; (6.) a fingerprinting requirement for Plaintiffs and their employees; (7.) limits on the quantity of firearms and ammunition Plaintiffs may keep on the premises; (8.) a three day "cure or forfeit license" provision for any (even inadvertent) violations of the UVA.

The infringements of the UVA, while some (like the exterior signage advertising ban) are unconstitutional in their own right, some are imposing requirements that are unfair because they

25

are being placed upon Plaintiffs alone. *See Olech*, 528 U.S. at 564-65 (village requiring 33 foot easement from property owner for connection to town water supply, where other property owners were only required to grant 15 foot easement, and increased demand was arbitrary and irrational, gave rise to claim for equal protection violation).

Plaintiffs will be similarly situated to every other weapons dealer in Norridge, but will be intentionally treated different with stifling restrictions imposed upon them. There is no rational basis for treating Plaintiffs different from any other weapon dealer in the Village. "If the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court. This was implied by the Supreme Court in *City of Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at 446-47, when it pointed out that some objectives of state action simply are illegitimate and will not support actions challenged as denials of equal protection." *Esmail v. Macrane*, 53 F.3d 176, 179-180 (7th Cir. 1995). ". . . [C]lassifications should be scrutinized more carefully the smaller and more vulnerable the class is. A class of one is likely to be the most vulnerable of all . . . ." *Esmail*, 53 F.3d at 180.

There is no legitimate motive to treat Plaintiffs differently than any other weapons dealer that may open in Norridge. If that was an unintended and unplanned consequence of the UVA, as if the Village had not considered the eventual drafting of the New Ordinance when the UVA was written, then the Village should concede this. Otherwise, the only other possibilities for treating Plaintiff differently are all illegitimate. And whether the Village's illegitimate reasons are irrational due to arbitrariness, malignancy, a desire to suppress Plaintiffs' constitutional rights, or a combination of all three, the violations of Plaintiff's Equal Protection rights must be stopped by this Court.

V. THE BALANCE OF INTERESTS FAVOR IMMEDIATE INJUNCTIVE RELIEF.

The Plaintiffs are certain to prevail on the merits. Absent relief they will suffer irreparable injury in the loss of Second Amendment rights, if not actual physical harm. They will also suffer the loss of their First and Fourteenth Amendment rights. The Village officials' apparent disliking of guns is not a legitimate interest. *See Christian Legal Soc'y*, 453 F.3d at 859. The balance of interests could not more completely tilt in favor of immediate injunctive relief.

## CONCLUSION

The Defendant cannot functionally ban gun stores completely from within its municipal limits by zoning laws, restrictive Ordinances, and coerced "agreements." In the meantime, while this matter is pending the Plaintiffs are going to be legislated out of business. Plaintiffs respectfully request that their motion for preliminary injunctive relief be granted.


Dated: February 9, 2014                          Respectfully submitted,


By: _____ /s/David G. Sigale _____
                      David G. Sigale

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com

27

### CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.      On February 9, 2014, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

      2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                              /s/ David G. Sigale
                                Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
739 Roosevelt Road, Suite 304
Glen Ellyn, IL 60137
630.452.4547/Fax 630.596.4445
dsigale@sigalelaw.com