```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   TONY KOLE and GHOST INDUSTRIES,  )  Docket No. 11 C 3871
     LLC, an Illinois limited         )
 4   liability company,               )
                                      )
 5              Plaintiffs,           )  Chicago, Illinois
                                      )  November 27, 2013
 6         v.                         )  2:18 p.m.
                                      )
 7   VILLAGE OF NORRIDGE, an          )
     Illinois municipal corporation,  )
 8                                    )
                Defendant.            )
 9

10         TRANSCRIPT OF PROCEEDINGS - Motion Hearing
          BEFORE THE HONORABLE THOMAS M. DURKIN
11

12   APPEARANCES:

13

14   For the Plaintiffs:  LAW FIRM OF DAVID G. SIGALE PC by
                          MR. DAVID G. SIGALE
15                        739 Roosevelt Road
                          Suite 304
16                        Glen Ellyn, IL 60137

17   For the Defendant:   ANCEL GLINK DIAMOND BUSH
                          DiCIANNI & KRAFTHEFER PC by
18                        MR. THOMAS G. DiCIANNI
                          MR. BRENT O. DENZIN
19                        140 S. Dearborn Street
                          Suite 600
20                        Chicago, IL 60603

21

22   Court Reporter:      LAURA R. RENKE, CSR, RDR, CRR
                          Official Court Reporter
23                        219 S. Dearborn Street, Room 1432
                          Chicago, IL 60604
24                        312.435.6053
                          laura_renke@ilnd.uscourts.gov
25
```

1    (In open court.)

2    THE COURT:  Okay.  Please call the next case.

3    THE CLERK:  11 C 3871, Kole v. Village of Norridge.

4    MR. SIGALE:  Good afternoon, your Honor.  David

5    Sigale, S-I-G-A-L-E, on behalf of the plaintiffs.

6    MR. DiCIANNI:  Thomas DiCianni for the defendant,

7    Village of Norridge.

8    MR. DENZIN:  And Brent Denzin, D-E-N-Z-I-N, on behalf

9    of Village of Norridge.

10    THE COURT:  All right.  We had an off-the-record

11    conference in an effort to attempt to resolve the pending

12    motion.  Is -- do we need to have another conference, or do we

13    want to state where we're at on the record at this point?

14    MR. DiCIANNI:  I don't think -- I don't know what we

15    would accomplish by a conference.

16    THE COURT:  Okay.

17    MR. DiCIANNI:  I think we just need to go forward.

18    THE COURT:  Fair enough.

19    Well, why don't one of you tell me what the status of

20    things are.  There were a couple tasks you all agreed to

21    perform in the -- since yesterday, get some information from

22    your clients and get some advice from your clients.  Where do

23    we stand?

24    MR. SIGALE:  Your Honor, with regard to the

25    plaintiffs' side, I've obtained all the information the Court

1    asked for, and I can answer those questions.

2                 THE COURT:  Go ahead.

3                 MR. SIGALE:  Go ahead?

4                 THE COURT:  Yeah.

5                 MR. SIGALE:  Well, the Court asked sales for my

6    client, Ghost Industries, the percentage of the business from

7    the online -- make the order and then receive the firearm and

8    ultimately ship it to another FFL that's local to the customer

9    for pickup -- as well as the percentage of business from people

10   who pick up the firearm from the Montrose location, both those

11   who are walk-ins or -- and call first or -- and those people

12   who order online but pick it up at the Montrose location.

13                THE COURT:  Okay.

14                MR. SIGALE:  The answer to that question is out of

15   865 firearms sold, 35 percent of them are transferred to a

16   local customer.

17                THE COURT:  By -- in what manner?

18                MR. SIGALE:  By people who come to the Montrose

19   location and retrieve the firearm from -- physically from that

20   location.

21                THE COURT:  Okay.  All right.

22                MR. SIGALE:  65 percent of them, or 542, were shipped

23   to another FFL in some other location.

24                THE COURT:  Okay.

25                MR. SIGALE:  There are no local customers -- my client

1    put that in quotes, "local customers" -- who order online and

2    then pick it up.  They don't do that.

