IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TONY KOLE and GHOST INDUSTRIES, LLC, an Illinois limited liability company, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 3871 |
| v. | ) ) | |
| VILLAGE OF NORRIDGE, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) | |

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

NOW COME the Plaintiffs, TONY KOLE and GHOST INDUSTRIES, LLC,

an Illinois limited liability company, by and through undersigned counsel, and

submit their Memorandum in Support of their F.R.Civ.P. 56(a) Motion for Summary

Judgment.

Dated: August 3, 2016                Respectfully submitted,


                                     By:  ___/s/ David G. Sigale___
                                          David G. Sigale


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## <u>TABLE OF CONTENTS</u>

Table of Authorities ………………………………………………………………… iii

Introduction .......................................................................................... 1

Procedural Background ………………………………………………………… 2

Summary of Argument ...................................................................... 3

Summary Judgment Standard …………………………………………….… 6

Argument........................................................................................ 6

    I.    THE AGREEMENT AND THE 2011 WEAPONS DEALER
        ORDINANCE VIOLATED PLAINTIFFS' FIRST, SECOND, AND
        FOURTEENTH AMENDMENT RIGHTS....................................... 6

    II.   THE AGREEMENT AND THE 2013 WEAPONS DEALER
        ORDINANCE VIOLATED PLAINTIFFS' SECOND AND
        FOURTEENTH AMENDMENT RIGHTS ...................................15

    III.  THE AGREEMENT, AND THE 2011 AND 2013 ORDINANCES,
        VIOLATED THE DORMANT COMMERCE CLAUSE........................ 23

    IV.  THE AGREEMENT VIOLATED PLAINTIFFS' FIRST AMENDMENT
        RIGHTS BY PROHIBITING GHOST FROM DISPLAYING PRODUCTS
        AND HAVING EXTERIOR SIGNANGE ........................................... 25

Conclusion ………………………………………........................................ 28

## TABLE OF AUTHORITIES

*Cases*

*City of Los Angeles v. Alameda Books, Inc.,*
535 U.S. 425 (2002) ................................................................................. 22

*Alameda Books, Inc. v. City of Los Angeles,*
631 F.3d 1031 (9th Cir. 2011) .................................................................18

*Alliant Energy Corp. v. Bie,*
330 F.3d 904 (7th Cir. 2003) .................................................................. 24

*Annex Books, Inc. v. City of Indianapolis,*
2014 U.S. App. LEXIS 1477 (7th Cir., January 24, 2014) ................................. 21

*Annex Books, Inc. v. City of Indianapolis,*
624 F.3d 368 (7th Cir. 2010) .................................................................            20

*Ballen v. City of Redmond,*
466 F.3d 736 (9th Cir. 2006) .................................................................. 27

*Cavel, Int'l, Inc. v. Madigan,*
500 F.3d 551 (7th Cir. 2007) .................................................................. 25

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .............................................................................  6

*Central Hudson Gas & Electric Corporation v. Public Service Commission,*
447 U.S. 557 (1980) ...........................................................................   26, 27

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006)...................................................................... 25

*City of Cincinnati v. Discovery Network Inc.,*
507 U.S. 410 (1993) .............................................................................. 27

*City of Renton v. Playtime Theatres, Inc.,*
475 U.S. 41 (1986) ...........................................................................   17, 18

*Department of Revenue v. Davis,*
553 U.S. 328 (2008) .............................................................................. 24

*District of Columbia v. Heller,*
128 S. Ct. 2783 (2008).......................................................................... *passim*

*Excalibur Group, Inc. v. City of Minneapolis,*
116 F.3d 1216 (8th Cir. 1997) ...................................................... 28

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ..............................................................*passim*

*Grant-Hall v. Cavalry Portfolio Servs., LLC,*
856 F. Supp. 2d 929 (N.D.Ill. 2012) ................................................ 25

*Gresham v. Peterson,*
225 F.3d 899 (7th Cir. 2000) ...........................................................17

*Horina v. City of Granite City,*
538 F.3d 624 (7th Cir. 2008) ....................................................17, 21

*Hughes v. Oklahoma,*
441 U.S. 322 (1979) ........................................................................ 24

*Illinois Ass'n of Firearms Retailers v. City of Chicago,*
961 F. Supp. 2d 928 (N.D. Ill. 2014) .............................................. 10

*Kennedy v. Louisiana,*
128 S. Ct. 2641 (2008) ....................................................................12

*King v. Preferred Technical Group,*
166 F.3d 887 (7th Cir. 1999) ......................................................... 6

*Latke v. Cont'l Cas. Co.,*
248 F. Supp. 2d 797 (C.D.Ill. 2003) .............................................. 6

*Lawrence v. Texas,*
539 U.S. 558 (2003) .......................................................................12

*Martin v. Harrington & Richardson, Inc.,*
743 F.2d 1200 (7th Cir. 1984) ....................................................... 7

*McDonald v. City of Chicago,*
130 S. Ct. 3020 (2010).............................................................. 7, 9, 11

iv

*Midwest Title Loans, Inc. v. Mills,*
593 F.3d 660 (7th Cir. 2010) ........................................................ 25

*Moore v. East Cleveland,*
431 U.S. 494 (1977) ...................................................................... 16

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012) ..................................................... 8, 20

*Nat'l Paint & Coatings Assn. v. City of Chicago,*
45 F.3d 1124 (7th Cir. 1995) ......................................................... 25

