## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TONY KOLE AND                              )
GHOST INDUSTRIES, LLC,                     )
                                           )
      Plaintiffs,               )
                                           )    No. 11 C 3871
      v.                        )
                                           )
VILLAGE OF NORRIDGE,                       )    Judge Thomas M. Durkin
                                           )
      Defendant.                )

## AMENDED MEMORANDUM OPINION & ORDER

Plaintiffs Tony Kole and Ghost Industries, LLC sued the Village of Norridge (the "Village") for impeding plaintiffs' attempts to operate a licensed gun store in the Village. Plaintiffs raise a variety of constitutional claims pursuant to 42 U.S.C. § 1983, including for violations of the Second and Fourteenth Amendments (Count I), violations of Fourteenth Amendment substantive due process (Count II), violations of the dormant commerce clause (Count III), violations of the First Amendment (Count IV), and violations of the Fourteenth Amendment right to equal protection of the law (Count VIII). Plaintiffs also seek declaratory relief under the Illinois Constitution (Count V) and claim that the Village retaliated against them for asserting their Second and Fourteenth Amendment rights (Counts VI and VII).

Several months after this Court denied in part a motion to dismiss plaintiffs' claims and a few weeks after the Court entered a temporary restraining order to preserve the status quo, the Village amended its weapons dealer ordinance from an outright ban (with a time-limited exception for plaintiffs) to a set of zoning

requirements. Plaintiffs sought to enjoin enforcement of the amended ordinance, and this Court held a preliminary injunction hearing. When the Court was about to rule on plaintiffs' motion for a preliminary injunction, the Village again amended its weapons dealer ordinance to make the zoning requirements less restrictive.

Plaintiffs do not challenge the legality of the most recent ordinance, and they have stopped pursuing the possibility of operating a gun store in the Village. They therefore no longer make facial constitutional challenges to the Village's ordinances or request injunctive relief. R. 226 at 3. Instead, they make as-applied challenges to the prior ordinances and to an agreement they signed with the Village, and they seek damages for the time period those ordinances and agreement were in effect. *Id.*

Plaintiffs and the Village have filed cross-motions for summary judgment. R. 191; R. 196. Plaintiffs seek summary judgment on Counts I, III, IV (in part), VI, and VII only. R. 196; R. 206 at 2. The Village seeks summary judgment on all claims. R. 191; R. 195. The Court ordered the parties to file summary judgment motions on liability only as an initial matter, leaving the issue of damages for another day.

For the reasons explained below, the Court denies both parties' motions for summary judgment on Counts I, IV (in part), VI, and VII. The Court grants the Village's motion for summary judgment on the remaining counts.

## Background[1]

---

[1]    The Court cites the Village's Statement of Material Facts (R. 190) as "DSMF ¶ __," plaintiffs' Response (R. 220) as "PR ¶ __," plaintiffs' Statement of Material Facts (R. 197) as "PSMF ¶ __," the Village's Response (R. 219) as "DR ¶ __," and plaintiffs' Response to the Village's Statement of Additional Material Facts (R. 236)

Although most of the material facts in this case are undisputed, several fact disputes remain as set forth below. In July 2010, Kole organized Ghost Industries, a firearm sales business engaged in interstate commerce. DR ¶¶ 3, 4; PR ¶¶ 4-5, 8. Kole originally told the Village he planned to operate an online-only business and to lease office space "for administrative purposes only." PR ¶¶ 9, 12. In an August 11, 2010 email, the Village's engineer and building commissioner Brian Gaseor advised Kole to "check our ordinance for Weapons Dealers" and informed him that "[l]ots 'B-3' GENERAL BUSINESS DISTRICT and 'C' COMMERCIAL DISTRICT could accommodate your office." R. 238 at 9; PSMF ¶ 8.

After communicating with Gaseor, Kole entered into a one-year lease on October 1, 2010 for a property in the Village. DR ¶ 6; PR ¶ 13. That rental property would have needed to be renovated before it could be used as a retail space. PR ¶ 13. The lease allowed for mutual cancellation on or before December 31, 2010 if Kole "failed to obtain a Federal Firearms License ['FFL']" as long as he "exercised due diligence" in the attempt. P-Ex 7 ¶ 9.

Regulations give the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") the right to perform an inspection before issuing an FFL. PR ¶ 13. When Kole was en route to an ATF inspection for his FFL, he received a call from the ATF investigator cancelling it. DR ¶ 7; P-Ex. 16 at 31. The parties dispute whether the Village had a hand in the cancellation, with Kole testifying that it did. DR ¶ 7.

---

as PR-DAF ¶ __. The exhibits filed in support of plaintiffs' Statement of Material Facts are cited as P-Ex __.

Following the cancellation, Kole spoke with Gaseor and reminded him that Kole leased an office based on the Village's representations about zoning and the Village's weapons dealer ordinance. DR ¶ 8. Kole and his attorney then had numerous communications with the Village's attorney Mark Chester. DR ¶ 9; PR ¶ 15. Chester explained to Kole that the Village's weapons dealer ordinance was written in 1972 in response to a request by Kmart, and "everyone had forgotten the ordinance existed until Kole came along." DR ¶ 10; PR ¶ 10.

## A. The Agreement

On November 30, 2010, Kole and the Village entered into an Agreement whereby the Village would issue Kole a weapons dealer business license subject to a number of terms and conditions. PR ¶ 21; DR ¶ 11. Agreement negotiations involved several back-and-forth letters between Kole and Chester. PR ¶¶ 16-20. Kole's attorney was involved in this exchange and approved at least one version of the Agreement. PR ¶ 17.

The Agreement's terms and conditions included:

- Plaintiffs could not deliver firearms or ammunition to any recipient at the premises (*i.e.*, there could be no retail sales);
- All deliveries from the premises had to be sent in unmarked packaging for used firearms and in the original packaging for new firearms;
- Plaintiffs could not store firearms or ammunition on the premises overnight or for more than 12 hours a day, and any inventory had to be disabled by a locking device or secured in a locked cabinet;
- Plaintiffs could not maintain a sales or retail display of firearms or ammunition on the premises;
- Plaintiffs could not post exterior signage advertising their location to the public or indicating that they sell firearms and must comply with limits on interior signage;

- Plaintiffs' officers and employees had to submit to fingerprinting and annual criminal background checks, at the Village's expense;

- Plaintiffs had to install and maintain a video surveillance system;

- Plaintiffs had to abide by monthly limits on the quantity of firearms and ammunition received at the premises and a limit on the quantity of firearms and ammunition that may be on the premises at any one time; and

- Plaintiffs had to allow one random and two scheduled inspections of the premises per month.

P-Ex. 8.

The Agreement provided that "Norridge will renew Ghost's License twice annually provided that Ghost remains in compliance with this Agreement and to exempt Ghost from any change in its business license ordinances and rules in any amendments Norridge may make to its Code of Ordinances." PR ¶ 13. The Agreement explained that "in the event that Norridge repeals its Weapons Dealer Ordinance within thirty six months of the execution of the Agreement, Norridge will exempt Ghost from the repeal during that period." P-Ex. 8.

Fact disputes remain as to whether, and to what degree, Kole negotiated the Agreement with the Village under economic duress or unwillingly because it was the only way he could get a weapons dealer license. He was undisputedly unemployed at the time and had already signed a lease. PR ¶¶ 7, 13; DR ¶¶ 6, 8. He testified that he was "[u]nder duress" because he was "unemployed," "had a small amount of savings," and "was investing all of [his] savings into this business venture." P-Ex 15 at 61; DR ¶ 11. He testified that he would not have agreed to any Agreement terms if he was not under such duress. P-Ex 15 at 62.