3           They will come to him through word of mouth.

4           The -- most local customers call first because

5    walk-ins are impossible when a physical storefront does not

6    exist.

7           So the answer to the question yesterday is if -- let's

8    say the village -- let's say there was some temporary

9    arrangement where they were still allowed to do their online

10   ship it to another location.  That still knocks out 35 percent

11   of their business, which --

12          THE COURT:  What -- well, go ahead.

13          MR. SIGALE:  Well, and we had discussed in conference

14   the kind of extreme examples yesterday about, well, 5 percent

15   of the business versus 95 percent of the business, and

16   obviously those would be extreme examples.

17          But I believe that 35 percent is significant enough to

18   move forward.

19          THE COURT:  All right.

20          MR. SIGALE:  The Court also asked -- I'm sorry, your

21   Honor?

22          THE COURT:  What period of time was that for?  Is that

23   from the time he opened his doors?

24          MR. SIGALE:  I believe that's from the time he's

25   opened his store.

1        THE COURT:  And is there a trend to it?  Was it

2   more -- maybe this was more granular than you talked to him

3   about.  But is it -- was that consistently during that period

4   of time 35 percent walked in to order and then pick up, or was

5   it something where that is a more recent phenomenon?  Or it was

6   something that that's how it started and now it's almost all

7   Internet purchase and ship to an FFL somewhere else?  Do you

8   know that?

9        MR. SIGALE:  I didn't ask the question, but I also

10   would believe that if such a trend were like that, it would be

11   significant enough that it would have been pointed out to me.

12   So I'm going to go on the -- in the absence of being told,

13   yeah, but this is the number, but in recent whatever, I'm going

14   to go on the basis that that is statistically even and spread

15   out --

16        THE COURT:  No, that's the only way you can assume it

17   to be.

18        MR. SIGALE:  Right.

19        THE COURT:  But I may ask you to call your client --

20   we'll see how the rest of this plays out.  I may ask you to

21   call your client --

22        MR. SIGALE:  The Court --

23        THE COURT:  -- to get a --

24        MR. SIGALE:  The Court --

25        THE COURT:  -- see whether or not there's a trend on

1  this one way or the other.

2          MR. SIGALE:  Of course.

3          THE COURT:  Okay.  Go ahead.

4          MR. SIGALE:  You also -- the Court also asked

5  regarding could my client proceed without a -- with a physical

6  storefront but without a business license.

7          THE COURT:  Yes.

8          MR. SIGALE:  ATF requires that all local and state

9  business licenses be obtained within 30 days of the FFL being

10  issued, or the FFL becomes void.

11          THE COURT:  Okay.  So in English, what that means is

12  if the Village of Norridge takes away his business license,

13  within 30 days he will lose his FFL license.

14          MR. SIGALE:  Yes.

15          THE COURT:  And then he's out of business.

16          MR. SIGALE:  Yes.

17          THE COURT:  Have I stated it correctly?

18          MR. SIGALE:  You have.

19          THE COURT:  Okay.

20          MR. SIGALE:  And if the weapon dealer -- and once the

21  weapon dealer category and thus ability to obtain such a

22  business license is eliminated, as it, in fact, has been but

23  will be as applied to him on November 30th, then you'll get the

24  same result.

25          THE COURT:  All right.

1           MR. SIGALE:  And then the last question that was

2    asked -- and I mentioned this to counsel.  I was referencing a

3    question that counsel had asked, and I couldn't remember what

4    it was, and counsel couldn't remember the question either.

5           But it had been asked of me during the conference

6    yesterday for those firearm transfers that would be by UPS or

7    FedEx to a local FFL somewhere else, what was the method of

8    shipping.  Does the -- does Ghost Industries take the package

9    to a delivery location, or does the delivery person, the FedEx

10   guy, for example, show up at the door?

11          My client says that it's 50/50, and it's purely a

12   function of convenience.  So I don't believe that that's got

13   any impact on anything.

14          THE COURT:  All right.  But the guns -- the guns are

15   shipped to his store.  They're held in a safe.  And either he

16   delivers those guns to a delivery service half the time or a

17   delivery service comes and picks them up from him half the time

18   if they're going to an FFL and not being picked up by a

19   customer.