*Native Am. Arts, Inc. v. Waldron Corp.,*
2004 U.S. Dist. LEXIS 14289 (N.D. Ill. July 22, 2004) ..................... 26

*New Albany DVD, LLC v. City of New Albany,*
581 F.3d 556 (7th Cir. 2009) ......................................................... 21

*Oregon Waste Sys., Inc. v. Dept of Envtl. Quality,*
511 U.S. 93 (1994) ...................................................................... 24

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970) ...................................................................... 24

*Pleasureland Museum, Inc. v. Beutter,*
288 F.3d 988 (7th Cir. 2002) ......................................................... 28

*R.V.S., L.L.C. v. City of Rockford,*
361 F.3d 402 (7th Cir. 2004) ..................................................... 18, 22

*Reliable Consultants, Inc. v. Earle,*
517 F.3d 738 (5th Cir. 2008) ........................................................... 7

*Richmond Newspapers v. Virginia,*
448 U.S. 555 (1980) ......................................................................... 8

*Schad v. Borough of Mt. Ephraim,*
452 U.S. 61 (1981) .......................................................... 14, 16, 19, 20

*Schneider v. State of New Jersey,*
308 U.S. 147 (1939) ................................................................. 14, 19

v

*Teixeira v. County of Alameda,*
822 F.3d 1047 (9th Cir. 2016) ................................................................ 10, 11

*United States v. Marzzarella,*
614 F.3d 85 (3rd Cir. 2010) .................................................................... 10

*United States v. Miller,*
307 U.S. 174 (1939) ................................................................................ 12

*United States v. Virginia,*
518 U.S. 515 (1996) ................................................................................ 22

*Virginia Pharmacy Board v. Virginia Citizens Consumer Council,*
425 U.S. 748 (1976) ............................................................................ 25, 26

*Winter v. Minn. Mut. Life Ins. Co.,*
199 F.3d 399 (7th Cir. 1999) .................................................................. 6

### Constitutional Provisions

U.S. Const. Art. I, § 8 ............................................................................ 23

U.S. Const. amend. I ............................................................................. 25

U.S. Const. amend. II ....................................................................... *passim*

U.S. Const. amend. XIV ................................................................... *passim*

### Statutes, Rules, and Ordinances

18 U.S.C. § 922(q)(2)(B)(ii) ................................................................... 17

36 U.S.C. §§ 40701 ............................................................................... 11

F.R.Civ.P. 56(c) ..................................................................................... 6

An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1697-11 ....................................…...... 7

An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1785-13 ......................................15

## Other Sources

Curwen, *Some Considerations on the Game Laws* 54 (1796) ............................. 12

Thomas Jefferson, 6 *Writings* 252-53 (P. Ford ed. 1895) ................................... 12

Laws of Virginia, February, 1676-77, *VA. STAT. AT LARGE*, 2 HENING 403 (1823) ................................................................................. 12

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms. The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983) ......... 13

## INTRODUCTION

The Defendant, for political and perhaps other improper reasons, did not want a gun store in Norridge. When Plaintiffs attempted to open one in 2010, they were allowed to open only under a set of restrictions that ensured that (A.) no one would know Plaintiffs were there; (B.) Plaintiffs would barely be able to conduct business, and (C.) Plaintiffs would be out of Norridge within a couple of years. To make sure this was the case, a revised Weapons Dealers Ordinance was passed in 2011 that eliminated the Weapons Dealers business license that had sat on the books unnoticed for many years because no one else had asked about it until Kole came along (SUF 10). Though the 2011 Ordinance allowed Kole to operate until 2013, it was still a looming ban that threatened to end Plaintiffs' business. When that was challenged in Court, Norridge again revised the Weapons Dealers Ordinance in 2013, which, through unconstitutional zoning and distance restrictions, literally limited Plaintiffs' possible retail location to one unavailable street corner. When that too was challenged in Court, Norridge finally loosened the restrictions, but by then it was too late for Ghost to survive.

Defendant's Ordinances and restrictions that impacted Plaintiffs' business to the point of closure violated the Plaintiffs' Second Amendment right to sell firearms. They also violated Plaintiff's First Amendment right to advertise its business in the most useful location – right outside. The Defendant also violated the Constitution's dormant commerce clause by its illegitimate actions. Therefore, summary judgment

1

should be granted in Plaintiffs' favor and damages awarded, even as it is too late for injunctive relief to afford Plaintiffs any relief.

<u>PROCEDURAL BACKGROUND</u>

Plaintiffs filed a pending Third Amended Complaint (Dkt. #115), which challenges the Defendant's imposition of heavy restrictions before Plaintiffs were allowed to open a gun sales business ("the Agreement) (Exh. 8), as well as the Defendant's 2011 and 2013 Weapons Dealers Ordinances (Exh. 10, 11). Plaintiffs sought injunctive relief, as appropriate, and damages for past unlawful violations of Plaintiffs' rights. Count I alleges violations of Plaintiffs' and their customers' Second and Fourteenth Amendment rights. Count II alleges denial of substantive due process. Count III alleges violations of the Dormant Commerce Clause. Count IV alleges violations of Plaintiffs' First Amendment freedom of speech. Count V seeks declaratory relief. Counts VI and VII allege retaliation against the Plaintiffs for asserting Second Amendment rights by enacting the various challenged Ordinances and restrictions. Count VIII alleges violation of Plaintiffs' Fourteenth Amendment right to equal protection of the law.