But Kole also was represented by counsel during the Agreement negotiations, and, as the Village emphasizes, at one point Kole sent a letter to Chester with suggested terms, many of which closely resemble those in the Agreement. PR ¶ 16 ("I [Kole] am restating the negotiable terms that the Company would like to reach an agreement with the Village . . . . Please contact me at your earliest convenience so that we can schedule a meeting to discuss the terms of an agreement and allow the Company to address the Village's concerns with regard to ensuring that the safety of the community is the top priority of the Company."). Among those terms were agreements not to "post or erect any signage" and to "sell the majority of firearms and ammunition to Nonlaw enforcement personnel through internet and direct sales." PR ¶¶ 16 & 22. The Village also points out that other Agreement terms were requirements in plaintiffs' lease, and plaintiffs had the opportunity to cancel that lease prior to December 31, 2010 if, with due diligence, they were unable to obtain an FFL. PR ¶ 22; R. 238 at 10. The Village further notes that plaintiffs have not quantified the degree of savings Kole had invested at the time. DR ¶ 11.

**B.    The 2011 Ordinance**

On February 9, 2011, the Village revised its weapons dealer ordinance. DR ¶ 17; PR ¶ 23. The 2011 Ordinance limited the number of weapons business licenses in the Village to one (*i.e.*, the license issued to plaintiffs) through April 30, 2013. P-Ex. 10. The Ordinance stated that "the one current Village weapons dealers licensee has agreed that it will cease doing business in the Village no later than April 30,

2013." P-Ex. 10. The Ordinance further provided that it would terminate weapons business licenses altogether as of April 30, 2013. P-Ex. 10.

Kole testified that sometime in 2011, after operating for about six months to a year, he realized that he wanted to shift his business model to a retail sales business with outside signage and advertising in order to increase revenue, which he could not do pursuant to the Agreement. DR ¶ 16; PR ¶ 24. In June 2011, plaintiffs filed this lawsuit challenging the 2011 Ordinance and the conditions imposed by the Agreement. R. 1.

In March 2013, Kole began working again in his former job as an elevator constructor. PR ¶ 39. He hired an independent contractor to operate Ghost Industries on a part-time basis. PR ¶ 39. A month later, in April 2013, this Court granted in part and denied in part a motion to dismiss, finding, among other things, that plaintiffs had stated a valid Second Amendment claim challenging the Agreement and 2011 Ordinance. R. 79.

As of April 30, 2013, the status of plaintiffs' weapons dealer license was uncertain. The 2011 Ordinance, by its terms, terminated all weapons dealer licenses in the Village as of April 30, 2013. P-Ex. 10. The 2011 Ordinance further stated that plaintiffs "agreed" to "cease doing business in the Village no later than April 30, 2013." P-Ex. 10. Under the Agreement, however, "Norridge . . . exempt[ed] Ghost from the repeal" of its prior ordinance for 36 months (*i.e.*, from November 30, 2010 through November 30, 2013). P-Ex. 8. On November 27, 2013, this Court granted

plaintiffs' motion for a temporary restraining order allowing plaintiffs to remain in business and preserving the status quo while this case was pending. R. 108.

## C.    The 2013 Ordinance

On December 11, 2013, a few weeks after this Court granted plaintiffs' motion for a TRO, the Village again revised its weapons dealer ordinance. The 2013 Ordinance contained zoning restrictions rather than a limitation on weapons business licenses. DR ¶ 20; PR ¶ 32. The 2013 Ordinance prohibited gun stores from operating "within one thousand feet (1,000') of the property boundary of any: a) public or private nursery, elementary, or secondary school; b) childcare facility; c) government building; d) public park, playground, playing field, forest preserve, or other recreational area; or (e) place of religious worship." P-Ex. 11 § 22-362. It further provided that a "licensee hereunder may locate its business as a special use in the Village's B-3 General Business District, subject to the requirements of the Zoning Ordinance of the Village of Norridge, as amended." P-Ex. 11 § 22-364(G).

These restrictions undisputedly left only 0.57% of the total Village land area including roads available to locate a gun store (or 0.76% of the total Village land area excluding roads). DR ¶ 23 & P-Exs. 12, 16. More than half (62.61%) of the Village's total land area is zoned for residential use, and 10.32% is zoned for commercial use. PR ¶ 32.

The property Kole was leasing for his online sales business did not meet the 2013 Ordinance's requirements. DR ¶ 22; PR ¶ 14. He began to look for available

space for a retail store, including using a feature on the Village's website that would tell him if a selected location met the 2013 Ordinance's requirements. DR ¶ 22.

Unless Kole first obtained a zoning variance, the 2013 Ordinance restricted potential locations for a gun store to one strip mall with two potential rental units available. DR ¶¶ 24-25; P-Ex. 16 at 54-55, 192-96, 238; P-Ex. 14 at ¶ 10; P-Ex. 15 at 73. Kole called the leasing agent of those two rental units multiple times, but she never called him back. DR ¶ 25. As of February 9, 2016, these rental units were still vacant. DR ¶ 25. Kole found one potential rental space for a retail store with a landlord who was initially agreeable, but that space did not meet the zoning requirement. DR ¶ 26.

As of August 8, 2014, Ghost was operating on a limited basis, DR ¶ 30, Kole let his rental lease lapse at his original location. DR ¶ 32; PR ¶ 7. After that, plaintiffs' only sales were from Kole's personal collection. DR ¶ 34.

The parties dispute the reason for Ghost's decline. Kole claims the reason he began operating on a limited basis was because he did not have a retail storefront, which reduced his profitability. P-Ex 15 at 96-97, 101. He points out that his two main distributors revoked his credit lines because they required a physical storefront. DR ¶ 30; P-Ex 15 at 97; P-Ex 16 at 69-70; P-Exs. 20-21. Without these credit lines, Kole's business options were limited, including because he could not purchase from a distributor until he took a payment from a customer. DR ¶ 31.

The Village disputes that the lack of a retail storefront "caused Plaintiffs to not have the resources to remain a viable business." DR ¶ 30. The Village points to

plaintiffs' decent profits from its online business: $64,053 in 2011, $141,162 in 2012, and $136,450 in 2013. PR ¶¶ 26-28. The Village claims the reason for plaintiffs' limited operations and decline in 2014 was that Kole had returned to work as a full-time elevator constructor in March 2013. DR ¶ 30. And the Village notes that Kole's creditors never accommodated his online business model. DR ¶ 30.

On August 18, 2014, this Court held a preliminary injunction hearing to determine whether to enjoin the 2013 Ordinance. At that hearing, the Village's engineer and building commissioner Gaseor testified that it was "Correct" that "literally then, the only area [plaintiffs] could move into without having a zoning variance is that [strip mall] area we spoke of." P-Ex. 16 at 195. Gaseor testified that it would be possible for plaintiffs to apply for a zoning variance, but no one had ever tried to do so for a gun store to his knowledge, and so he had no basis for knowing what would happen if plaintiffs did. DR ¶ 26 & P-Ex 16 at 190-9. And Gaseor testified that plaintiffs could not apply for a zoning variance without first obtaining a lease agreement or demonstrating an intent to purchase the property in question. P-Ex 16 at 228. Gaseor also acknowledged at the hearing that he is not "aware of any studies, any data, regarding any negative effects of gun stores." DR ¶ 26.

### D. The 2014 Ordinance

On December 10, 2014, prior to this Court's ruling on plaintiffs' preliminary injunction motion, the Village again amended its weapons dealer ordinance. PR ¶ 41. The 2014 Ordinance added more zoning districts for weapons dealers to locate (B-2, B-3, B-5, and C districts as opposed to just C districts under the 2013

Ordinance). PR ¶ 41. The 2014 Ordinance also reduced the distancing requirement to within 500 feet of a sensitive site. PR ¶ 41.

In mid-2015, Kole attempted to re-lease his old premises, but the owner did not agree. DR ¶ 35. As of August 2016, Ghost was out of business and Kole's LLC for Ghost involuntarily dissolved. DR ¶ 36.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the parties have filed cross-motions for summary judgment, the Court applies this standard to each motion separately in order to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Marcatante v. City of Chicago,* 657 F.3d 433, 438-39 (7th Cir. 2011).