20          MR. SIGALE:  Correct.

21          THE COURT:  Okay.  Okay.

22          Thank you.  Those are the questions I had, and thank

23   you for getting the answers.

24          Mr. DiCianni.

25          MR. DiCIANNI:  Yes.  Your Honor, I think the focus of

1    our conversation yesterday had to do with the -- to what extent

2    would the plaintiff be put out of business as a result of your

3    not granting this injunction.  Not loss of profits or loss of

4    sales, but will he be able to stay in business if the

5    injunction is not granted.

6            The village's position is that if he is no longer

7    receiving guns or shipping guns from the Montrose location, he

8    could have a general business license, which based on what

9    counsel has been saying, he would qualify for allowing him to

10   have his federal -- maintain his federal license.  It won't be

11   a gun seller's local license, but it will be a business

12   license.

13           So he will have a business license and something

14   called a back-office license where the -- the example we were

15   giving yesterday, where Remington may have an office in some

16   location.  They don't actually sell guns out of it, but they

17   may do business for a company that sells guns is what he would

18   have.  So he would be able to have that type of a business

19   license.

20           Regarding the receipt of guns at the office, the

21   village's position is that would require the license that no

22   longer exists.  Now --

23           THE COURT:  No longer exists as of now or as of

24   November 30th?

25           MR. DiCIANNI:  As of November 30th.

1          THE COURT:  Okay.

2          MR. DiCIANNI:  Or as of December 1st would no longer

3    exist.

4          THE COURT:  Correct.  Okay.  All right.

5          MR. DiCIANNI:  So the receipt of guns and the transfer

6    of guns.

7          Now, regarding 35 percent of his business going away

8    by the inability to have guns at the store, regardless of what

9    his online business may be, I'll point out that the agreement

10   prohibits that type of a sale.  Article -- part 1 of the

11   agreement, which -- under which he's been operating for the

12   last three years, says:  "Ghost will not physically deliver any

13   firearm or ammunition to any recipient in the Premises other

14   than to its President and Owner and to its employees that

15   successfully pass a Criminal Background Investigation,"

16   et cetera.

17         So it seems to me that he's been operating illegally,

18   at least as to 35 percent of his business.  The point before

19   the Court is not whether any of this is legal.  That's the

20   ultimate issue in the case.  The point before the Court is the

21   extent to which he can satisfy the requirements of a

22   preliminary injunction for purposes of what he's requesting.

23         I don't think that the Court should take into

24   consideration the loss he may suffer as a result of him

25   violating the law if the Court enters this injunction.

1          THE COURT:  All right.

2          MR. DiCIANNI:  So our position is he can maintain his

3    business.  He can say Ghost Industries is located at 7601 West

4    Montrose in the village.  The village will give him with the

5    filing of an application and a license and a fee a business

6    license.

7          But what he would need in order to operate in terms of

8    delivering and selling and shipping guns out of that location

9    is a weapons dealer license, which will not exist as of

10   December 1.

11         THE COURT:  So in other words, the village is willing

12   to let him use that address as a business address, give him a

13   business license, but no weapons can come in or out of that

14   location.

15         MR. DiCIANNI:  That's correct.

16         THE COURT:  All right.  And that's not the business

17   model Mr. Kole uses right now.  In fact, the vast majority of

18   the weapons he sells come in and out of that address.  Is that

19   correct, Mr. Sigale?

20         MR. SIGALE:  The short answer is yes.  The longer

21   answer is they have to.

22         THE COURT:  Well, I think -- there's no mechanism

23   where he can do a direct purchase from Remington, for instance,

24   and deliver it to a customer; in other words, be an Amazon-like

25   distributor where he purchases remotely and then has it

1    delivered remotely where the actual physical weapon doesn't

2    come into his hands?

3            MR. SIGALE:  From my understanding is there might be a

4    de minimis percent of distributors that would be willing to do

5    that.  But the answer to the question is no.  The distributors

6    aren't just going to say, "Oh, okay.  We'll ship it to

7    someone's house."