Twice Plaintiffs have sought a preliminary injunction: first against the Agreement and the 2011 Ordinance, then against the Agreement and the 2013 Ordinance. Both times the Defendant enacted a new Ordinance prior to the Court's ruling on Plaintiffs' Motions.

While not waiving their claims under Counts II, IV, V and VIII, Plaintiffs are only seeking summary judgment in this Motion as to Counts I, III, VI and VII.

It has been ruled by the Court that the only issue in this Motion and stage of the litigation is the question of Norridge's liability for unconstitutionally depriving Plaintiffs of their rights. The issue of damages is specifically not addressed in this Motion, and Plaintiffs will seek to submit evidence on that issue once this Motion is decided.

<u>SUMMARY OF ARGUMENT</u>

In 2010, Tony Kole wished to open a lawful, constitutionally-protected business in Norridge. Because that business, firearms sales, is politically controversial, especially in the Chicago area, Norridge did its very best to keep Kole's business, Ghost Industries, from opening. The Village officials first refused to allow the ATF to do a required premises inspection unless Kole agreed to the terms of a document ironically labeled the "Agreement" (Exh. 8). Without the inspection, Kole would not obtain a Federal Firearms License (FFL), which is required for a commercial seller of firearms (SUF 9). Plus, based on the representations of Village officials, Kole was already paying rent on a Norridge office space (SUF 8).

The Agreement, which by its terms would follow Kole wherever he attempted to set up shop in Norridge, was so restrictive that no logical gun dealer would have agreed to sign it unless he was under the economic duress that was afflicting Kole. But that was just the start. The Agreement at par. 13 only allowed for a two-time renewal of Ghost's business license. And once that was in place, the Village enacted

3

a new Weapons Dealers Ordinance banning the business altogether (SUF 17; Exh. 10).

After much litigation, and just prior to a ruling on Plaintiffs' request for an injunction against this unconstitutional handcuffing,[1] in December, 2013, the Village passed a new Ordinance, purportedly allowing gun stores in the Village. However, this 2013 Ordinance (Exh. 11) literally restricted gun stores to one corner of one intersection in the entire Village (SUF 23, 24). Unfortunately, the agent for the owner repeatedly gave Kole the brush-off, and when Kole finally talked to the owner he refused to allow Kole to rent the premises (SUF 25). Thus, there was actually nowhere in Norridge for Plaintiffs to go.

Kole looked at other locations, but they were either not retail space (SUF 27), or they did not fall within the zoning and/or distance requirements (SUF 26). When Kole attempted to see if the property was available such that a variance could be sought, the owner stopped calling Kole back (SUF 26).

Eventually, as options faded and Kole's two largest suppliers stopped extending him credit for inventory due to his lack of a retail space (SUF 30), Ghost Industries went out of business. When the owner of his Montrose office space died, Kole contacted the new owner about at least re-letting his old premises to try and re-start Ghost, but the new owner refused and threatened to have him arrested for trespassing if Kole came onto the premises (SUF 32, 35).

---

[1] The Court did grant Plaintiffs' Motion for Preliminary Injunction in part and entered a restraining order that allowed Plaintiffs' to remain in business at the *status quo* while this case was pending (Dkt. #108).

For approximately four years, firearms sales were functionally banned in Norridge due to zoning laws and Village Ordinances. Not coincidentally, those were the four years Kole was attempting to operate Ghost. Between the Agreement,[2] the literal ban of the 2011 Ordinance, and the functional ban of the 2013 Ordinance, Plaintiffs were directly harmed by being frustrated in their ability to exercise their Second Amendment right to sell firearms, as well as financially harmed by being unable to conduct a constitutionally-protected business. Not for nothing, the Ordinances and restrictions also harmed Plaintiffs' customers, who have a Second Amendment right to purchase the firearms Plaintiffs wished to sell.

Norridge did everything possible to keep Kole from operating in town, and when Kole was allowed to operate, it had to be in such a manner that no one driving through Norridge would know he was there.

Defendant Norridge's 2011 and 2013 Ordinances, alone and when coupled with the Agreement that Norridge imposed upon Plaintiffs, unquestionably violated the Second Amendment freedoms of selling and purchasing arms for self-defense and lawful purposes. The Village violated Kole's First Amendment right to advertise his business, and violated the Constitution's dormant commerce clause as well. There was no legitimate excuse for the Defendant's actions between November, 2010 and December 10, 2014, when the less-restrictive Weapons Dealer

---

[2] This document (Exh. 8) was originally labeled the UVA or *ultra vires* agreement by Plaintiffs, then for sake of consistency agreed to call it "the Agreement." However, as should be plain by now, Plaintiffs never actually agreed to the document or its terms, but only went along because the Defendant withheld permission to allow the ATF to do a premises inspection, so that Ghost could obtain an FFL, unless Plaintiffs "agreed to terms" (SUF 9-11).

5

Ordinance 1816-14. Because of these constitutional violations over the relevant four year period, summary judgment must be entered in Plaintiffs' favor.

### <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In evaluating a summary judgment motion, the court focuses on whether any material dispute of fact exists that would require a trial. *Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999). In making this determination, the court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999). Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, however, the nonmoving party must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial." *Latke v. Cont'l Cas. Co.*, 248 F. Supp. 2d 797 (C.D.Ill. 2003) (citation omitted).