In ruling on each cross-motion for summary judgment, the Court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Ind. Dep't of Child Servs.,* 635 F.3d 921, 925 (7th Cir. 2011).

## Analysis

### I. Standing

The Village begins by challenging plaintiffs' standing. The Village claims it is entitled to summary judgment on all of plaintiffs' claims because plaintiffs are no longer bringing facial challenges, and they lack standing to bring as-applied challenges to the constitutionality of the repealed 2011 and 2013 Ordinances and the expired Agreement. "An as-applied challenge is one that charges an act as unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011).

The Seventh Circuit decided standing issues in the First Amendment context that are very similar to those here in *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795 (7th Cir. 2016). And, as the Seventh Circuit's Second Amendment decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*"), showed, analogizing to the First Amendment context is appropriate in Second Amendment cases. *See id.* at 697, 701-02; *id.* at 703 ("[b]orrowing from the [Supreme] Court's First Amendment doctrine" to determine standard of review for Second Amendment challenges); *id.* at 706-07 ("we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context").

In *Six Star*, the court held that plaintiffs had standing to bring as-applied First Amendment challenges to repealed ordinances that prevented plaintiffs from opening adult entertainment clubs in Milwaukee. 821 F.3d at 803. The *Six Star* court began with settled standing principles. "Article III standing 'requires the litigant to prove that he has suffered [1] a concrete and particularized injury [2] that is fairly traceable to the challenged conduct, and [3] is likely to be redressed by a favorable decision.'" *Id.* at 801 (quoting *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013)). "As the party invoking federal jurisdiction," a plaintiff "bears the burden of establishing these elements." *Id.* (quotation marks omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, but at summary judgment, the plaintiff must set forth by affidavit or other evidence specific facts" supporting standing. *Id.* at 801-02 (quotation marks and alterations omitted).

The *Six Star* plaintiff "alleged—and a jury ultimately found—that it refrained from protected speech" of opening an adult entertainment club "in response to the City's unconstitutional ordinances." *Id.* at 803. The Seventh Circuit found that "[t]his describe[d] an injury-in-fact sufficient to support standing." *Id.* And the injury-in-fact was "fairly traceable to the unconstitutional ordinances" because the plaintiff "alleged that, but for the ordinances, it would have engaged in protected speech" by opening such a club, "and a jury ultimately found this to be true." *Id.* Turning to the third element of standing, the *Six Star* court found that "[d]amages redress the harm . . . by replacing the lost profits [plaintiff] would have

earned if it had been able to open its club at the planned time." *Id.* The Court finds *Six Star*'s reasoning with respect to each standing element to be directly applicable here.

**Injury-in-fact.** Like in *Six Star*, plaintiffs in this case have set forth specific facts that satisfy the first standing element of injury-in-fact. As further discussed below in addressing plaintiffs' Second and Fourteenth Amendment claims, plaintiffs have produced evidence that "in response to" the Ordinances and Agreement, they "refrained from protected" conduct of opening a retail gun store to fulfill Village residents' right to acquire firearms under the Second Amendment. *See id.*; *see also, e.g., Ezell I*, 651 F.3d at 696 (firing-range facilities supplier had injury-in-fact sufficient to support standing because it was "harmed by the firing-range ban and [wa]s also permitted to act[ ] as [an] advocate[ ] of the rights of third parties who seek access to its services") (quotation marks omitted); *Teixeira v. County of Alameda*, 2017 WL 4509038, at *6 (9th Cir. Oct. 10, 2017) (en banc) ("Teixeira, as the would-be operator of a gun store, thus has derivative standing to assert the subsidiary right to acquire arms on behalf of his customers").

The Village claims plaintiffs did not suffer any injury-in-fact with respect to the 2011 Ordinance because it never applied to them. It is true that the Agreement exempted plaintiffs from the 2011 Ordinance for 36 months, and by the time the 36 months ended, this Court had entered a TRO preserving the status quo. But *Six Star* shows that lack of enforcement of an ordinance against a plaintiff is not dispositive of standing. The *Six Star* court explained that a plaintiff could satisfy

the injury-in-fact requirement by bringing a "pre-enforcement challenge" if "the threat of enforcement" of the repealed licensing ordinance when it was in effect "caused injury that was 'actual or immediate, not conjectural or hypothetical.'" *Six Star*, 821 F.3d at 802 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)). This Court already determined when denying the Village's motion to dismiss that the 2011 Ordinance posed an actual and immediate threat. It found that "Plaintiffs' professed 'fear' that the [2011] Ordinance w[ould] be applied against them" was "hardly speculative" where the Agreement's exemption was set to expire on November 30, 2013. R. 79 at 16. "And by eliminating the one remaining weapons dealer business license," as of April 30, 2013, "the [2011] Ordinance clearly target[ed] Plaintiffs." *Id. Six Star* shows that the real threat of enforcement of the 2011 Ordinance against plaintiffs constitutes an injury-in-fact for standing purposes.

The Village also argues that plaintiffs do not have an injury-in-fact based on the 2013 Ordinance. The Village claims plaintiffs never made concrete plans to operate a retail sales business in the Village, making the "threat of enforcement" of the 2013 Ordinance "conjectural or hypothetical." R. 195 at 6 (quoting *Six Star*, 821 F.3d at 802). But, as further discussed below, the undisputed evidence shows that plaintiffs did make plans to open a retail gun store while the 2013 Ordinance was in effect, including trying unsuccessfully to obtain a lease at the two rental properties available under the 2013 Ordinance.

**Fairly Traceable.** Turning to the second element of standing, plaintiffs also have produced evidence "that, but for" combination of the Ordinances and the Agreement, they "would have engaged in protected" conduct of opening a retail gun store. *See Six Star*, 821 F.3d at 803. As explained below, the Court finds a disputed issue of material fact as to whether and for what time period this was true. But, as in *Six Star*, this evidence is sufficient at the summary judgment stage to show that plaintiffs' injury-in-fact was "fairly traceable" to the challenged ordinances. *See id.*

The Village argues that the second element of standing is not satisfied with respect to the Agreement in particular. It claims that plaintiffs' alleged harms are not fairly traceable to the Village because all of the Agreement's terms were self-imposed. The Village cites evidence that Kole originally intended to operate an online-only business as reflected in the Agreement, that many of the Agreement terms were suggested by Kole, and that others were already required by Kole's landlord. But there is also evidence that at the time the Agreement was negotiated, Kole had already signed a lease and invested in the business, and the Village was holding up the process. It is not clear from the summary judgment record what exactly transpired in negotiations between Kole and the Village, and in particular whether Kole volunteered the terms suggested in his letter to Chester or whether the Village demanded them as necessary conditions to giving Kole a weapons dealer license.

The Court therefore finds disputed issues of material fact as to whether the Agreement was negotiated under economic distress and its terms coerced. If it was,

then a reasonable jury could determine that the Agreement violated the "unconstitutional conditions" doctrine, which "prevent[s] the government from achieving indirectly what the Constitution prevents it from achieving directly." *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). The doctrine "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Id.* Plaintiffs have set forth sufficient evidence that harms caused by the Agreement were unconstitutional conditions fairly traceable to the Village to satisfy the second element of standing.

**Redressability.** Turning to the third element of standing, although the Court has deferred the question of damages, it finds that the "damages" plaintiffs seek would "redress the harm" suffered in the form of any lost profits plaintiffs are able to prove. *See Six Star*, 821 F.3d at 803. Accordingly, plaintiffs have standing to bring their as-applied challenges to the Agreement, the 2011 Ordinance, and the 2013 Ordinance.[2]

## II.   Count I – Second and Fourteenth Amendment

Plaintiffs and the Village cross-move for summary judgment on plaintiffs' Second and Fourteenth Amendment claims in Count I. Second and Fourteenth

---

[2]      Nor does the fact that the challenged Ordinances are repealed moot plaintiffs' damages claims. As the *Six Star* court held, the repeal of challenged ordinances does not moot the case if plaintiffs continue to pursue damages. 821 F.3d at 799 ("Once the ordinances were repealed, the plaintiffs dropped their requests for injunctive relief but continued to pursue damages. The latter request saves the case from mootness.").