8            THE COURT:  Okay.

9            MR. DENZIN:  Your Honor --

10           THE COURT:  Go ahead.

11           MR. DENZIN:  -- if I could just also add.

12           THE COURT:  Sure.

13           MR. DENZIN:  In the declaration from Tony Kole and in

14   the support for the motion, there still is this open-ended

15   question that has not been answered is whether or not they

16   could operate their business, keep their license, and have just

17   another location where Ghost Industries, the weapons would come

18   and be sent out of another location.  Not necessarily sent

19   directly to the actual recipient, but if they do need a

20   location where it needs to touch their hands and go somewhere

21   else, why does that need to be 7601 Montrose?

22           THE COURT:  Well, you're saying it can't be anywhere

23   with a Norridge address.

24           MR. DENZIN:  The location where those guns would come

25   in and come out after November 30th.  That's correct.

1          THE COURT:  Well, that's his business.

2          MR. DENZIN:  Well --

3          THE COURT:  That's where his business would be.

4    You're basically saying move the business somewhere else other

5    than Norridge.

6          MR. DENZIN:  I guess, your Honor, move that aspect

7    of -- that aspect of the business at some other location.

8          THE COURT:  That's the whole business, though.  I

9    mean, move that aspect; he's not a major corporation.  It's one

10   guy, as I understand it.

11         MR. SIGALE:  That's true.

12         THE COURT:  He's a single -- he's a sole proprietor

13   with one employee, a safe, working in the back of an Allstate

14   agency.  And you're asking him to use an address in Norridge,

15   but then have the physical delivery of the guns be in some

16   other town.

17         That is the equivalent of telling him to stop doing

18   business, in my mind, because it's not as if he's got an office

19   out in Elgin where he can make the guns -- have the guns come

20   into Elgin and leave Elgin and he just keeps his mailing

21   address in Norridge.  It's not that big a company.  I don't

22   think that's practical.

23         So if I have the positions correctly, though, as of

24   December 1st, it's the position that he will lose his business

25   license.

```
 1              MR. DiCIANNI:  Yes.

 2              THE COURT:  And -- is that correct?

 3              MR. DiCIANNI:  That's correct.

 4              MR. DENZIN:  His gun dealer's license.

 5              MR. DiCIANNI:  Gun dealer's license.

 6              THE COURT:  Gun dealer's license.

 7              And, Mr. Sigale, you say upon losing a gun dealer's

 8    license, he will within 30 days lose his -- his local gun

 9    dealer's license, within 30 days he'll lose his federal

10    firearms license.

11              MR. SIGALE:  That is correct.

12              THE COURT:  Okay.  And the suggestion by Norridge that

13    he run his business in such a way that the guns don't come in

14    and out of Norridge I don't believe is workable.

15              Mr. Sigale, do you -- can you see a way your client

16    can do that and run a business?

17              MR. SIGALE:  Not without allowing Norridge to run him

18    out of town and violate the Constitution at the same time.

19              THE COURT:  Well --

20              MR. DiCIANNI:  Well, that's --

21              MR. SIGALE:  Well, I'm not --

22              MR. DiCIANNI:  That's the ultimate question.

23              MR. SIGALE:  But I'm not trying to be glib, your

24    Honor.  I mean, the -- his business is in Norridge.  So is

25    it --
```

1          THE COURT:  Well, that was where I was going.  I was

2     speculating that he doesn't have another office.  But I take it

3     he doesn't have a place where he has a license in another town

4     where he could receive and send out the guns.

5          MR. SIGALE:  No.

6          THE COURT:  Okay.  Because you need a license if

7     you're going to run that kind of a business wherever you go, I

8     assume.

9          MR. SIGALE:  I would assume as well.

10         THE COURT:  Unless you're unincorporated.  But even if

11    you're unincorporated, you're subject to either county or state

12    regulation in that regard.  So there's -- you're going to get

13    regulated if you buy and sell guns and keep them, not just

14    regulated by the federal government, but presumably by a state

15    or local government.