### <u>ARGUMENT</u>

I.    **THE AGREEMENT AND THE 2011 WEAPONS DEALER ORDINANCE VIOLATED PLAINTIFFS' FIRST, SECOND, AND FOURTEENTH AMENDMENT RIGHTS.**

In 2011, following Kole's signing of the Agreement which only allowed two renewals of Ghost's business license, Norridge passed *An Ordinance Repealing and*

6

*Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1697-11.* Under the 2011 Ordinance version of Sec. 22-362, all weapons dealers were banned in the Village as of April 30, 2013. Plaintiffs were to be forced out of business as of that date.

Defendant's residents, like most Americans and people residing in this country, enjoy a fundamental right to keep and bear arms. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). "[T]he inherent right of self-defense has been central to the Second Amendment right." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008). The Second Amendment right is incorporated against the Defendant *via* the Fourteenth Amendment. *See McDonald*.

"The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Further, the Courts have held that ". . . restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). Indeed, in *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), the Seventh Circuit confronted the issue of strict tort liability for firearms manufacturers when a criminal caused injury with a handgun. The Court said "[i]mposing liability for the sale of handguns, which would in practice drive manufacturers out of business, would produce a handgun ban by judicial fiat in the face of the decision by Illinois to allow its citizens to possess handguns." *Id.* at 1204.

7

Defendant Norridge's 2011 gun store ban unquestionably violated the constitutional guarantees of purchasing arms for self-defense and lawful purposes, as did the other parts of the 2011 Ordinance and Agreement that, regardless of their validity as generally applied, undeniably frustrated constitutionally-secured activity.

"[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). While the Supreme Court has noted that "laws imposing conditions and qualifications on the commercial sale of arms" are presumably acceptable (*See Heller*, 128 S.Ct. at 2817), which Plaintiffs do not contest so long as they are within lawful limits, it was the outright ban of the sale of arms that was unconstitutional. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 128 S.Ct. 2781, 2821 (2008).

There is no doubt the sale and purchase of firearms for self-defense implicates the Second Amendment. And while a categorical ban on the sale and purchase of firearms transcends levels of scrutiny and is unconstitutional on its face (*See, e.g. Moore v, Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("our analysis is not based on degrees of scrutiny, but on Illinois's failure to justify the most restrictive gun law of any of the 50 states")), should the Court employ means-ends scrutiny in

8

its analysis, *Ezell* mandates that either strict scrutiny or near-strict scrutiny be employed, as "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Ezell*, 651 F.3d at 708.

The 2011 gun store ban impaired peoples' ability to possess guns, rendering the gun store ban unconstitutional on its face. "In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Ezell*, 651 F.3d at 697 (citing *Reno v. Flores*, 507 U.S. 292, 300-01, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993)).

Indeed, the Seventh Circuit has provided the framework for analyzing this issue: "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. *Heller*, 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a free-standing 'interest-balancing' approach.'); *McDonald*, 130 S. Ct. at 3047-48." *Ezell*, 651 F.3d at 703. And Norridge certainly cannot argue that its Ordinances were anything approaching long-standing.

*Ezell* is not alone. "In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine

9

the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92, fn 8 (3rd Cir. 2010).

The Ninth Circuit's holding in *Teixeira v. County of Alameda*, 822 F.3d 1047, 2016 U.S.App. LEXIS 8925 (9th Cir. 2016), where that Court struck down a 500 foot distance from "sensitive areas" requirement for gun stores, is instructive as to this issue. The plaintiffs in *Teixeira* argued that "as a result of the 500-foot rule, "there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales . . . that the zoning ordinance 'is not reasonably related to any possible public safety concerns' and effectively 'red-lin[es] . . . gun stores out of existence.'" *Id.* at *9.

The Court held that:

> If "the right of the people to keep and bear arms" is to have any force, the people must have a right to acquire the very firearms they are entitled to keep and to bear. Indeed, where a right depends on subsidiary activity, it would make little sense if the right did not extend, at least partly, to such activity as well.

*Id.* at *18. The Court went on to cite that which should now be familiar:

> Thus, the Second Amendment "right must also include the right to acquire a firearm." *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014). As the District Court for the Northern District of Illinois noted in striking down a Chicago ordinance that abridged such right, a "ban on gun sales and transfers prevents [citizens] from ful-filling . . . the most fundamental prerequisite of legal gun

ownership--that of simple acquisition." *Id.* at 938; *see also Mance v. Holder*, 74 F. Supp. 3d 795, 807 n.8 (N.D. Tex. 2015) ("[O]perating a business that provides Second Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny."); *Radich v. Guerrero*, No. 1:14-CV-00020, 2016 U.S. Dist. LEXIS 41877, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016) ("If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns.").

*Id.* at 19-20. The *Teixeira* Court further held that the ordinance restricting the commercial sale of firearms came close to the core of the Second Amendment right. *Id.* at *28-29. This is similar to *Ezell*, which is almost directly on point, as the right to train with a firearm prohibited the City of Chicago from banning all such places. In 2011, Norridge instituted a total ban on gun stores, a complete deprivation of Plaintiffs' Second Amendment rights, with only a small grace period and the clock ticking. The only recourse Plaintiffs had was litigation. The Defendant ultimately undid the restrictions in a number of stages, but only after the Court each time informed the Defendant that the figurative writing was on the wall. Unfortunately, these changes came about too slowly for Plaintiffs, who went out of business in the interim. Defendant may so far have won the war of attrition, but this Court should not allow Defendants to escape accountability for its unlawful actions.