Amendment jurisprudence has evolved significantly in recent years. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court struck down the District of Columbia's ban on the possession of handguns. The Supreme Court concluded that the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation." *Id.* at 592. Two years later in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the Fourteenth Amendment due process clause incorporates against states the Second Amendment right to possess a handgun in the home for self-defense.

These opinions left open many questions, including the level of scrutiny to apply to firearm regulations. The *Heller* Court "specifically excluded rational-basis review." *Ezell I*, 651 F.3d at 701. But it also made clear that certain gun control measures would pass constitutional scrutiny. *See Heller*, 554 U.S. at 626-27 ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms"); *see also McDonald*, 561 U.S. at 786 ("repeat[ing] those assurances" from *Heller*).

In *Ezell I*, the Seventh Circuit set forth a two-part framework to resolve Second Amendment cases. Incorporated within that framework is a determination of the rigor of judicial review the Court will apply. "The threshold question is whether the regulated activity falls within the scope of the Second Amendment." *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) ("*Ezell II*"). "This is a

textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" *Id.* (quoting *Ezell I*, 651 F.3d at 703).

If the regulated activity is not outside the scope of the Second Amendment, "then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ezell I*, 651 F.3d at 703. This inquiry evaluates "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* "[T]he rigor of this judicial review will depend on how close the law comes to the core Second Amendment right and the severity of the law's burden on the right." *Id.* "Severe burdens on the core right of armed defense requires a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Ezell II*, 846 F.3d at 892. "In all cases the government bears the burden of justifying its law under a heightened standard of scrutiny." *Id.*

A.     **Step 1**

"The relevant time period for the first-step historical analysis" for purposes of both the Second and Fourteenth Amendments "is 1791." *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 935 (N.D. Ill. 2014) (citing *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)). And the defendant "bears the

burden of first establishing that the [ordinances] regulate[ ] activity generally understood in 1791 to be *un*protected by the Second Amendment." *Id.* at 936.

In *Illinois Association of Firearms Retailers*, a court in this district considered a challenge to a City of Chicago ordinance banning virtually all sales and transfers of firearms in the City. *See id.* at 936-37. Like in that case, the challenged Ordinances and Agreement heavily regulate firearms sales and transfers within the Village. That means the Village specifically "bears the burden of demonstrating that firearms sales and transfers are categorically outside the scope of the Second Amendment as it was understood in 1791." *See id.* at 937.

Recent case law appears to foreclose the Village's argument that the regulated conduct in this case falls outside the scope of the Second Amendment. And even if it did not, the sources the Village cites do not meet its burden.

### 1.     Recent Case Law

Addressing a firing-range ban in *Ezell I* and later a set of firing-range zoning restrictions in *Ezell II*, the Seventh Circuit reasoned that the "core individual right of armed defense" as generally understood in 1791 "include[d] a corresponding right to acquire and maintain proficiency in firearm use," because "the core right to possess firearms for protection 'wouldn't mean much without the training and practice that make it effective.'" *Ezell II*, 846 F.3d at 892 (quoting *Ezell I*, 651 F.3d at 704). Analogizing to *Ezell I* in its recent en banc decision in *Teixeira*, the Ninth Circuit explained that "[a]s with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear

arms for self-defense 'wouldn't mean much' without the ability to acquire arms."
*Teixeira*, 2017 WL 4509038, at *6 (quoting *Ezell I*, 651 F.3d at 704). This is also
what the Tennessee Supreme Court observed back in 1871: "[t]he right to keep
arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn.
165, 178 (1871). And it is what the district court determined in *Illinois Association
of Firearms Retailers*: "the right to keep and bear arms for self-defense under the
Second Amendment . . . must also include the right to *acquire* a firearm, although
that acquisition right is far from absolute." 961 F. Supp. 2d at 930. Both the courts
in *Teixeira* and *Illinois Association of Firearms Retailers* in turn found that the
right to acquire firearms is directly implicated by laws directly or functionally
banning firearm sales in a given area. *See id.*; *Teixeira*, 2017 WL 4509038, at *6.

This Court agrees with the courts in *Teixeira* and *Illinois Association of
Firearms Retailers* that the Second Amendment right to keep and bear arms for
self-defense necessarily includes the right to acquire a firearm, and that this right is
implicated by local laws directly or functionally banning firearm sales. This
conclusion plainly follows from the Seventh Circuit's reasoning in *Ezell I* and *II*.

### 2.     The Village's Evidence

In any event, the Village has not met its burden to show that the regulated
conduct falls outside the scope of the Second Amendment. The Village—like the
City of Chicago in *Illinois Association of Firearms Retailers*, 961 F. Supp. 2d at
937—points to a few state statutes prohibiting the sale of certain firearms that were
enacted more than 50 years after 1791 but before the Fourteenth Amendment. R.

195 at 10-11. The Village also points to many post-Fourteenth Amendment state bans on firearm sales. *Id.* at 11-12. Because of the timing of their enactment, "[t]hese statutes are . . . not very compelling historical evidence for how the Second Amendment was historically understood." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937. The founding-era sources cited by plaintiffs are more relevant. *E.g.*, Thomas Jefferson, 6 Writings 252-53 (P. Ford ed. 1895) ("Our citizens have always been free to make, vend, and export arms."); CURWEN, SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796) ("What law forbids the veriest pauper, *if he can raise a sum sufficient for the purchase of it*, from mounting his Gun on his Chimney Piece, with which he may not only defend his Personal Property from the Ruffian, but his Personal Rights, from the invader of them.") (emphasis added). And regardless, "citation to a few isolated statutes . . . 'fall[s] far short' of establishing that gun sales and transfers were historically unprotected by the Second Amendment." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (quoting *Ezell I,* 651 F.3d at 706).

The Village also cites prohibitions on firearm possession and carrying in sensitive places prior to 1791 and through today. R. 195 at 8-20. Citing language from *Heller* recognizing that such "laws prohibiting the carrying of firearms in sensitive places" are "presumptively lawful," 554 U.S. at 626-27 & n.26, the Village argues that "commercial arms sales in sensitive places are categorically unprotected" under the Second Amendment. R. 225 at 15. But the Seventh Circuit in *Ezell II* rejected this very argument—*i.e.*, that distancing requirements from

sensitive places are "essentially immune from challenge under *Heller*." 846 F.3d at 894. The Court finds that the Village's evidence of longstanding restrictions on firearm *possession* in sensitive places does not show that "firearms *sales and transfers* are categorically outside the scope of the Second Amendment as it was understood in 1791." *See Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937 (emphasis added).

Finally, the Village points to state and federal licensing requirements for firearms dealers, explaining that even though these requirements "are of 20th century vintage, their prevalence establishes them as longstanding regulations that do not impinge upon the right protected by the Second Amendment." R. 195 at 12-14. Like the Fourth Circuit in *United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016), however, this Court finds the "condition or qualification" of obtaining a license for firearm dealing—a "longstanding condition or qualification on the commercial sale of arms" under *Heller* (554 U.S. at 626-27 & n.26)—to be completely distinct from "a functional ban on firearm acquisition." *Hosford*, 843 F.3d at 166 (distinguishing licensing requirements in that case from functional ban in *Illinois Association of Firearms Retailers*). Indeed, plaintiffs "do not contest" that licensing requirements and other "laws imposing conditions and qualifications on the commercial sale of arms are presumable acceptable"—they instead challenge

what they claim was a ban (in the 2011 Ordinance and Agreement) and a functional ban (in the 2013 Ordinance) on firearm acquisition in the Village. R. 206 at 8.[3]

Because the Village's "proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment," the Court "move[s] on to the second step of the inquiry." *See Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937.