16         Any disagreement on that?

17         MR. DiCIANNI:  No.

18         THE COURT:  Okay.  Mr. Sigale?

19         MR. SIGALE:  Without sounding stereotypical, I can

20    imagine some backwoods in some -- you know, in Mississippi

21    or --

22         THE COURT:  Let's put it in the area where --

23         MR. SIGALE:  -- Alabama or some such, but --

24         THE COURT:  -- in the area where Mr. Kole lives and

25    works.  It is -- I'm just trying to make sure I have my facts

1   straight, that it's unlikely -- in fact, remote -- that he

2   could run the kind of business he has without getting some --

3   requiring a permit from the area he is running that business

4   from.

5           MR. SIGALE:  I haven't checked every jurisdiction, but

6   I would put those odds as less than remote.

7           THE COURT:  Okay.  And Mr. DiCianni agreed with that,

8   and he represents most of these jurisdictions, so he's in an

9   informed position to talk about it -- or he represents many of

10  them.

11          All right.  Well, I have to -- one -- let's go off the

12  record for a minute.

13      (Off-the-record discussion.)

14          THE COURT:  Let's go back on the record.

15          All right.  Based on the verified motion for temporary

16  restraining order with an affidavit from the plaintiff -- I've

17  considered that.  I've considered the response by the village.

18  I've considered extensive argument by the village and by

19  Mr. Kole.

20          And upon the representation of the plaintiff that the

21  loss of the business license will result in the revocation of

22  the federal firearms license within 30 days, I believe

23  irreparable harm would be caused by the removal of the business

24  license of Mr. Kole while I consider the pending motion to

25  dismiss.  I'm going to try and look at that expeditiously.

1        So what I'm going to do is enter a temporary

2   restraining order as of the -- it will be effective at

3   12:01 a.m. December 1st, which I believe is when the business

4   license that you currently have, Mr. Sigale -- your client

5   currently has would expire.

6        Is that true, Mr. DiCianni?

7        MR. DiCIANNI:  Correct.  The agreement extended -- the

8   village has conceded to the Court's interpretation of the

9   agreement as extending his license up until November 30.

10        THE COURT:  All right.  So I'm going to enter the

11   temporary restraining order effective 12:01 a.m. on

12   December 1st.  It will run for 14 days.

13        I'll have you in two to three days before, depending

14   on the timing of the weekend.  I'll have you in two or three

15   days before the expiration of the temporary restraining order,

16   at which case I'll hear argument, if necessary, on whether it

17   needs to be extended, whether it needs to be converted to a

18   preliminary injunction, or whether I'm going to dissolve it.

19        I will note for the record that none of this alters

20   what the agreement is that Mr. Kole has with the village.  If

21   he's found in violation of it and there's a mechanism within

22   the village -- within that agreement to deal with violations,

23   so be it.  But I'm not altering the agreement you had.  I'm

24   maintaining the status quo as of what you have today through

25   14 days after December 1st.

1          If -- so whatever that agreement is and however it's

2   interpreted between the village and Mr. Kole, that agreement,

3   in effect, is extended.  The agreement allows him to have a

4   business license.  He's -- I'm ordering that the village not

5   revoke that business license while the restraining order

6   remains in place.

7          I'm not going to order a bond to be issued.  I will

8   waive the bond on this restraining order.  I find there's no

9   basis to impose a bond in that he has been operating under this

10  agreement for many months now, and there is no financial loss

11  to the village by simply having this agreement that he's been

12  operating under extended for a relatively short period of time.

13         Sandy, what date do we have before December 15th?

14         THE CLERK:  We can do the 12th.

15         THE COURT:  What day is that?

16         THE CLERK:  That's a Thursday.

17         THE COURT:  Fine.

18         Does that work for both of you or all of you?

19         MR. DiCIANNI:  I think so.

20         MR. SIGALE:  It does.

21         THE COURT:  How about Mr. Denzin and Mr. DiCianni?

22         MR. DiCIANNI:  Yeah, that's fine.

23         MR. DENZIN:  I can -- I can make it work.

24         THE COURT:  Okay.  Do we have anything else that day?

25         THE CLERK:  Well, you have your 9:00s.  But we've got

1    a trial going on.  That's during the Haskell v. Cook County.