Based on the history of this litigation, and the relevant case law, the gun store ban contained in the Agreement and the 2011 Ordinance would have failed due to its unconstitutionality. *Cf. McDonald* (rarity of Chicago handgun ban indicates its unconstitutional nature) (plurality op.); *cf.* 36 U.S.C. §§ 40701, *et seq.*

11

(Civilian Marksmanship Program); *see also Lawrence v. Texas*, 539 U.S. 558, 573 (2003) (only four states prohibit intimate practice); *cf. Kennedy v. Louisiana*, 128 S. Ct. 2641, 2653 (2008) (punishment known in only six states violates Eighth Amendment). Indeed, in *Heller*, neither the D.C. Circuit nor the Supreme Court bothered to engage in any balancing test or other extended analysis before striking down Washington, D.C.'s ban on the possession of functional firearms for self-defense, as that law literally contradicted a "core" aspect of Second Amendment rights. *Heller*, 128 S. Ct. at 2818. A complete ban on firearms sales, as Norridge implemented for years, should render Norridge liable for the damages to Plaintiffs' business.

As far as the Founders, Thomas Jefferson said "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895).[3]

The early militia was made up of males capable of bearing arms, and the militia members exercised their right to private firearm possession. *See United States v. Miller*, 307 U.S. 174, 179 (1939) ("the Militia comprised all males physically capable of acting in concert for the common defense & [a]nd further &

---

[3] See also CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them& .") (emphasis added) (quoted in *Heller*, 554 U.S. at 583 n.7); Laws of Virginia, February, 1676-77, VA. STAT. AT LARGE, 2 HENING 403 (1823) ("It is ordered that all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony ....").

ordinarily when called for service these men were expected to appear *bearing arms supplied by themselves*") (emphasis added). If the militia members had to arm themselves, they must have been provided the means to do so, and therefore commercial firearms sales could not have been banned.

Of course, government has attempted to ban gun sales and purchases in the past. "Between the Restoration and the Glorious Revolution, the Stuart Kings" used disarmament as a means of "suppress[ing] political dissidents." *Heller*, 554 U.S. at 592. Charles II restricted the trade in arms as a tactic to suppress the people. Joyce Lee Malcolm, The Right of the People to Keep and Bear Arms. The Common Law Tradition, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983).

Defendant had no interest, let alone an important or substantial one, in banning all gun stores, as it did in 2011. Indeed, the governmental interest here is precisely the suppression of gun ownership as the manifestation of political fear and dislike of firearms. This "purpose" was made clear when Defendant argues: "Just as the Village does not have to permit gun sales on street corners near schools, it can reasonably restrict in-person purchases in physical storefronts in a Village populated by many sensitive places." (*See* Dkt. #101, p.2.) By comparing lawful firearm sales to illicit back-alley transfers, and labeling the entire Village a sensitive area, Defendant's purpose amounted to no more than NIMBY – Not In My Back Yard. And even if the Defendant's actions were merely a form of regulating firearms activity in furtherance of some legitimate interest, a total ban on gun stores was plainly overbroad, something the Defendant finally realized when it

13

passed the 2014 Ordinance (which, again, came only right before the Court was about to make a ruling on the functional ban's constitutionality in this litigation).

Gaseor stated to Kole he believed that gun stores could be prohibited in Norridge because there were other gun stores in the area (Exh. 4). Even if this were true, this was not a justification for implementing the restrictions in the Agreement or the 2011 ban, and this was an argument that failed in *Ezell*:

> In the First Amendment context, the Supreme Court long ago made it clear that "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77, 101 S. Ct. 2176, 68 L. Ed. 2d 671 (1981) (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163, 60 S. Ct. 146, 84 L. Ed. 155 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Ezell*, 651 F.3d at 697.

It is unfathomable that Defendant would ever try to ban libraries, or houses of worship, or even adult bookstore, on the grounds that people can go to those places in another municipality, or that books, adult material and religious materials can be found on the Internet.

Law-abiding people are severely limited in their ability to exercise their core Second Amendment right to self-defense if they are unable to purchase firearms, and if sellers like Kole/Ghost are unable to be in business. Likewise, said people are

severely limited in their ability to exercise their fundamental Second Amendment right to train with a firearm for the purpose of acquiring and maintaining proficiency in order to be able to engage in self-defense (*See Ezell*, 651 F.3d at 704), if they are unable to purchase a firearm and sellers like Kole are not allowed to operate. It is clear that Norridge implemented unconstitutional restrictions and an unconstitutional ban on Kole's business in 2010 and 2011. There is also no genuine issue of fact that the reason for doing so was a mixture of politics and a dislike of firearms, neither of which was a legitimate motivation. The only way this was eventually halted was through Plaintiffs' willingness to challenge the restrictions and ban through this litigation, though not in time to keep Ghost in business. Plaintiffs should be granted summary judgment.

## II.  NORRIDGE'S 2013 WEAPONS DEALER ORDINANCE VIOLATED PLAINTIFFS' SECOND AND FOURTEENTH AMENDMENT RIGHTS.

In December, 2013, and just prior to the Court ruling on Plaintiffs' Motion to enjoin the 2011 Ordinance, the Village passed *An Ordinance Repealing and Reenacting Chapter 22, Article VIII, and Amending Chapter 38, Section 22 of the Revised Municipal Code of the Village of Norridge - 2002 An Ordinance Reenacting Weapons Dealers Licensing and Amending Associated Fees and Penalties, Ordinance No. 1785-13* (2013 Ordinance). Per the 2013 Ordinance, weapons dealers were no longer banned but were restricted to locating in areas zoned B-3 (Sec. 22-364(G)). They also needed to be located at least 1000 feet from multiple types of other uses, including schools and government buildings (Sec. 22-362).