**B.    Step 2**

The second inquiry functions as a sliding scale. "Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Ezell II*, 846 F.3d at 892.

The Seventh Circuit in *Moore* established that "the breadth of restriction," and thus the degree of means-end fit required, "is not just a function of *what* is affected, but also *who* is affected." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 936 (citing *Moore*, 702 F.3d at 940). "So *Moore* ultimately looked to two factors on the sliding scale to fashion the level of scrutiny: how much activity was regulated (a blanket prohibition on gun carriage and not a lesser burden on armed self-defense), and who was regulated (law-abiding citizens and not people with criminal records)."

---

[3]    As Judge Tallman reasoned in his partial concurrence and partial dissent in *Teixeira*, "Justice Scalia's footnote in *Heller*" about presumptions of unlawfulness "could not have been addressing county ordinances meant to restrict firearm acquisition and possession as much as a local government can get away with." 2017 WL 4509038, at *18. Like Judge Tallman found in *Teixeira* and as further set forth below, the record here shows evidence of "animus" of the Village toward plaintiffs. *Id.* For this reason as well, the Court finds that the "ordinance[s] do[ ] not fall within the *Heller* categories and do[ ] not earn its presumption of lawfulness." *Id.*

*Id.* "[T]he quantity and persuasiveness of the evidence required to justify each ordinance varies depending on how much it affects the core Second Amendment right to armed self-defense and on whose right it affects." *Id.*

### 1. Standard of Scrutiny

To determine the appropriate level of scrutiny in this case, the Court needs to look no further than the Seventh Circuit's decisions in *Ezell I* and *II*. Like the firing-range ban in *Ezell I*, the 2011 Ordinance "*prohibit[ed]*" "the law-abiding, responsible citizens" of the Village from participating in "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense" by acquiring firearms in the Village. 651 F.3d at 708 (quotation marks omitted). It is true that the Agreement gave plaintiffs a 36-month grace period to operate an online-only business. But the Agreement prevented plaintiffs from operating a retail sales business, and it had an expiration date after which plaintiffs would be subject to the full ban of the 2011 Ordinance.

The *Ezell II* decision indicates that the Agreement and its burdens on Second Amendment rights should be evaluated "in tandem" and "as a package" with the 2011 Ordinance. *See* 846 F.3d at 894. Operating in tandem, the Agreement and the 2011 Ordinance prevented anyone in the Village from walking into a store and legally purchasing a firearm for self-defense. Because they effectively operated as a gun-store ban much like the firing-range ban in *Ezell I*, the 2011 Ordinance and Agreement require "a strong public-interest justification" and a close means-end fit—*i.e.*, a showing "more rigorous" than intermediate scrutiny "if not quite 'strict

25

scrutiny.'" 651 F.3d at 708; *see also Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 938 (regulations that "prevent the acquisition of firearms within Chicago" were "substantial burdens that deserve[d] more stringent scrutiny than intermediate scrutiny").[4]

Just as the 2011 Ordinance and Agreement are analogous to the firing-range ban addressed in *Ezell I*, the 2013 Ordinance is analogous to the firing-range zoning restrictions addressed in *Ezell II*. The *Ezell II* Court made clear that all of an ordinance's requirements must be evaluated as "a single regulatory package" to determine whether the ordinance is "carefully drafted to serve actual public interests while at the same time making" an exercise of Second Amendment rights "practicable" in the municipality at issue. 846 F.3d at 894. "The combined effect of the manufacturing-district classification and the distancing restriction" in *Ezell II* left "only about 2.2% of the city's total acreage even theoretically available to site a shooting range (10.6% of the total acreage currently zoned for business, commercial, and manufacturing use)." *Id.* The Seventh Circuit found that these zoning regulations "severely burdened Second Amendment rights," meaning that the City was required "to establish a close fit between the challenged zoning regulations and

---

[4]     Plaintiffs argue that the 2011 Ordinance "transcends levels of scrutiny and is unconstitutional on its face." R. 206 at 8. The Court declines to go that far. In both *Moore* and *Ezell I*, even though the ordinances effectively amounted to total bans, the Seventh Circuit did not categorically reject the bans, but instead gave the government a chance to justify them and evaluated the empirical strengths of that justification. *Moore*, 702 F.3d at 937-40; *Ezell I*, 651 F.3d at 689-90. The Court will do the same here.

the actual public benefits they serve—and to do so with actual evidence, not just assertions." *Id.*

It is undisputed that the combined effect of the zoning classification and the distancing restriction in the 2013 Ordinance left an even smaller percentage—0.57% of the Village acreage including roads and 0.76% excluding roads—available for gun stores than the 2.2% of acreage available for firing ranges in *Ezell II*. *See id.* And in that area, Kole could not find a single location available to rent. DR ¶ 23 & P-Exs. 12, 16. This is far from the "reasonable opportunity for protected activity" with "an ample amount of land area available" that the Village claims. R. 225 at 20.

Nor does the evidence demonstrate that obtaining a zoning variance was a realistic possibility. Gaesor testified that no one had ever tried to obtain a variance for a gun store to his knowledge, and so he had no basis for knowing what would happen if plaintiffs did. DR ¶ 26 & P-Ex 16 at 190-9. And Gaseor testified that plaintiffs could not apply for a zoning variance without first obtaining a lease agreement or demonstrating an intent to purchase property. P-Ex 16 at 228. Analogizing to the First Amendment context as the Seventh Circuit found appropriate in *Ezell I*, the possibility of exercising a constitutional right "must be more than 'merely theoretically available'—'it must be realistic as well.'" *Horina v. City of Granite City, Ill.*, 538 F.3d 624, 635 (7th Cir. 2008) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). Under the 2013 Ordinance, exercising a Second Amendment right to acquire a firearm for self-defense in the Village was not a realistic possibility.

It is for this reason that the Village's attempts to analogize to the zoning regulations addressed by the Ninth Circuit in *Teixeira* fail. In *Teixeira*, Alameda County adopted a "500-foot from sensitive area" distancing restriction (much like the less restrictive, 500-foot parameter in the 2014 Ordinance that plaintiffs do not challenge (R. 206 at 19)). *See* 2017 WL 4509038 at *2-3. And exhibits attached to the plaintiff's complaint demonstrated that under this restriction, "Alameda County residents [could] freely purchase firearms within the County." *Id.* at *6-7. "As of December 2011, there were ten gun stores in Alameda County," and "[i]n fact, Alameda County residents c[ould] purchase guns approximately 600 feet away from the proposed site of Teixeira's planned store, at a Big 5 Sporting Goods Store." *Id.* at *7. The Ninth Circuit therefore found that "Teixeira did not adequately allege in his complaint that Alameda County residents [could] not purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular." *Id.* at *6. The *Teixeira* court explicitly distinguished *Ezell II* as "involv[ing] an entirely different situation with regard to the availability of a gun-related service to county residents," where the regulations "'though not on their face an outright prohibition on gun ranges, nonetheless severely restrict[ed] the right of Chicagoans to train in firearm use at a range.'" *Id.* at *7 (quoting *Ezell II*, 846 F.3d at 894).

Unlike in *Teixeira* where an Alameda County resident could purchase a firearm 600 feet away from the plaintiff's planned store, the 2013 Ordinance meant that no Village resident could purchase firearms from a storefront anywhere in the Village. First categorically and then functionally, the Village prohibited any retail

gun store from operating in its boundaries between February 2011 and December 2014.

Thus, just as in *Ezell I*, a burden higher than intermediate scrutiny applies to the 2011 Ordinance and Agreement, and just as in *Ezell II*, a burden higher than intermediate scrutiny applies to the 2013 Ordinance. "Stated differently, the [Village] must demonstrate that" firearm acquisition from a licensed firearm retail store in the Village "creates such genuine and serious risks to public safety" that the Ordinances are "justified." *Ezell I*, 651 F.3d at 709; *accord Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 940 ("the City must demonstrate that otherwise legitimate gun sales and transfers create such genuine and serious risks to public safety that prohibiting them within Chicago is justified").