2         THE COURT:  All right.  Well, we'll still hear this at

3    9:00.  And if it turns out that I think there's going to be

4    more time needed to deal with this, we'll call and set it for a

5    lunch break or at the close of the trial day that day.  But

6    we'll hear it that day so that there's -- I'm in a position to

7    tell you what's going on with the motion to dismiss, and you

8    can also advise me of any further developments in the case.

9         I'd ask you to talk.

10        MR. DiCIANNI:  Yeah.

11        MR. SIGALE:  Sure.

12        THE COURT:  And but that will be the order of the

13   Court.  Any additional questions?

14        MR. DiCIANNI:  Is there going to be a written order?

15        THE COURT:  No.  Well, there will be a minute order

16   entering a temporary restraining order for the reasons stated

17   on the record.  I find that there is some likelihood of success

18   on the merits, that at least the -- and it's a sliding scale

19   that I'm required to impose.  There's got to be a likelihood of

20   success on the merits, there has to be a showing of irreparable

21   harm to the plaintiff, and --

22        MR. DiCIANNI:  Inadequate remedy.

23        THE COURT:  -- inadequate remedy at law.  And then,

24   finally, if I find those facts, I also have to look at whether

25   the non-movant is damaged and whether it's in the public

1   interest to allow for the injunction.

2          My -- I believe the irreparable harm is significant.

3   If he loses his federal firearm license, he's out of business.

4   And that constitutes an irreparable harm.

5          And when the -- when one of the factors, such as

6   irreparable harm, is significant, the sliding scale analysis

7   I'm allowed to apply according to the 7th Circuit means that

8   the issue of likelihood of success on the merits, it -- the

9   word "some" is in front of it, some likelihood of success on

10  the merits.

11         MR. DiCIANNI:  I understand.

12         THE COURT:  And the higher the irreparable harm goes,

13  the less likely you have to be successful on the merits.

14         I recognize that a total ban of a person from

15  operating a gun shop may very well be unconstitutional.

16  Reasonable bans on gun shops -- reasonable restrictions on them

17  can be constitutional.  The question of whether the

18  restrictions that Norridge has in place are reasonable or not

19  is an issue I have to decide.

20         But I do know that while this case is pending, if the

21  business license is lost, Mr. Kole will be out of business in

22  very short order.  He can't run his business any other way in

23  Norridge.

24         I also find that the damage to the non-movant in this

25  case is slight.  The village has been able to -- there's no

1   public nuisance associated with Mr. Kole.  He's operating his

2   business very nondescriptly.  If, in fact -- and he's been

3   operating it for months without at least some -- my knowledge

4   of any complaint by Norridge other than the fact he's running

5   his business.

6           If there was something about the manner in which he

7   was running it that would cause damage to the non-movant, I

8   assume I would have heard about it; I haven't heard it.

9           And I believe it's in the public interest only in the

10  sense that it's a constitutional right -- there's a

11  constitutional right to bear arms, which the courts have held.

12  There's also a constitutional right, within limits and within

13  restrictions, to purchase those firearms you have a right to

14  bear.

15          I don't believe that any citizen of Norridge is being

16  prevented from having the right to bear arms either for or

17  either with Mr. Kole running his business or not running his

18  business.  I don't find that to be a persuasive argument.

19  There's plenty of gun dealers around, and close ones or the

20  Internet allows them to even buy and purchase guns from

21  Mr. Kole.

22          But as a practical business matter, if you're a

23  Norridge resident and you purchase a gun from Mr. Kole over the

24  Internet and he tells you you've got to go to Elgin or

25  Des Plaines to go pick it up rather than down the block to

1    Norridge, that to me seems odd and may, again, cause damage to

2    Mr. Kole's business.

3            But I don't believe that the -- so you know where I'm

4    looking at this, ultimately, if there's an argument for a

5    preliminary injunction, I don't believe anybody in Norridge is

6    being prevented the right to bear arms, to keep a gun in their

7    home if -- provided the regulations of Norridge allow it, but

8    that's not before me.

9            But nobody's without the resource -- resources

10   available to them to find a gun dealer nearby and purchase a

11   gun, whether through a computer or through a face-to-face

12   interaction with a gun dealer.