15

Like the literal gun store ban of 2011, the functional ban on firearms stores imposed by the 2013 Ordinance also violated Plaintiffs' Second Amendment rights.

"The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities. But the zoning power is not infinite and unchallengeable; it 'must be exercised within constitutional limits.'" *Schad v. Mt. Ephraim*, 452 U.S. 61, 68 (1981) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 514 (1977) (Stevens, J., concurring)). "[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Id.* at 68. Norridge's permission of gun stores was illusory if, by the zoning and distance restrictions of the 2013 Ordinance, there was no place to actually locate a gun store. By now, it is well known this was the case. The Village cannot eliminate gun stores via zoning, but that is precisely what it did to Ghost. It was not allowed to zone gun stores to target them as-such, because gun stores are constitutionally protected, but it did this to Ghost as well. And the Village can only zone ranges on account of secondary effects — if any. Norridge's 2013 gun store zoning scheme violated every relevant legal principle.

According to the Norridge Land Area for Weapons Dealers chart (Exh. 12), only a tiny portion of the municipality was zoned B-3, even before considering whether any particular B-3 lot was within 1000 feet of a "sensitive use." This was an unconstitutionally small percentage, especially given that the "facts" upon which Norridge have based the 2013 Ordinance were relevantly incorrect, including its

16

incorrect recitation of 18 U.S.C. 922(q)(2), which makes no mention of 1000 feet buffer zones. The Village was allowed to properly zone, "[b]ut the alternative must be more than 'merely theoretically available'—'it must be realistic as well.'" *Horina v. City of Granite City*, 538 F.3d 624, 635 (7th Cir. 2008) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Because we are looking with the benefit of hindsight, we know there was no realistic opportunity for Ghost to open a retail establishment in 2013, but it cannot be ignored that Kole has been proclaiming this, and litigating this issue, since the 2013 Ordinance went into effect.

Since the Seventh Circuit, in *Ezell*, held that First Amendment doctrine should guide the development of Second Amendment doctrine, it is useful to note how zoning fares under the First Amendment when governments claim that First Amendment-protected uses must be restrictively zoned for their alleged harm. The Ninth Circuit summed up the state of the law:

> [T]he test for the constitutionality under the First Amendment of a dispersal ordinance relating to adult businesses remains that prescribed in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). We have encapsulated that test recently as follows: First, we must determine whether the regulation is a complete ban on protected expression. *Renton*, 475 U.S. at 46. Second, we must determine whether the county's purpose in enacting the provision is the amelioration of secondary effects. Id. at 47. If so, it is subject to intermediate scrutiny, and we must ask whether the provision is designed to serve a substantial government interest, and whether reasonable alternative avenues of communication remain available. *Id.*

*Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031, 1040 (9th Cir. 2011) (parallel citations omitted); *see R.V.S., L.L.C. v. City of Rockford*, 361 F.3d 402 (7th Cir. 2004).

In the adult bookstore context, for example, the stores are regulated not for their content but for adverse secondary effects. The same is true in the Second Amendment context. Contrary to Defendant's arguments to date, baseless fear of speculative harm is not an adverse secondary effect. Guns are sold all over the United States, at hardware stores, sporting goods stores, Wal-Mart, and many other places. Gun stores do not pollute or otherwise degrade a neighborhood, and it is one of the few businesses where both the buyer and seller undergo stringent background checks.

Plaintiffs have never claimed that gun stores are beyond regulation. Churches and bookstores, too, must be built to code, and comply with constitutionally-adequate zoning requirements. They can be regulated for the adverse secondary effects of noise, pollution, traffic, *etc.*.... But the 2013 virtual ban on gun stores, which was allegedly a remedy for the 2011 blanket prohibition on gun stores, was beyond constitutional limitations. Norridge's 2013 actions in functionally banning such a business outright was simply unlawful. Under *City of Renton*, Plaintiffs should have received the reasonable opportunity to open and operate somewhere within the Village limits before being forced out of business. The Defendant's 2013 ban failed this standard miserably, and by the time

18

Defendant's Weapons Dealers Ordinance came more into compliance with the Constitution (in the 2014 Ordinance), it was too late for Plaintiffs.

As applied to gun ranges, the relevant test would be "more rigorous" than intermediate "if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708. While adult establishments are acknowledged to have adverse secondary effects, there are no such secondary effects caused by gun stores — and certainly, none that would justify the types of zoning restrictions the Village enforced against Plaintiffs. The Village offered no data to support any supposition that gun stores would be harmful, and even the 2013 Ordinance's preamble is incorrect and based on supposition in any event.

Specifically, the Village had no evidence regarding the interaction of gun stores, specifically, and schools, government buildings, playing fields, forest preserves, recreational areas, or places of religious worship—the various land uses whose presence, under the Village's zoning ordinance, made gun stores impossible to locate. Nor did the Village have any evidence that would justify restricting gun stores to the B-3 zones as opposed to allowing them in any business district. Even without this, however, it zoned and restricted Ghost out of business.

"Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." *Schad*, 452 U.S. at 69-70 (quoting *Schneider v. State*, 308 U.S. 147, 161 (1939)). *Schad* disposed of the government's

19

unfounded claim that its alleged purpose automatically trumped plaintiff's constitutional rights:

> Mount Ephraim contends that it may selectively exclude commercial live entertainment from the broad range of commercial uses permitted in the Borough for reasons normally associated with zoning in commercial districts, that is, to avoid the problems that may be associated with live entertainment, such as parking, trash, police protection, and medical facilities. The Borough has presented no evidence, and it is not immediately apparent as a matter of experience, that live entertainment poses problems of this nature more significant than those associated with various permitted uses; nor does it appear that the Borough's zoning authority has arrived at a defensible conclusion that unusual problems are presented by live entertainment.