### 2.    The Village's Justifications

The Village cites two objectives that it claims justified the 2013 Ordinance and the combination of the 2011 Ordinance and the Agreement. First, the Village claims a compelling interest in public safety served by reducing weapons possession in sensitive places. In support, the Village points to the Gun Free School Zones Act, which restricts weapons possession within 1,000 feet of school grounds. 18 U.S.C. § 921(a)(25). It points to evidence that in the United States generally, 283 people were killed and 330 people were wounded in mass shootings in schools, government buildings, and religious buildings since 1982. PR-DAF ¶ 2. It also cites: (1) a study of school shootings from 1986 through 1990 finding that a sizeable number of incidents occurred around school buildings; (2) a study showing that homicide is the

second leading cause of death of youths ages 5-18; (3) a study showing that 69% of homicides committed at school in the United States between 1994 and 1999 were committed with a firearm; (4) a study showing that student perpetrators purchased the firearms used in 9.6% of school-associated homicide events from 1992 through 1999; and (5) a study finding that 54% of schools within 17 square miles of D.C. had experienced at least one burst of gunfire within 1,000 feet. R. 195 at 22.

Second, the Village claims a compelling interest in reducing crime. It points to evidence that between 2012 and 2015, federal firearms licensees in Illinois reported theft or loss of 1,247 firearms. PR-DAF ¶ 3. It cites a statistic that between 2009 and 2013, local weapons dealers sold more than 3,173 firearms later recovered in crimes in Chicago, with 12% of those firearms moving from a local retailer to a crime scene in less than three years. PR-DAF ¶¶ 4-5. And it cites a 2004 study of inmates in correctional facilities showing that licensed gun dealers were the source of handguns for 11.4% of those incarcerated. R. 195 at 24.

Public safety and reducing crime are certainly important public interests. *See, e.g.*, *Ezell II*, 846 F.3d at 895 ("preventing crime" is an "important public concern[ ]"). But just as in *Ezell I* and *II*, the Village has done little to show the "close fit" between these interests and the means employed (*i.e.*, the 2011 and 2013 Ordinances and the Agreement, which resulted in an effective prohibition on retail gun stores in the Village).

As in *Ezell I*, the Village cites "no data or expert opinion" regarding the impact of the types of restrictions imposed on firearm *sales and acquisition* (as

opposed to firearm *possession*) on crime rates and public safety. *See* 651 F.3d at 709. And like in *Ezell II*, the Village "has provided no evidentiary support for" its claims that limiting gun stores to certain "districts and distancing them from" "sensitive places" like schools and places of worship, would in fact "reduc[e] the[ ] risks" it identifies. *See* 846 F.3d at 895. To the contrary, as in *Ezell II*, the Village's "*own witness*[ ] testified to the lack of evidentiary support for these assertions." 846 F.3d at 895 (emphasis in original); *see* DR ¶ 26 (Gaseor testified at the preliminary injunction hearing that he was not "aware of any studies, any data, regarding any negative effects of gun stores").

There is another flaw in the Village's argument. The Village would have the Court independently evaluate the 1000-foot buffer from schools in the 2013 Ordinance and find it constitutional based on the Gun Free School Zones Act, which prohibits possession of weapons within 1000 feet of schools. R. 195 at 28. The Village then would have the Court separately address the zoning requirements in the 2013 Ordinance. *Id.* at 29-30. But as *Ezell II* makes clear, the Court must consider all of the conditions imposed by the 2013 Ordinance "*in tandem*" to determine whether they are "carefully drafted to serve actual public interests while at the same time making [acquiring firearms] practicable" in the Village. 846 F.3d at 894 (emphasis added). And here, considered in tandem, the 2013 Ordinance's conditions clearly did not make acquiring firearms practicable.

Nor is it an "answer . . . that plenty of gun [stores] were located in the neighboring suburbs," even close ones. *Ill. Ass'n of Firearms Retailers*, 961 F. Supp.

2d at 938. As plaintiffs properly explain, this justification by the Village amounts to a "not in my backyard" rationale that courts have consistently rejected. As "[i]n the First Amendment context, . . . 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Ezell I*, 651 F.3d at 697 (quoting *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 76–77 (1981)). "[T]his reasoning makes sense, because if all cities and municipalities can prohibit gun sales and transfers within their own borders, then all gun sales and transfers may be banned across a wide swath of the country if this principle is carried forward to its natural conclusion." *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 939. "[T]he fact that [Village residents] may travel outside the [Village] to acquire a firearm does not bear on the validity of the ordinance *inside* the [Village]." *Id.*

For these reasons, the Village has not established the required means-end fit between the challenged regulations and its justifications. The Village appeared to recognize as much when, just as this Court was about to rule on plaintiffs' motion for a preliminary injunction, the Village enacted the 2014 Ordinance that still incorporates a distancing restriction from sensitive places but is significantly less restrictive.

### 3. Fact Issues Bearing on Plaintiffs' As-Applied Challenges

**2011 Ordinance and Agreement.** The Village further argues that even if the 2011 Ordinance was facially unconstitutional, it was not unconstitutional as applied to plaintiffs because prior to the time that the 2011 Ordinance was repealed

in December 2013, the Agreement exempted plaintiffs. And the Village argues that the Agreement was not unconstitutional as applied to plaintiffs because it was voluntary.

As explained above, however, the Agreement's constitutionality as applied to plaintiffs depends on the disputed factual issue of whether and to what extent it was coerced. If it was a coerced condition, then its restrictions preventing plaintiffs from operating a retail gun store would be unconstitutional just like the ban in the 2011 Ordinance. If it was not coerced, on the other hand, then the Agreement would constitute a valid waiver of Kole's constitutional rights. The Agreement was negotiated by the parties, Kole was represented by counsel during those negotiations, and, aside from the disputed issue of coercion, there has been no showing of unequal bargaining power between Kole and the Village. *See Leonard v. Clark*, 758 F. Supp. 616, 619 (D. Or. 1991), *aff'd,* 12 F.3d 885 (9th Cir. 1993) ("a party is deemed to have voluntarily and knowingly waived its constitutional rights through a contract where 1) the parties to the contract have bargaining equality; 2) the parties have negotiated the terms of the contract; and 3) the waiving party is advised by competent counsel") (citing *Erie Tel., Inc. v. City of Erie*, 853 F.2d 1084, 1097 (3d Cir. 1988); *GLF Const. Corp. v. Dallas Area Rapid Transit*, 546 F. App'x 429, 430 (5th Cir. 2013) ("a strong public policy favoring freedom of contract allows contracting parties to waive statutory, or even constitutional rights").

The 2011 Ordinance's constitutionality as applied to plaintiffs depends in part on the Agreement's constitutionality. If the jury finds the Agreement non-

coerced, then the Village is correct that plaintiffs would not have an as-applied claim under the 2011 Ordinance because they would have entered into a voluntary Agreement that exempted them from the 2011 Ordinance for its entire duration.

If the jury finds the Agreement to be coerced such that it was an unconstitutional condition, by contrast, the Court finds disputed issues of material fact as to the constitutionality of the combination of the 2011 Ordinance and Agreement as applied to plaintiffs. As the Seventh Circuit found in *Six Star*, the plaintiff could bring an as-applied, "pre-enforcement challenge" to a repealed ordinance even if it never applied for a license under that ordinance based on an injury caused by "the threat of enforcement." 821 F.3d at 802. The district court in *Six Star* "put the questions of causations and damages before a jury" to determine whether plaintiff would have opened a "gentlemen's club . . . but for the existence of the" ordinances at issue. *Id.* at 801. The plaintiff in *Six Star* "suffer[ed] an injury from the unconstitutional ordinances" where "a jury ultimately found . . . that it refrained from protected [conduct] in response to the City's unconstitutional ordinances." *Id.* at 803.