13           So that part I'm not -- which was an argument made in

14   your motion for temporary restraining order.  I'm not -- I'm

15   not persuaded by that.

16           But I am giving you a temporary restraining order.

17   And we'll see you back on the date set.  And I'll -- I may have

18   more questions at that point.

19           MR. DiCIANNI:  Okay.  Very good.

20           MR. SIGALE:  Okay.

21           THE COURT:  Any other issues?

22           MR. DiCIANNI:  No.

23           THE COURT:  Anything else I need to address in the

24   order so that your client knows what the order is?

25           MR. DiCIANNI:  I don't think so.

1          THE COURT:  Okay.  Mr. Sigale, anything?

2          MR. SIGALE:  The only concern I had -- and I didn't

3    ask my client this, and I wish I had, and I can go call and --

4    is that my client, Mr. Kole, had been complaining to me -- and

5    I had relayed this to the Court in previous appearances -- that

6    his business license actually never got processed, that he sent

7    in his check, that he filled out his application, and

8    through -- for whatever reason at Norridge, it got sat on.

9          Now, I haven't heard him complain about that in recent

10   months, which makes me think that maybe it finally did get

11   processed.

12         THE COURT:  I would hope for his sake it was because

13   if he doesn't have that business license, I've just been told

14   that he's likely to lose his FFL license.

15         MR. SIGALE:  Right.  So I guess the -- the -- all

16   other things being equal is that if I'm able -- because I've

17   mentioned this to Mr. DiCianni and his associates before, that

18   if, in fact, he's entitled to have this license, at least for

19   the next four days plus the 14 of the restraining order, and

20   Mr. Kole tells me, well, that's fine and good except that they

21   never got around to doing it in the first place, that it get

22   done.

23         And it might still only be good for 16 days or till we

24   go to court, but at least -- that's really what maintains the

25   status quo.  But he didn't tell me it yesterday.

1          THE COURT:  Do you know the status of it,

2    Mr. DiCianni?

3          MR. DiCIANNI:  Well, my understanding was the position

4    the village was taking is that as of April 30th, which is their

5    new -- when their new ordinance actually went into effect --

6          THE COURT:  Right.

7          MR. DiCIANNI:  -- that license no longer existed, but

8    that Mr. Kole was being allowed to do business under the

9    agreement in lieu of a license.

10         THE COURT:  All right.

11         MR. DiCIANNI:  I don't know what effect that

12   arrangement might have on his ability to keep his federal

13   license.  But in terms of -- they haven't seen the need to

14   issue a license that technically doesn't exist anymore.

15         THE COURT:  Well, whether it's a license or you -- I

16   don't know the ATF requirements on whether or not you need a

17   physical piece of paper as a license or an agreement that you

18   are allowed to operate a business in a village.

19         MR. SIGALE:  Okay.

20         THE COURT:  It may very well be that they don't put

21   form over substance and that the agreement to operate in the

22   village satisfies the requirement that ATF has that you have

23   the ability to legally operate in the municipality you have

24   your business in.  Hopefully, that's the interpretation.

25         If not, I'm sure I'll hear back from all of you one

1   way or the other on the need to get a piece of paper.

2            MR. SIGALE:  Okay.  And, obviously, if that's the case

3   and it's during the next 16 days -- 18 days -- wasn't a math

4   major, your Honor -- I will contact Mr. DiCianni first before I

5   seek to involve the Court any further on that.

6            THE COURT:  Please do because it seems like, again,

7   that's something you ought to be able to reach some agreement

8   on.

9            MR. DiCIANNI:  Yes.

10           THE COURT:  Okay.  All right.  Anything else?

11           MR. SIGALE:  Happy Thanksgiving, your Honor.

12           MR. DiCIANNI:  Yes.

13           THE COURT:  Same to you all.  Thank you.

14        (Concluded at 2:52 p.m.)

15                  C E R T I F I C A T E

16      I certify that the foregoing is a correct transcript of the

17   record of proceedings in the above-entitled matter.

18

19   */s/ LAURA R. RENKE*                    *March 20, 2014*
     LAURA R. RENKE, CSR, RDR, CRR
20   Official Court Reporter

21

22

23

24

25