*Schad*, 452 U.S. at 73.

Likewise, in 2013 there was no "defensible conclusion that unusual problems are presented by" gun stores. Indeed, this is exactly what the Seventh Circuit concluded in *Ezell*, when it noted: "[t]he City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns. . ." *Ezell*, 651 F.3d at 709.

Since *Ezell,* the Seventh Circuit reaffirmed this concept in *Moore*, where it noted: "Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden." *Moore*, 702 F.3d at 942. This follows a line of Seventh Circuit cases such as *Annex Books, Inc. v. City of Indianapolis*, 624 F.3d 368 (7th Cir. 2010), where the Court affirmed a preliminary injunction against the

20

city's restrictions on hours of operation for adult bookstores, which "did not produce any measurable benefit." *Id.* at 760. The Seventh Circuit then ordered judgment in the bookstores' favor. *Annex Books, Inc. v. City of Indianapolis*, 2014 U.S. App. LEXIS 1477 (7th Cir., January 24, 2014). In another adult bookstore closure ordinance, the Seventh Circuit stated,

> Anyway, if an adult bookstore located 200 feet from a church attracts thieves, won't a bookstore located 1,500 feet from a church do the same? Maybe the City's concern is for the worshippers, who may become the thieves' targets when video buyers are unavailable. But if that's so, the City needs some evidence that thefts from passers by are a serious problem--and a more severe problem for outlets near churches than for outlets father away.

*New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009).

The Village has never had anything better to offer this Court, besides incorrectly recited statutes and baseless "facts." Such unsupported conjecture is "verboten in the First Amendment context," *Horina*, 538 F.3d at 633, and in *Ezell* the Seventh Circuit made clear the same rule applies to attempted abridgements of the Second Amendment. "That is why the government has the burden of showing that there is evidence supporting its proffered justification for its speech restriction when asserting that the restriction survives the time, place, and manner analysis." *Id.*

In this case, there was no connection between any secondary effects being offered and the activity of firearms purchases at a gun store. In part, this is because there are no actual secondary effects to have connected. But also, even if the

Defendant's speculations had been taken at face value, there was no evidence that
forcing gun stores to keep distances from other businesses, or placing them in B-3
zones, would have removed or even alleviated robberies or other crime.[4]  In fact, it
has appeared to be Defendant's contention that the mere existence of gun stores
would somehow lead to crime and mayhem. But just as in the *New Albany DVD*
case, if the alleged secondary effects exist regardless, then there is no reason to
restrict a gun store's location.  The Seventh Circuit required this in *R.V.S., L.L.C.*
when it stated:

> [S]imply stating that an ordinance is designed to combat
> secondary effects is insufficient to survive intermediate scrutiny.
> The governmental interest of regulating secondary effects may
> only be upheld as substantial if a connection can be made
> between the negative effects and the regulated speech. In
> evaluating the sufficiency of this connection, courts must
> 'examine evidence concerning regulated speech and secondary
> effects.'  *Alameda Books*, 535 U.S. at 441.  According to the
> *Alameda Books* plurality, the evidentiary requirement is met if
> the evidence upon which the municipality enacted the regulation
> 'is reasonably believed to be relevant for demonstrating a
> connection between [secondary effects producing] speech and a
> substantial, independent government interest.'  535 U.S. at 438
> (internal quotations omitted).

*R.V.S.*, 361 F.3d at 408; *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996)
(intermediate scrutiny "justification must be genuine, not hypothesized or invented
*post hoc* in response to litigation").

It is clear that without evidentiary support for the proposition that the 2013
Weapons Dealer Ordinance ameliorated any supposed secondary effects, this Court

---

[4] In fact, if there were any negative effects of gun stores being allowed in B-2 zones, as is
now the case in Norridge, Plaintiffs have no doubt they would have heard about them.

should employ strict scrutiny, declare the provisions unconstitutional, and enter summary judgment for Plaintiffs as to those unlawful provisions. However, even if the Court finds there are secondary effects, the restrictions would fail the "more rigorous" than intermediate scrutiny standard.

Therefore, just as the Village's 2011 ban on weapons dealers that attempted to explicitly run Plaintiffs out of business was impermissible to this Court, so too should be the 2013 Ordinance, which tacitly attempted to run Plaintiffs out of business by not allowing Plaintiffs any business location. The 2013 Ordinance amounted to a functional ban and was therefore unconstitutional, whether from the perspective of Plaintiffs or their customers. Though it is too late for injunctive relief, Plaintiffs should be awarded summary judgment and their damages resulting from the Village's unconstitutional conduct.

## III. THE AGREEMENT, AND THE 2011 AND 2013 ORDINANCES, VIOLATED THE DORMANT COMMERCE CLAUSE.

As this Court has noted:

> The Constitution generally gives Congress the power to regulate interstate commerce. U.S. Const. Art. I, § 8 ("The Congress shall have power . . . To regulate Commerce . . . and among the several States."). Although the Commerce Clause does not expressly limit state power over interstate commerce, courts have long recognized that in certain circumstances, state and local laws imposing substantial burdens on interstate commerce are not allowed. This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce.

23

*Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003)." *See* Dkt. #79, pp.24-25.