The fact that plaintiffs did not in fact attempt to open a retail gun store under the 2011 Ordinance and Agreement is not dispositive of their as-applied challenge if the 2011 Ordinance and Agreement together caused plaintiffs to refrain from protected conduct. Whether the 2011 Ordinance and Agreement in fact caused plaintiffs to refrain from protected conduct depends in part on the Agreement's voluntariness and also on Kole's credibility in testifying that he had an intent to

open a retail gun store at some point in 2011, which in turn is a question for the jury. *See, e.g.*, *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009) ("intent and credibility" should "go to a jury unless no rational factfinder could draw the contrary inference") (quotation marks omitted).

The Court thus finds genuine issues of material fact as to whether plaintiffs refrained from opening a retail store as a result of the Agreement and the 2011 Ordinance prior to the time the 2011 Ordinance expired. If so, then the questions of the period of time for which this was true and plaintiffs' resulting damages also are questions for the jury. *See, e.g.*, *Six Star*, 821 F.3d at 803 (causation satisfied if jury finds that "but for the ordinances, [plaintiff] would have engaged in protected speech," and "[d]amages redress the harm that [plaintiff] suffered by replacing the lost profits [plaintiff] would have earned if it had been able to open its club at the planned time").

**2013 Ordinance.** The as-applied inquiry is easier with respect to the 2013 Ordinance. The undisputed facts show that at least for some period of time, the 2013 Ordinance functionally restricted plaintiffs' intent to open a retail gun store in the Village. The length of time for which that was true and the resulting damages are questions for the jury that depend in part on disputed issues of fact as to why plaintiffs stopped operating in August 2014. *See Six Star*, 821 F.3d at 803.

## III. Count II – Substantive Due Process

Only the Village moves for summary judgment on Count II, plaintiffs' substantive due process claim. As the court in *Second Amendment Arms v. City of*

*Chicago*, 135 F. Supp. 3d 743 (N.D. Ill. 2015), found when addressing a substantially similar substantive due process claim to plaintiffs', "where another Amendment 'provides an explicit textual source of constitutional protection against [the alleged] source of physically intrusive government conduct, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claims.'" *Id.* at 763 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Like in *Second Amendment Arms*, "the right to sell firearms is a Second Amendment concern, and the right to display firearms falls under the protections of the First Amendment. As such, this portion of Plaintiff's substantive due process challenge is dismissed, as Plaintiff must pursue these theories under his First and Second Amendment claims." *Id.*

Plaintiffs also claim a violation of their "right to their livelihood of choice." R. 226 at 33. But the facts underlying this claim are the same as those underlying their Second Amendment claim—*i.e.*, a challenge to "the effective ban on opening a constitutionally-protected firearms store within the Defendant's municipal limits." R. 226 at 33. As the *Second Amendment Arms* court found, this "right to earn his livelihood" component of plaintiffs' substantive due process claim is likewise "a Second Amendment claim in Fourteenth Amendment [substantive due process] clothing, and thus the Second Amendment must be 'the guide for analyzing'" it. 135 F. Supp. 3d at 764 (quoting *Graham*, 490 U.S. at 395)). The Court therefore grants the Village's motion for summary judgment on Count II.

## IV. Count III – Dormant Commerce Clause

Both plaintiffs and the Village seek summary judgment on plaintiffs' dormant commerce clause claim in Count III. The Constitution generally gives Congress the power to regulate interstate commerce. U.S. Const. Art. I, § 8 ("The Congress shall have power . . . To regulate Commerce . . . and among the several States."). Although the commerce clause does not expressly limit state power over interstate commerce, courts have long recognized that in certain circumstances, state and local laws imposing substantial burdens on interstate commerce are not allowed. "This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce." *Alliant Energy Corp. v. Bie,* 330 F.3d 904, 911 (7th Cir. 2003).

Under the dormant commerce clause, state and local laws are generally analyzed under a two-tier approach. The first step is to determine whether the law "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 99 (1994) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979)). A law is discriminatory if it involves "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* Plaintiffs do not argue that the 2011 and 2013 Ordinances and the Agreement are discriminatory under this step.

Instead, plaintiffs argue that under the second step, the 2011 and 2013 Ordinances and the Agreement "unconstitutionally burden interstate commerce with no local purpose (except an improper political purpose)." R. 226 at 35. The second step applies a balancing test from *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld *unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.* If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142 (citation omitted, emphasis added). The Seventh Circuit has explained that "a plaintiff has a steep hill to climb" to meet this standard, *Midwest Title Loans, Inc. v. Mills,* 593 F.3d 660, 665 (7th Cir. 2010) (quotation marks omitted), and has likened it to "normal rational-basis" review. *Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1131-32 (7th Cir. 1995).

Plaintiffs do not show how the Agreement and the 2011 and 2013 Ordinances burden interstate commerce. *See Pike,* 397 U.S. at 142. In any event, any burden on interstate commerce is not "clearly excessive in relation to the putative local benefits" in this case. *Id.* Plaintiffs claim that the Village's only motivation was political, and "dislike of guns is not a legitimate [local] interest." R. 226 at 35. In support of their claim of political motivation, plaintiffs cite an alleged statement by Chester to Kole that the Village president and trustees were concerned about their

"political careers" suffering "should something ever happen" as a result of Kole's gun store. But this statement is inadmissible hearsay. *See* DR ¶ 10. And even if it was admissible, this single statement does not show, as plaintiffs claim, that the Village acted "for solely political reasons" (R. 226 at 36) and had no legitimate purpose for its actions.

Indeed, to the contrary, the Village has cited interests in public safety and crime prevention, and it has cited statistical evidence in support. The Court has already found these to be important local interests. Although the Court did not find this evidence sufficient to satisfy a higher than intermediate scrutiny standard for purposes of Second and Fourteenth Amendment review, the Court does find that it satisfies the standard akin to "normal rational-basis" review from *Pike*.

## V.     Count IV – First Amendment

Plaintiffs seek summary judgment on the portion of their First Amendment claim in Count IV challenging the Agreement's exterior sign prohibition. R. 235 at 19. Defendants seek summary judgment on plaintiffs' First Amendment challenge to both the Agreement's exterior sign prohibition and its weapons display prohibition. This Court already dismissed plaintiffs' First Amendment claim regarding the Agreement's weapons display prohibition as a matter of law. R. 79 at 28-29. So the record is clear, however, the Court grants the Village's motion for summary judgment on that claim for the same reasons set forth in the motion to dismiss ruling. *See id.*

The First Amendment protects commercial speech but "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562-63 (1980). Restrictions on commercial speech are analyzed under a form of "intermediate" scrutiny. *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 623 (1995). In *Central Hudson,* the Supreme Court established a four-part test for analyzing restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. [1] For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. [2] Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether [3] the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566.

In its motion to dismiss opinion, the Court found that plaintiffs' challenge to the Agreement's restriction on exterior signage to promote Ghost's internet sales business survived the first prong of the *Central Hudson* test. R. 79 at 29-30. The Agreement broadly prohibited "any exterior signage indicating to the public that its offices are located on the Premises or indicating the business of Ghost (*i.e.*, weapons sales)." R. 115-3 ¶ 4. Thus, for example, the Agreement prohibited plaintiffs from posting exterior signs even referring potential customers to their internet site. As a result, "the limit on exterior signage does concern at least some lawful activity." R. 79 at 29.

The next question is whether the asserted government interest is substantial. *Cent. Hudson*, 447 U.S. at 566. The Village says the restrictions serve "aesthetic interests." R. 238 at 20; R. 225 at 19. In a case considering regulations that distinguish between on-site and off-site signage, the Seventh Circuit determined that an "interest[ ] in . . . aesthetics" qualifies as a "substantial municipal goal[ ]." *Lavey v. City of Two Rivers*, 171 F.3d 1110, 1114 (7th Cir. 1999). Accordingly, the Village has asserted a substantial government interest under the second prong.