Under the Dormant Commerce Clause, state and local laws are generally analyzed under a two-tier approach. First it is determined whether the law "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Oregon Waste Sys., Inc. v. Dept of Envtl. Quality*, 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).

While it cannot be disputed that the very nature of Ghost's business involved the interstate transfer of firearms, Plaintiffs are not alleging the gun store bans of the Agreement, 2011 Ordinance, and 2013 Ordinance discriminated against interstate commerce, though the bans did unconstitutionally burden interstate commerce with no local purpose (except am improper political purpose). Therefore, the Court should apply the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, an on whether it could be promoted as well with a lesser impact on interstate activities. (Citation omitted, emphasis added.)

*See also Department of Revenue v. Davis*, 553 U.S. 328, 338-339 (2008).

24

Though the Seventh Circuit has held that "a plaintiff has a steep hill to climb" to meet this standard, *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665 (7th Cir. 2010), and likened it to "normal rational-basis" review, *Nat'l Paint & Coatings Assn. v. City of Chicago*, 45 F.3d 1124, 1131-32 (7th Cir. 1995). *See also Cavel, Int'l, Inc. v. Madigan*, 500 F.3d 551, 556 (7th Cir. 2007); *Grant-Hall v. Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 938 (N.D.Ill. 2012), Plaintiffs' claim has met this burden. Simply put, the Village officials' apparent disliking of guns is not a legitimate interest. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

It is clear that Norridge did not deal even-handedly with Kole, there was no legitimate local purpose, and even if there was one Norridge could have acted with far less impact on interstate activities. Indeed, for solely political reasons Norridge used not a scalpel in regulating Ghost's business, but a cleaver. Summary Judgment on Plaintiffs' dormant commerce clause claim should be granted.

## IV. THE AGREEMENT VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS BY PROHIBITING PLAINTIFFS FROM DISPLAYING EXTERIOR SIGNANGE.

"The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761-762 (1976). Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest

in the fullest possible dissemination of information." *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557, 561-562 (1980).

"'A government's restrictions on commercial speech may be no more broad or no more expansive than 'necessary' to serve its substantial interests.'" *Native Am. Arts, Inc. v. Waldron Corp.*, 2004 U.S. Dist. LEXIS 14289, 14-15 (N.D. Ill. July 22, 2004) (quoting *Virginia Pharmacy Bd.*, 425 U.S. at 764-766).

Because of the Agreement, Plaintiffs were forbidden from advertising its presence or displaying its products. This was a blatant violation of Plaintiffs' First Amendment rights.

The Supreme Court has determined: "[i]n commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566.

In *Central Hudson*, the State of New York passed a regulation banning promotional advertising by electrical utilities. At first it was due to an electrical shortage, but after that had passed the regulation remained in place in order to promote the conservation of energy. *Id.* at 559. The State's highest Court (N.Y. Court of Appeals) upheld the regulation but the Supreme Court reversed as the

26

above test was not met by the State, since the advertising ban was not linked to the purported state interest. *Id.* at 599-602.

In *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), a city ordinance banned portable signs with ten exceptions, which did not include plaintiff's advertising of his bagel store. The city claimed the purposes of traffic safety and community aesthetics. *Id.* at 740. Using the *Central Hudson* test, the Court determined the regulation was more extensive than necessary to achieve its goals, and that the regulations were not sufficiently narrowly tailored. The city had the burden of proving the ordinance was narrowly tailored. *Id.* (citing *City of Cincinnati v. Discovery Network Inc.*, 507 U.S. 410, 416 (1993) (ban on commercial handbills on newsracks where non-commercial handbills not so banned was not narrowly tailored and was unconstitutional). The *Ballen* Court noted the portable sign ban and exceptions were completely content-based, and the city failed to show how the banned content affected the stated governmental goals any more than the exempted content. *Id.* at 743.

Here, the advertising and display bans forced upon Plaintiffs in the Agreement failed the four-part test completely, which no doubt contributed to Ghost's demise. Plaintiffs' business was legal, not to mention constitutionally protected. There was nothing misleading nor harmful about letting the public see firearms where it is already obvious firearms would be sold. There are no secondary effects of seeing firearms, such as claimed in adult-oriented businesses (*See*, *e.g.*, *Excalibur Group, Inc. v. City of Minneapolis*, 116 F.3d 1216, 1221 (8th Cir. 1997).

27

Defendant had no substantial interest (except for those assumed or imagined) in banning Plaintiffs from promoting their business, which means the ban could not advance the non-existent government interest, and also means the ban was much more extensive than necessary to promote the non-existent interest (*See, e.g., Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988 (7th Cir. 2002) (ordinance that restricted adult-business signage to that only stating the name of the business was not constitutionally narrowly-tailored)). Therefore, the advertising and display ban in the Agreement was an unconstitutional restriction upon Plaintiffs. Though it is too late for equitable relief to be of help, Plaintiffs request summary judgment and compensatory relief.

## <u>CONCLUSION</u>

WHEREFORE, the Plaintiffs, Tony Kole and Ghost Industries, LLC, an Illinois limited liability company, requests this Honorable Court to grant their F.R.Civ.P. 56(a) Motion for Summary Judgment, as well as any and all further relief as this Court deems just and proper.

Dated: August 3, 2016        Respectfully submitted,


                            By:       /s/ David G. Sigale      
                                  Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.    On August 3, 2016, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

      2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CMJECF participants in this matter.


                              /s/ David G. Sigale
                              Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com