As in *Lavey*, the restriction's constitutionality thus turns on the third and fourth prongs of the *Central Hudson* test. Under those prongs, the Supreme Court has "invalidated commercial speech regulations because the underinclusiveness of the restriction made the fit between the regulation's goals and the restrictions not sufficiently close." *Id.* (discussing *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993)). "In *Discovery Network*, the Court struck down a city ordinance that prohibited commercial handbills while allowing newspapers displayed on newsracks. The Court determined that this underinclusiveness . . . revealed the absence of a sufficient fit between these restrictions and the ordinance's safety and aesthetic goals." *Id.* Similarly in *Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006), the Ninth Circuit upheld a determination that a commercial signage ordinance was an impermissible restriction on commercial speech where it contained ten categories of content-based exceptions. The Ninth Circuit held that "[t]he City . . . failed to show how the exempted signs reduce vehicular and

pedestrian safety or besmirch community aesthetics any less than the prohibited signs." *Id.* at 743.

Here, the Village has not provided any record support linking its stated interest in aesthetics to the Agreement's exterior signage prohibition. It has not shown why allowing interior signs but not exterior signs furthered that interest or that it imposed similar restrictions on any other companies. Based on the (underdeveloped) summary judgment record on this issue, the Court finds genuine issues of material fact as to whether the Agreement's restriction on signage for plaintiffs' business is really a content-based, "underinclusive[ ]" condition that fails the *Central Hudson* test. *See Lavey*, 171 F.3d at 1114.

In sum, the Court grants the Village's motion for summary judgment with respect to the weapons display portion of plaintiffs' First Amendment claim, and denies both plaintiffs' and the Village's motions for summary judgment with respect to the exterior signage portion of the claim.

## VI.   Count V – Declaratory Judgment, Illinois Constitution

Plaintiffs have abandoned all of their Illinois Constitution claims in Count V except their claim under Article I, Section 22 (Illinois' version of the Second Amendment), and they do not move for summary judgment on their Article I, Section 22 claim. R. 226 at 40-41. But the Village does move for summary judgment on Count V.

In the remaining portion of Count V, Plaintiffs seek declaratory judgments under Article I, Section 22 of the Illinois Constitution. Because the challenged

Ordinances and Agreement are no longer in effect, however, plaintiffs' claims for declaratory judgment are moot. *E.g.*, *Markadonatos v. Village of Woodridge,* 760 F.3d 545, 546 (7th Cir. 2014) ("the ordinance has been repealed and the repeal moots the plaintiff's request for declaratory and injunctive relief"); *Roehl v. City of Naperville*, 857 F. Supp. 2d 707, 710–11 (N.D. Ill. 2012) ("claim for declaratory relief is moot" when challenged ordinance has been repealed). Although plaintiffs' damages claims are not moot for the reasons explained in n.2 above, plaintiffs do not sue for damages under the Illinois Constitution, and for good reason: "Illinois courts will not entertain a suit for *damages* under the Illinois constitution." *E.g.*, *Klein v. Village of Mettawa*, 2014 WL 1661631, at *4 (N.D. Ill. Apr. 25, 2014) (declaratory relief claim under the Illinois Constitution was moot). The Court therefore grants the Village's motion for summary judgment on plaintiffs' claim under Article I, Section 22 of the Illinois Constitution.

## VII.   Counts VI and VII – Retaliation

Plaintiffs and the Village cross-move for summary judgment on plaintiffs' claims for retaliation for exercising their rights under the Second (Count VI) and Fourteenth (Count VII) Amendments.

As an initial matter, the Village contests whether a retaliation claim can arise under the Second Amendment. It points out that plaintiffs cite no authority recognizing a retaliation claim under the Second Amendment and instead rely on First Amendment retaliation cases. As the Eastern District of Kentucky recently reasoned, however, "although § 1983 retaliation claims have traditionally been

brought based on First Amendment activities, when 'certain provisions of the Constitution define individual rights with which the government generally cannot interfere—actions taken pursuant to those rights are protected by the Constitution.'" *Horn v. City of Covington*, 2015 WL 4042154, at *8 (E.D. Ky. July 1, 2015) (quoting *Thaddeus–X v. Blatter,* 175 F.3d 378, 386 (6th Cir. 1999)). The Second Amendment guarantees precisely such an "individual right." *Heller*, 554 U.S. at 592. On this basis, the *Horn* court recognized a Second Amendment retaliation claim. 2015 WL 4042154, at *8-9. Like the Eastern District of Kentucky in *Horn*, this Court finds it appropriate to apply First Amendment retaliation doctrine in the Second Amendment context (as the Court already did in its motion to dismiss opinion, R. 79). *See also Ezell I*, 651 F.3d at 697, 701-03, 706-07 (borrowing from First Amendment doctrine in Second Amendment case).

Borrowing from First Amendment doctrine, a Second Amendment retaliation claim has three elements: plaintiffs (1) "engaged in a constitutionally protected activity"; (2) "suffered a deprivation that would likely deter protected activity in the future"; and (3) "a causal connection between the two." R. 79 at 33 (citing *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010)).

This Court already has found that plaintiffs "engaged in constitutionally protected activity" under the Second and Fourteenth Amendments (with fact issues remaining as to the time period in which they did so and the amount of damages sustained). The Village claims plaintiffs cannot show the required causal connection between plaintiffs' conduct and any deprivation because "the Village obviously acted

because its 1972 Ordinance was out of date, not because Plaintiffs sought to exercise their Second Amendment rights." R. 238 at 21-22. The Village says the Agreement was voluntary and the Ordinances were a result of the Village's independent "stud[y]" of its "weapons dealer regulations under a new regime of gun rights." R. 238 at 21.

The Court finds that the Village's motive is far from "obviously" neutral based on the facts in the record. To the contrary, a reasonable jury could find that the Village acted with animus toward plaintiffs. The facts show, for example, that the Village's 1972 weapons dealer ordinance lay dormant for nearly 40 years until plaintiffs asked for a weapons dealer license. When plaintiffs did, the Village negotiated a strict Agreement with plaintiffs regarding the conditions under which they could operate—an Agreement that a reasonable jury could find coerced. The Village then enacted the 2011 Ordinance putting a time-limit on plaintiffs' firearms dealer license. And later, in apparent response to events in this lawsuit, the Village enacted the 2013 Ordinance that appeared less restrictive but in fact made it functionally impossible for plaintiffs to open a retail gun store in the Village. In light of these facts, a reasonable jury could find that the 2011 and 2013 Ordinances were enacted and the Agreement insisted upon in retaliation for plaintiffs' constitutionally protected conduct (*i.e.*, a "causal connection") and this was a "deprivation that would likely deter protected activity in the future." *See* R. 79 at 33. The Court therefore finds genuine issues of material fact on plaintiffs'

retaliation claims in Counts VI and VII.[5] *See Darchak*, 580 F.3d at 633 ("intent" should "go to a jury unless no rational factfinder could draw the contrary inference").

## VIII. Count VIII - Equal Protection

Plaintiffs "are no longer pursuing their equal protection claim." R. 226 at 43. Accordingly, the grants the Village's motion for summary judgment on that claim.

## Conclusion

For the foregoing reasons, the Court denies the Village's and plaintiffs' cross-motions for summary judgment (R. 191; R. 196) on plaintiffs' Second and Fourteenth Amendment claims in Count I and plaintiffs' corresponding retaliation claims in Counts VI and VII. The Court also denies the Village's and plaintiffs' cross-motions for summary judgment on plaintiffs' First Amendment claim regarding the exterior signage prohibition in Count IV.

The Court grants the Village's motion for summary judgment (R. 191) with respect to plaintiffs' remaining claims: Count II (substantive due process); Count III (dormant commerce clause); Count V (declaratory judgment under the Illinois Constitution); and Count VIII (equal protection).

---

[5] As plaintiffs acknowledge, they will not be able to achieve a "double recovery for their damages" on their Count I claims and their Count VI and VII retaliation claims. R. 226 at 43.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: November 6, 2017